Michael P. Canty (*pro hac vice*)
Thomas G. Hoffman, Jr. (*pro hac vice*)
Charles J. Stiene (*pro hac vice*)

**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477
Email: mcanty@labaton.com
thoffman@labaton.com
cstiene@labaton.com

*Attorneys for Lead Plaintiff and the Class*

James M. Wagstaffe (#95535)
Frank Busch (#258288)

**WAGSTAFFE, VON LOEWENFELDT,
BUSCH & RADWICK, LLP**
100 Pine Street, Suite 2250
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 371-0500
Email: wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>       v.<br><br>OKTA, INC., TODD MCKINNON, BRETT TIGHE, and FREDERIC KERREST,<br><br>                              Defendants. | **Case No.: 3:22-cv-02990-SI**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**Hon. Susan Illston** |

# TABLE OF CONTENTS

Page

I.      NATURE OF THE ACTION ............................................................................ 2

II.     JURISDICTION AND VENUE ....................................................................... 6

III.    PARTIES .......................................................................................................... 7

        A.      Lead Plaintiff ........................................................................................ 7

        B.      Defendants ............................................................................................ 7

        C.      Relevant Third Parties ......................................................................... 8

IV.     SUBSTANIVE ALLEGATIONS OF FRAUD ............................................. 11

        A.      Overview of Okta's Business .............................................................. 11

                1.      Okta Is a Data Security Company that Focuses on Identity Solutions ..... 11

                2.      Okta is a Growth Company ...................................................... 12

                3.      Data Security and Maintaining Customer Trust Is Essential to Okta's
                        Success ...................................................................................... 13

        B.      Okta Acquires Auth0 to Maintain the Company's High Growth Rate ............... 14

        C.      Unbeknownst to Investors, Okta Shed Senior Employees, Jeopardizing the
                Successful Integration of Auth0 Immediately After the Acquisition .................. 15

        D.      Okta Scraps the Company's Integration Plan and Requires Auth0 Employees
                to be "Generalists", Not "Specialists" ................................................................ 21

        E.      Unbeknownst to Investors, the Integration of the Companies' Sales Teams Is
                Stifled as Auth0 Employees Exit ....................................................................... 24

        F.      The January 2022 Breach Is Made Public By Hackers ........................................ 27

                1.      Unbeknownst to Investors, Okta Fails to Properly Secure Its
                        Administrative Tools Resulting in a Security Breach.............................. 27

                2.      Okta Fails to Disclose the Breach for Two Months, Resulting in
                        Reputational Risk Due to Lack of Transparency..................................... 30

                3.      Okta's Injured Reputation Affects Sales and Growth.............................. 31

                4.      Defendants Tout the Retention of Customers and Reaffirm
                        Commitment to Revenue Target............................................................... 35

G.      The Truth About Severe Problems with the Auth0 Integration and Okta's Slowed Growth Emerges ........................................................................ 37

V.      FALSE AND MISLEADING STATEMENTS AND OMISSIONS.............................. 40

A.      September 1, 2021 – Press Release and 2Q 2022 Earnings Call ........................ 41

B.      September 2, 2021 – 2Q 2022 10-Q.................................................................... 42

C.      September 14, 2021 – Piper Sandler Virtual Global Technology Conference ..... 43

D.      September 15, 2021 – Citi Globalc Technology Virtual Conference ................. 44

E.      October 13, 2021 – Press Release "Okta Advances Customer Identity with Auth0 and New Okta Features" ........................................................................ 45

F.      December 1, 2021 – Press Release and 3Q 2022 Earnings Call.......................... 47

G.      December 2, 2021 – 3Q 2022 10-Q .................................................................... 48

H.      March 2, 2022 – 4Q 2022 Earnings Call ............................................................ 50

I.      March 7, 2022 – 2022 Form 10-K....................................................................... 51

J.      June 2, 2022 – 1Q 2023 Earnings Call ............................................................... 55

K.      June 3, 2022 - 1Q 2023 10-Q.............................................................................. 56

L.      June 8, 2022 – CNBC Jim Cramer Interview with Todd McKinnon................... 58

VI.     LOSS CAUSATION ........................................................................................... 58

A.      March 22, 2022 – First Partial Corrective Disclosure/Materialization of the Risk........................................................................................................... 60

B.      March 22, 2022 – Second Partial Corrective Disclosure/Materialization of the Risk........................................................................................................... 62

C.      August 31, 2022 – Final Corrective Disclosure/Materialization of the Risk........ 63

VII.    ADDITIONAL INDICIA OF SCIENTER ........................................................... 68

A.      The Auth0 Acquisition Was a Critical Transaction for the Company, and Its Successful Integration Was Essential to Okta's Growth ..................................... 68

B.      Defendants' Personal Involvement in the Okta-Auth0 Integration Efforts Supports Their Scienter ...................................................................................... 71

C.      Corporate Scienter .............................................................................................. 73

D.      Defendants' Statements Themselves Support Scienter ....................................... 74

VIII.   CONTROL PERSON ALLEGATIONS ........................................................................ 75

IX.   THE STATUTORY SAFE HARBOR IS INAPPLICABLE ......................................... 76

X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ................................................................................................................. 77

XI.   CLASS ACTION ALLEGATIONS ........................................................................... 79

      FIRST CLAIM FOR RELIEF  (For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants) ...................... 80

      SECOND CLAIM FOR RELIEF (For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants) ........................................................................... 82

XII.   REQUEST FOR RELIEF ........................................................................................... 83

XIII.   JURY DEMAND ........................................................................................................ 84

1    Court-appointed Lead Plaintiff Nebraska Investment Council ("Nebraska" or "Lead

2    Plaintiff"), individually and on behalf of all persons and entities who or which, during the period

3    from September 1, 2021 through September 1, 2022, inclusive (the "Class Period"), purchased

4    the publicly traded Class A common stock of Okta, Inc. ("Okta" or the "Company") and were

5    damaged thereby (the "Class"),[1] brings this Amended Class Action Complaint for Violations of

6    the Federal Securities Laws (the "Complaint") against Defendants Okta and several of Okta's

7    senior executives—Chief Executive Officer ("CEO") and Co-Founder Todd McKinnon, current

8    Chief Financial Officer ("CFO") Brett Tighe, and current Executive Vice Chairman, Chief

9    Operating Officer ("COO") and Co-Founder Frederic Kerrest (collectively, the "Individual

10   Defendants").

11   Lead Plaintiff's claims are brought upon personal knowledge as to their own acts and

12   upon information and belief as to all other matters, based upon, among other things, a review and

13   analysis of: (1) reports and documents filed by Okta with the Securities and Exchange

14   Commission ("SEC"); (2) reports issued by analysts covering or concerning Okta and its

15   business; (3) press releases, news articles, transcripts, videos, and other public statements issued

16   by or about Okta, its business, and the Individual Defendants; (4) an investigation conducted by

17   Lead Plaintiff's attorneys, including interviews with confidential witnesses ("CWs");[2] and (5)

18   other publicly available information concerning Okta, its business, and the allegations contained

19   herein.  Lead Plaintiff believes that substantial additional evidentiary support exists for the

20   allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable

21   opportunity for discovery.

22

23
_____

24   [1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any
     Defendant who is an individual; (iii) any person who was an officer or director of Okta during
25   the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or
     had a controlling interest; (v) Okta's employee retirement and benefit plan(s) and their
26   participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the
     legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded
27   person.

28   [2] All CWs are former employees of Okta and/or Auth0.

# I.       NATURE OF THE ACTION

1.       This is a securities fraud class action brought under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder on behalf of all investors that purchased Okta's publicly traded Class A common stock during the Class Period.[3]

2.       Okta provides identity and access management ("IAM") software that helps companies secure user authentication into applications, and for developers to build identity controls into applications, website web services, and devices.  Okta primarily markets the Okta Identity Cloud as a one-stop solution that provides data security for an organization's workforce.

3.       As a data security company, protecting its customers from security breaches and maintaining customers' trust was critical to Okta's success.

4.       Another key area of concern for investors was the Company's growth given that Okta is a "growth company," *i.e.*, a company that prioritizes growth over profits.  Defendants consistently reminded investors that growth was a priority for Okta.  For example, during Okta's earnings call for its first quarter of fiscal year 2022, Defendant McKinnon stated, "philosophically this is a growth business."  As a growth company, Okta has yet to report a net profit and has incurred significant costs that stem from expensive acquisitions and large sales and marketing expenses.  While Okta is not and has never been profitable, it has previously reported year-over-year growth that has impressed investors and analysts.  Okta and its management leveraged these attractive financials to draw investor attention, stating, "we are confident we will be able to achieve $4 billion in revenue in FY'26 with growth of at least 35% each year while targeting a 20% free cash flow margin in FY'26."

5.       As part of its growth plan, in May 2021, Okta acquired Auth0, Inc. ("Auth0") in an attempt to sustain its high rate of growth.  Auth0 provided customer identity and access management ("CIAM") software, as opposed the IAM software that Okta primarily provided for

---

[3] All references to "common stock" herein refer to Okta's publicly traded Class A common stock.

an employer's workforce.  Therefore, Okta touted the Auth0 acquisition as an opportunity to grow its business in the lucrative CIAM market.  Okta announced that Auth0 would be integrated into Okta to "accelerate Okta's growth in the $55 billion identity market."

6.      Because of the stiff competition in the identity market, Okta management deemed the Auth0 acquisition essential to Okta's growth and its ability to seize additional market share before its competitors, namely, Microsoft.  For example, Okta's CEO, Todd McKinnon, repeatedly told investors that the integration of Auth0 was "very critical" to the success of the Company.

7.      Importantly, the successful integration of Auth0 and Okta required the retention of Auth0 employees.  As, JMP analyst Patrick Walravens noted on May 27, 2021, "[Okta] must show that it can integrate these businesses, **retain the Auth0 team and know-how, and, most importantly, successfully execute two different go-to-market strategies with two different product platforms**."

8.      However, soon after the close of the acquisition, Okta began to experience severe problems with the integration of Auth0.  According to CW1, Okta "up-leveled" a number of its employees just before the acquisition, promoting them in title above their soon-to-be counterparts from Auth0.  CW1 also stated that numerous senior Auth0 employees left the Company.  The loss of these senior Auth0 employees resulted in severe integration problems from the outset of the integration process.

9.      Nevertheless, Defendants concealed the loss of senior Auth0 employees from investors, while touting that the Company was already seeing progress with respect to the integration.

10.      Throughout the Class Period, these severe problems with the Auth0 integration only got worse.  For example, CW2 recalled that there was an integration plan that McKinnon and other senior officers signed off on, but that the plan was scrapped in December 2021.

11.     Nonetheless, Defendants continued to misleadingly tout the progress of the integration, stating, "*We're maintaining the momentum of both Okta and Auth0 and are making great progress on the integration*."

12.     Then, in January 2022, Okta experienced a security breach (the "January 2022 Breach").  Specifically, hackers were able to compromise and access customer information due to Okta's failure to secure administrative tools and require its sub-processors[4] to comply with the Company's fundamental security requirements.  Despite the fact that the Company is in the business of data security, Okta knew of but failed to disclose the January 2022 breach for over two months.

13.     Most troubling, Okta finally disclosed the breach only after the hackers posted screenshots on their blog while claiming to have accessed Okta's internal systems.  In response, on March 22, 2022, Defendant McKinnon admitted that there had been a breach and Okta had known about it since January 2022.  On this news, Okta's stock price fell $2.98 per share, or 1.76%, to close at $166.43 on March 22, 2022.

14.     Multiple news outlets reported that hundreds of Okta's clients were potentially affected by the January 2022 Breach.  For example, on March 23, 2022, *CNN* published an article entitled "Okta concedes hundreds of clients could be affected by breach."

15.     In addition, Raymond James downgraded Okta from "strong buy" to "market perform," noting, among other things, that "the handling of its latest security incident adds to our mounting concerns."

16.     As the market continued to digest the news and analyst reports on the impact of the January 2022 Breach on Okta's sales and reputation, investors continued to react negatively, causing Okta's stock price to fall another $17.88 per share, *or 10.74%*, to close at $148.55 on March 23, 2022.

---

[4] Sub-processors are third parties authorized to have access to and process Customer Personal Data in order to provide technical support and services.

17.     Soon thereafter, Defendants engaged in damage control efforts, including issuing public apologies for their lack of transparency and calling hundreds of customers in an attempt to regain their trust.  But Okta struggled to obtain new customers as a result of the negative reputational impact the Company suffered due to the January 2022 Breach.  Specifically, potential customers lost faith in Okta for failing to disclose the breach in a timely fashion, and only admitting that there was a breach after the Company was publicly exposed by the hackers.

18.     Unbeknownst to investors, Okta was internally saying that the Company was losing sales as a direct result of the January 2022 Breach, which only compounded the integration issues that the Company was experiencing with the Auth0 acquisition.  For example, CW3 explained that the Company was saying they were losing sales because of the breach.  CW3 added that the breach came up with every customer she spoke with.

19.     Nevertheless, Defendants assured investors that Okta was able to maintain customer trust.  For example, on June 8, 2022, Defendant McKinnon was interviewed by Jim Cramer, who asked about Okta's ability to maintain trust with its customers after the January 2022 Breach.  In response, Defendant McKinnon stated:

> We talked to over 1000 customers face to face over, over video and had these conversations.  I personally talked over 400.  And got a ton of feedback about what we could do better, how we could make sure that our support environment was not insecure, to make sure that we communicate better, to make sure that we are instill this trust.  ***At the end of the, I think we've been able to do that.***

20.     The truth finally, fully emerged on August 31, 2022, during Okta's earnings call for its second quarter financial results for fiscal year 2023.[5]  During that call, Defendants finally disclosed the severe problems with the Auth0 integration.  For example, Defendant McKinnon noted that Okta's second quarter financial results were "mixed" **due to challenges related to the integration of Auth0 and Okta sales organizations**.  Specifically, McKinnon stated that Okta **"experienced heightened attrition within the go-to-market organization as well as some confusion in the field, both of which have impacted our business momentum."**  Defendant McKinnon later elaborated on other issues related to the integration of the companies' sales

---

[5] Okta's fiscal year ends on January 31st.

teams, noting that Okta employees had trouble selling products in Auth0's portfolio and vice versa.

21.    Critically, Defendant Tighe confirmed that Okta was reevaluating its FY'26 growth targets and emphasized that the Company was also lowering its calculated billings "**by approximately $140 million due to the outlook headwinds outlined earlier**."

22.    On this news, the price of Okta's stock fell dramatically overnight by $22.25 per share, or *over 24.3%*, to open at $69.15 on September 1, 2022.

23.    The next day, Defendant McKinnon was interviewed on TechCheck, where he reconfirmed that Okta had to sort through near term challenges, such as sales to new customers, before they could meet their revenue target.

24.    As investors and analysts continued to digest this news, the price of Okta's stock fell an additional $8.55 per share, or *over 12.3%*, to close at $60.60 by the close of trading on September 1, 2022.

25.    Lead Plaintiff alleges that, during the Class Period, Defendants failed to disclose severe problems with the integration of Auth0 from the start, and that the Company had lost sales as a result of the January 2022 Breach.  As described in greater detail below, Lead Plaintiff alleges that this conduct violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## II.    JURISDICTION AND VENUE

26.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

28.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because Okta's headquarters are located in this District, the

1   Company conducts substantial business in this District, and many of the acts and practices

2   complained of herein occurred in substantial part in this District.

3         29.    In connection with the acts alleged in this Amended Complaint, Defendants,

4   directly or indirectly, used the means and instrumentalities of interstate commerce, including but

5   not limited to the mails, interstate telephone communications, and the facilities of the national

6   securities markets.

7   **III.    PARTIES**

8       **A.    Lead Plaintiff**

9         30.    Nebraska Investment Council, on behalf of Omaha School Public Employees'

10   Retirement System ("OSERS"), is a public pension fund that manages the funds entrusted to

11   them by the State of Nebraska.  Nebraska manages the investments for 30 state entities and

12   groups, including the State of Nebraska's employees and retirees.  On August 26, 2022, the

13   Court appointed Nebraska as Lead Plaintiff for this litigation.  As set forth in the attached

14   certification (Exhibit A), Nebraska purchased Okta's Class A common stock during the Class

15   Period and suffered damages as a result of Defendants' fraud.

16       **B.    Defendants**

17         31.    Defendant Okta is a Delaware corporation with its principal executive offices

18   located at 100 First Street, Suite 600, San Francisco, California 94105.  Okta's Class A common

19   stock trades in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the symbol

20   "OKTA."

21         32.    Defendant Todd McKinnon ("McKinnon") has served as Okta's CEO at all

22   relevant times.  McKinnon is also a co-founder of the Company.  In his role as CEO of Okta,

23   McKinnon participated in earnings calls and conferences with securities analysts and certified

24   Okta's financial statements.

25         33.    Defendant Brett Tighe ("Tighe") has served as Okta's CFO since January 2022.

26   Tighe also served as the Company's interim CFO from June 2021 to his appointment as

27

28

permanent CFO in January 2022.  In his role as CFO of Okta, Tighe participated in earnings calls and conferences with securities analysts and certified Okta's financial statements.

34.     Defendant Frederic Kerrest ("Kerrest") has served as Okta's Executive Vice Chairman, COO and Co-Founder at all relevant times.  In his role as COO of Okta, Kerrest participated in earnings calls and conferences with securities analysts.

35.     Okta is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

36.     The scienter of each of the Individual Defendants and each of the other employees and agents of the Company is similarly imputed to Okta under *respondeat superior* and agency principles.

37.     The Individual Defendants, because of their high-level positions of control and authority as senior executive officers of Okta, possessed the power and authority to control, and did ultimately control, the contents of Okta's SEC filings, press releases, content on the Company's website, and other market communications during the Class Period.  The Individual Defendants were provided with copies of the Company's reports and other releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions within the Company and their access to material information available to them, the Individual Defendants knew that the adverse facts specified herein had not been adequately disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

C.     **Relevant Third Parties**[6]

38.     CW1 was employed by Auth0 and then Okta from February 2020 until April 2022, holding several roles.  CW1 began with Auth0 in February 2020 as the Director of Internal

---

[6] All CWs are described in the feminine to protect their identities.

Communications and Culture, then served as Senior Director of Employee Experience at Auth0, and ultimately progressed to Senior Director, Employee Change and Communications following the acquisition. CW1 was part of the Okta M&A team focused on the 1,000+ Auth0 employees that moved to Okta following the acquisition.

39. CW2 was employed by Auth0 as the Senior Vice President and General Manage, Americas, and maintained this title following the acquisition. CW2 was employed by Auth0 and then Okta from August 2018 until July 2022. CW2 explained that her territories were responsible for approximately 80% of Auth0's revenue. According to CW2, she was also "deeply involved" and "intimately involved" with the Auth0 and Okta integration as a member of the "Tiger Team." CW2 continued to say that she spent eight hours per day over a period of six or seven months putting together the integration plan.

40. CW3 was employed by Okta as a Corporate Account Executive from December 2021 until August 2022 and her territory was focused on half of Dallas, Texas. According to CW3, she received her "module" of accounts in February 2022 at the start of the fiscal year and following the integration of Auth0 sales staff. CW3 explained that everyone in sales was "struggling," she only managed to achieve 20% of her quota during Okta's first quarter for fiscal year 2023, and only one or two team members did better. CW3 continued to say that she was placed on a performance plan for the second quarter with a number of subjective benchmarks to hit aside from a definite sales figure. According to CW3, while she started to get more sales opportunities in the Company's second quarter for fiscal year 2023, not enough closed in time to meet her objectives. CW3 added that a few customers were "biting" on Auth0 products, but "no one" was successfully selling Auth0 products during her tenure.

41. CW4 was employed by Auth0 before the acquisition and until the first quarter of fiscal 2023. CW4 worked as an Account Executive based in Europe. CW4's responsibilities included account management and booking revenue. CW4 most recently reported to a middle manager who then reported to Steven Rees-Pullman. Lead Plaintiff's independent search

1    showed that Pullman is currently Senior Vice President, Global CIAM Strategy and Execution at

2    Okta.[7]  Prior to the acquisition, Pullman worked for Auth0.

3          42.    CW5 was an Account Executive employed by Okta for over three years, including

4    during the Class period.

5          43.    CW6 was formerly employed by Okta, Inc. as a Senior Solutions Engineer,

6    SLED[8] from February 2019 through December 2021. CW6 worked as an engineer supporting the

7    sales team and had access to Okta's SuperUser systems.

8          44.    CW7 was formerly employed by Okta, Inc. as a Senior Solutions Engineer from

9    January 2020 through March 2021.  CW7 was part of the technical sales team, and her

10   responsibilities included demonstrating the Okta product to customers and having technical

11   discussions about it.  CW7 reported to Marc Solomon.  Lead Plaintiff's independent

12   investigation shows that Marc Solomon is currently employed at Okta as Senior Manager -

13   Solutions Engineering (May 2022 – Present) and was previously Manager - Solutions

14   Engineering (Nov 2020 – May 2022).

15         45.    CW8 was formerly employed by Okta, Inc. from fall of 2020 until spring 2022.

16   CW8 most recently worked as a Senior Account Executive and reported to Michelle Williams.

17   CW8's clients were based in the New York City area.

18         46.    CW9 was formerly employed by Okta, Inc. as a Site Director, Shared Services

19   Operations based in the Philippines from November 2020 through December 2021. CW9 served

20   as the site head for Okta's accounting, HR, recruiting, business platform, and IT support

21   departments. CW9 reported to Vahid Manie in San Francisco.  Lead Plaintiff's independent

22   investigation shows that Manie was formerly employed at Okta as Senior Director,

---

25   [7] "CIAM" stands for customer identity access management.  Auth0 defines CIAM as a
     means for "companies [to] give their end users access to their digital properties as well as how
26   they govern, collect, analyze, and securely store data for those users."  For example, CIAM can
     provide solutions such as multi-factor authentication for an enterprise's employees and
27   customers.

28   [8] CW6 added that SLED is an acronym for "State, Local and Educational" customers.

Finance/Accounting Operations & Shared Services (March 2020 – May 2022), among other roles, and that he was based in San Francisco.

## IV.    SUBSTANIVE ALLEGATIONS OF FRAUD

### A.    Overview of Okta's Business

#### 1.    Okta Is a Data Security Company that Focuses on Identity Solutions

47.    Okta was co-founded in 2009 by Defendants McKinnon and Kerrest, who previously worked together at Salesforce.  The idea behind the data security startup was to monopolize the market for an identity-based "simple sign-on" authentication that would allow a user to log into several independent software systems with a single ID.  This market had many related segments that Okta built upon, including lifecycle management (*i.e.*, the provisioning and de-provisioning of users) and multifactor authentication.  Okta marketed itself as a one-stop solution that provides identity solutions for an organization's workforce and its customers.  The Company's flagship platform, labeled the Okta Identity Cloud, enabled clients to securely access their network, data, and applications for customers, employees, and partners.  Okta's products and offerings include, among others, Simple Sign-On ("SSO") and Adaptive Multi-Factor Identification ("MFA").

48.    Okta employed a Software-as-a-Service ("SaaS") business model and generated revenue primarily by selling multi-year subscriptions for its cloud-based offerings.  Subscription fees include the use of the Company's service, technical support, and management of its platform.  Okta's subscription fees were based primarily on the products used and the number of users on its platform.

49.    The Company's main focus was to acquire and retain customers and increase customer spending through expanding the number of users who access the Okta Identity Cloud and up-selling additional products.  Okta sold its products directly through its sales teams, and indirectly through a network of channel partners, including resellers, system integrators and other distribution partners.

50. Okta currently has approximately 16,000 customers across various industries that use the Okta Identity Cloud to secure and manage identities around the world. These customers consist of large enterprises, to small and medium-sized businesses, universities, non-profits, and government agencies. However, it faces competition in an attractive market valued at $80 billion. Okta's principal competitor is Microsoft, but the Company's competitors also include authentication and life cycle management providers like CA Technologies, IBM, and Oracle; multi-factor authentication providers like RSA (a division of Dell Technologies) and Symantec; mobility management providers like Citrix, MobileIron, and VMware.; and solutions developed in-house by potential customers.

### 2. Okta is a Growth Company

51. Okta is a growth company that prioritizes growth over profit. The Company has yet to report any net income since its IPO in 2017. Okta continues to incur large operating expenses in an attempt to scale the Company's business. The largest operating expense category is sales and marketing, as Okta continues to invest in acquiring new customers. While Okta's earnings are net negative, it has garnered investor attention over the past few years by reporting impressive revenue and year-over-year ("YoY") growth.

52. In addition to revenue, Okta uses multiple metrics to measure its growth, including:

- **Calculated Billings ("Billings")**: Calculated Billings represent Okta's total revenue that reflects sales to new customers plus subscription renewals and upsells to existing customers, as well as revenue from support and professional services.[9]

---

[9] Okta defines Calculated Billings as "[Okta's] total revenue plus the change in deferred revenue, net of acquired deferred revenue, and less the change in unbilled receivables, net of acquired unbilled receivables, in the period. Calculated Billings in any particular period reflect sales to new customers plus subscription renewals and upsells to existing customers, and represent amounts invoiced for subscription, support and professional services. [Okta] typically invoice[s] customers in advance in annual installments for subscriptions to [its] platform."

- **Remaining Performance Obligations ("RPO")**: RPO represent all future, non-cancelable, contracted revenue under Okta's subscription contracts with customers that has not yet been recognized.[10]

- **Current Remaining Performance Obligations ("cRPO")**: Current RPO represents the portion of RPO expected to be recognized during the next 12 months.[11]

53.     Investors and analysts closely tracked these growth metrics during each reporting period.  For example, before the Class Period on March 4, 2021, William Blair issued an analyst report stating:

> Okta reported another strong quarter, beating expectations on revenue by $13.0 million at $234.7 million (40% growth year-over-year) and EPS by $0.07. This was supported by solid total billings of 40.5% growth year-over-year and current RPO growth of 42.1% to $841.8 million. Okta saw continuation of strong demand as identity access management benefits from a number of trends such as shift to cloud/hybrid environments, zero trust, and digital transformation. Large deal activity was again strong, with 170 new customers added with ACV greater than $100,000. CIAM (customer IAM), which represents about 25% of revenue, grew by 50%, while the core workforce business grew by about 37% year-over-year.

54.     These growth metrics were closely followed by analysts throughout the Class Period.  Analyst reports issued during the Class Period are referenced throughout the Complaint.

### 3.     Data Security and Maintaining Customer Trust Is Essential to Okta's Success

55.     Okta's growth and success is wholly dependent on obtaining and maintaining customer trust to secure proprietary information and user data.  As a data security company used by large enterprises and government agencies, Okta is an attractive target for hackers.  If an attack on Okta or its customers were successful, the Company's sales and reputation would be

---

[10] Okta defines Remaining Performance Obligations as "all future, non-cancelable, contracted revenue under [Okta's] subscription contracts with customers that has not been recognized, inclusive of deferred revenue that has been invoiced and non-cancelable amounts that will be invoiced and recognized as revenue in future periods."

[11] Okta defines Current Remaining Performance Obligations as "Current RPO represents the portion of RPO expected to be recognized during the next 12 months.  RPO fluctuates due to a number of factors, including the timing, duration and dollar amount of customer contracts."

damaged.  This alone could jeopardize Okta's ability to retain its customers and convince new customers to subscribe to its services.  Indeed, Defendants have continuously reaffirmed the existence and magnitude of this risk.

56.     For example, on February 18, 2021, Defendant McKinnon issued a blog post entitled "State of Digital Trust: How the Virtual Economy Changed Consumer Behavior," in which he described a survey of more than 15,000 office workers around the world to learn about their trust in the digital economy.  The report found that two main factors impact how much (or little) people trust a digital brand: reliability and security.  Further, Defendant McKinnon's blog post highlighted the finding that "Trust is big business" and "[l]oss of consumer trust can wreak havoc on a brand's reputation and finances."  Specifically, the report found that trust in the digital world directly correlates to consumer purchasing decisions.  According to the survey, 75% of U.S. respondents say they are unlikely to purchase from a digital brand they do not trust. The survey also found that 47% of Americans said they would permanently stop using a company's service if the brand misuses data or experiences a data breach.

57.     At the Wolfe Research Virtual "March Madness" Software Conference on March 23, 2022, McKinnon noted that customer trust is Okta's number one priority, stating "I think it's always been our number one, [*sic*] our number one continuous ongoing priority. It's customer success and trust and confidence in Okta."  Defendant McKinnon reaffirmed that customer trust is Okta's priority in a post on Twitter, dated April 4, 2022 (9:15 PM), that states "Nothing matters more than customer trust."

## B.   Okta Acquires Auth0 to Maintain the Company's High Growth Rate

58.     Prior to the Class Period, on March 3, 2021, Okta announced that it had entered into a definitive agreement to acquire Auth0 in a stock transaction valued at approximately $6.5 billion.  In a press release dated March 3, 2021 (the "March 3, 2021 Press Release"), Okta explained that the rationale for the acquisition was to have Auth0 complement Okta's growth in the CIAM market.

59.     Moreover, on March 5, 2021, during an interview with Jim Cramer on *Mad Money*, Defendant McKinnon explained how Auth0 complements Okta's business, noting that 75% of Okta's revenue stems from the $30 billion workforce identity market, whereas only 25% the Company's revenue stems from the $25 billion customer identity market.  McKinnon noted that Auth0 would give Okta a better way to go after the customer identity market.  Moreover, McKinnon added that Okta focuses on pre-built, pre-configured solutions while Auth0 is more focused on purpose-built application developers.

60.     Investors and analysts following Okta interpreted the acquisition similarly.  For example, RBC issued an analyst report on March 3, 2022, stating:

> Management recently closed the acquisition of Auth0 in an all-stock deal valued at $6.5B at $267.21 per OKTA share or ~23.5M shares, a ~14% ownership, increasing shares by ~16%. Management noted that Auth0 had an ARR trajectory of +$200M in FY/22 representing +50% growth. **The benefit is that Auth0's developer-focused IAM platform should extend Okta's capabilities in the CIAM market, which is a $25B opportunity and represents ~25% of Okta's business growth**. The other side is that the price could be seen as high for a company that has some overlap in access management compared to investing in adjacent areas such as IGA or PAM.

61.     On May 3, 2021, Okta announced the successful completion of its acquisition of Auth0 in a press release (the May 3, 2021 Press Release").

62.     Analysts understood that the successful integration of Okta would require the retention of Auth0 employees.  For example, JMP analyst Patrick Walravens noted that "the company must show that it can integrate these businesses, retain the Auth0 team and know-how, and, most importantly, successfully execute two different go-to-market strategies with two different product platforms."  However, analysts did not know that Okta lost senior Auth0 and key Okta employees.

**C.     Unbeknownst to Investors, Okta Shed Senior Employees, Jeopardizing the Successful Integration of Auth0 Immediately After the Acquisition**

63.     Immediately after the acquisition of Auth0, Okta begins to shed senior employees. According to CW1, who was part of the Okta M&A team focused on the transformational change related to the 1,000+ Auth0 employees that moved to Okta after the acquisition, Okta

1   "up-leveled" a number of employees right before the acquisition, promoting them in title above

2   their soon to be Auth0 counterparts.  CW1 clarified that this happened shortly after the hiring of

3   Okta's Senior Director of Employee Experience Christy Gilhoi, which occurred in April 2021.[12]

4   CW1 continued to explain that it was clear that once the integrations began taking place that the

5   Company would not have two leaders and "so many" senior Auth0 employees departed while

6   others were put into roles they did not want or were below the level of seniority they had held at

7   Auth0.

8          64.    CW1 added that during the acquisition process, Okta leadership explained that

9   Auth0 would "remain an independent business unit" and routinely used the word "merger" rather

10  than "acquisition."  CW1 continued to say that she had regular conversations with leadership

11  "warning" them about the language they were using, so they would not mislead Auth0

12  employees on their futures.  CW1 noted that she viewed the acquisition as a "bait and switch."

13  CW1 clarified that the "bait-and-switch" language was often used in employee surveys issued

14  around July or August 2021.  CW1 recalled that the survey responses said that it felt like a "bait-

15  and-switch" to initially characterize Auth0 as an independent business unit of Okta then alter

16  course and treat Auth0 as a smaller, independent product unit instead.

17         65.    CW1 then recalled that Eugenio Pace announced, in an internal letter, that senior

18  leadership was leaving the Company.[13]  CW1 clarified that this would have been around August

19  of 2021.[14]  CW1 recalled that Auth0 executives left around this time, including the Chief Legal

20  Officer, CHRO, and CFO.  CW1 explained that Auth0's former CRO, David Wilner, decided to

21  stay at Okta for the few first months after the acquisition, but Wilner made it clear that he was

22

23

24         [12] A commercially available database search shows that Christi Gilhoi is currently Senior
      Director, Employee Experience (April 2021 – Present).
25
           [13] Lead Plaintiff's independent investigation shows that Eugenio Pace has served as Okta's
26    President of Customer Identity since August 2022.  Prior to this role, Pace served as Auth0's
      CEO and Co-Founder.
27
           [14] CW1 added that the announcement of senior level departures was in writing on
28    Confluence and in Slack.

leaving the Company.[15]  CW1 recalled that maybe five people from Auth0 went on to lead Okta teams, and CW1 said that these people were often highlighted by leadership to show that the Auth0 integration was going well.

66.     CW4 advised that attrition was a "common concern."  CW4 recalled that Auth0 employees started to leave Okta "not long after May or June" 2021.  CW4 added that the President of Worldwide Field Operations at Okta, Susan St. Ledger, joined not long before the acquisition and her team did not integrate well.

67.     Similarly, CW5 noted that St. Ledger and Rowland "pushed out" all of the "founding fathers" of Okta as well as other employees that helped build the Company— approximately 75-80% of the VPs and SVPs.  CW5 explained that because of these departures, a number of directors got fired or resigned as well and subsequently St. Ledger and Rowland brought in people they had known from previous positions.  CW5 elaborated and noted that the people who had built and understood Okta's product and market had been pushed out and replaced with people who did not.

68.     Further, CW6 noted that Okta had never really completed a successful acquisition of this type; previous acquisitions had been integrated, but they were for stand-alone tools.  In contrast, CW6 stated that Auth0 had a completely different platform, which was like "night and day" compared to Okta.  CW6 questioned whether the two could ever be effectively integrated given how different the two platforms were.  CW6 also noted that management brought in new leaders through "nepotism" who were clueless about CIAM software technology, products, and

_____

[15] Lead Plaintiff's independent investigation revealed that Wilner filed suit on February 9, 2022 against Okta for, among other things, breach of contract and the wrongful withholding of wages.  *Wilner v. Okta, Inc., et al.*, No. 22-2-02045-8 SEA (Wash. Super Ct. King Cnty.), subsequently removed to No. 2:22-cv-00169-BJR  (W.D. Wash.).  In the complaint, Wilner alleges that "[s]oon after the acquisition closed, Okta . . . announced that [*sic*] majority of the Auth0 business would be combined with Okta rather than remaining as a separate business unit as intended at the time Okta initially agreed to acquire Auth0." *Id*.  Moreover, the complaint states "[i]t became clear to Wilner that, as a result, Okta and Auth0 planned to materially diminish his duties as Chief Revenue Officer of Auth0 in the near future. For example, Wilner learned that Okta and Auth0 had determined that the Auth0 sales team would no longer be reporting to him, which represented a material diminution of his authority, duties, and responsibilities, as well as a 'material change' in his reporting structure." *Id*.

markets.  CW6 indicated that Auth0's salespeople had "no clue" about Enterprise or Government sales.  CW6 recalled that there was a "mass exodus" of salespeople – both Okta and Auth0 employees – after Auth0 was acquired, around fall 2021.

69.     The loss of senior Auth0 employees, along with key Okta employees, from the outset of the acquisition jeopardized the plan for a successful integration.  While Okta and Auth0 both offer products in the CIAM space, Auth0's products were inherently different given their developer focus and customizability.  Accordingly, the retention of senior Auth0 employees was critical to the success of the Auth0 integration.

70.     Defendants were aware of this information prior to the Class Period and concealed it from investors to avoid raising any concerns related to the integration of Auth0.

71.     On the first day of the Class Period, September 1, 2021, Okta issued a press release that reported the Company's second quarter financial results for fiscal year 2022.  In the press release, Defendants touted the progress of the Auth0 integration while failing to disclose the loss of senior Auth0 and key Okta employees.  For example, the press release quoted Defendant McKinnon stating, "***In our first quarter as a combined company with Auth0, we're off to a fantastic start***."

72.     Similarly, in an earnings call on the same day, McKinnon stated, "***It's [sic] been less than four months since we closed the acquisition of Auth0, but we've already made a lot of progress and learned quite a bit***."  Defendant McKinnon then doubled down again on the progress of integrating Auth0, stating "***when you think about us plus Auth0, it is going very well***."

73.     Later, during the same call, Defendant McKinnon announced that Okta was accelerating the integration to unify the companies' sales teams.  McKinnon emphasized that he wanted sales representatives to sell all of the Company's products, meaning Okta employees would sell Okta and Auth0 products.  Moreover, McKinnon also acknowledged that Auth0's products would require a certain level of expertise:

> It's been less than 4 months since we closed the acquisition of Auth0, but we've already made a lot of progress and learned quite a bit.

We've made the decision to accelerate the timeline for integrating the sales organizations under Susan St. Ledger's leadership to the beginning of the new fiscal year in February. This move will allow the unified sales team to sell both platforms and benefits customers by providing more options to meet their unique use cases.

\*         \*         \*

And then, plus the integration is -- the sales integration detail planning is starting now. So we have a lot more work to do at the detail level and then budget communication internally and externally on that. At a high level, it's about growth and it's about taking the entire sales capacity of both organizations, combining them together, and making sure that all of that sales capacity, to some degree, can sell all the products: Okta SIEM, Okta Workforce, Auth0 SIEM. There'll be obviously some specialization and some overlays to get the -- to make sure the transition to this unified Salesforce works and that you get the right technical specialization because especially on the -- both SIEM products require technical specialization and particularly on the Auth0 side, it's a more developer-facing product, which means it has different kind of technical requirements.

So there will be specialization there, but the main high-level idea is more sales capacity, more ability to take this big lead we have in this market. And this market, like I mentioned before, is a $30 billion market, and we're by far the biggest vendor in here, but our ACV is only like $330 million. So this is a market that's happening before our eyes, and we're going to go capture it, both from the go-to-market, from the branding and positioning of us being the premier identity vendor from the execution on how we build the products going forward to make sure we're continuing to advance our respective leads in a separate category -- in the respective categories and subcategories.

74.     Then, an analyst asked Defendant McKinnon what he was doing to retain essential employees.  In response, Defendant McKinnon discussed, and even acknowledged the importance of, the retention of the Company's employees, but failed to disclose that the Company recently lost senior Auth0 and key Okta employees.

**Sterling Auty**
**JPMorgan Chase & Co, Research Division - Senior Analyst**

All right. Great. One quick one, Todd, for you. You mentioned the sales integration. You're going through the detailed planning now. This is the point where you get that uncertainty if you're a salesperson for Auth0, Okta, wondering what's going to happen to your territory, your job, et cetera. What are you doing to make sure that you retain the people that you really want to go forward with the combined organization between now and when you communicate the final details?

**Todd McKinnon**
**Okta, Inc. - Co-Founder, Chairman & CEO**

Well, one of the things we're not doing is we're not announcing new territories on the earnings call.

**Sterling Auty**
**JPMorgan Chase & Co, Research Division - Senior Analyst**

Well, that's good. That's a good starting point.

**Todd McKinnon**
**Okta, Inc. - Co-Founder, Chairman & CEO**

But I think that the main thing is as we manage the company in general, there's a ton of openness and transparency internally. As we walked through this integration process, we've worked really hard to be open about it even when we didn't have all the answers. And I think that helps a lot.

But I think the high order thing is that people see the opportunity. And particularly salespeople, they want to be able to -- their hard work and their talent as a salesperson translate into results. And what they see out there is they see the opportunity. They see a scaled vendor, they see all these people realizing they don't need to build the customer identity themselves. And that's compelling for them. On the Okta side, they see more products to sell. They see not just one CIAM platform, but two CIAM platforms that have distinct use cases and a way to deliver more value to the customer. ***So it's an important point you bring up, and those are some of the things we're thinking about as we go forward***.

75.     Later, during the same call, Defendant McKinnon touted the potential success of the integration with Auth0, noting that the two companies had a limited amount of overlapping customers and that the companies' unified sales team would have no issues targeting the right customers for the right platform:

So there's the qualitative, there's the quantitative in terms of the strategic priority of the combined entity.  So -- and then when you think about how we could further accelerate some of this integration, you think about what is actually happening in the first 4 months. And the first thing is we only have 300 overlapping customers.  So if these 2 CIAM platforms that were -- if it was just about like 2 competitors going after the same small pie, you would have had a way more overlap in terms of customers or at least the competitive pipeline, and we haven't seen that materialize.  You only have 300 companies that are overlapping customers.

And then the pipeline reviews, it's very clear which CIAM platform, Okta CIAM or the Auth0 CIAM platform should be targeted for

which customer.  So this is not confusing in the field. They're figuring it out.

76.     That would mean that only a small portion of Okta's approximately 13,050 customers, at the time, overlapped with Auth0 customers.  This information further assured investors that the Auth0 acquisition (and integration) would be growth accretive to the Company.  However, investors and analysts remained unaware of the Company's loss of senior Auth0 and key Okta employees.

**D.     Okta Scraps the Company's Integration Plan and Requires Auth0 Employees to be "Generalists", Not "Specialists"**

77.     As the Class Period progressed and Auth0 employees continued to exit the Company, Okta created and adopted an integration plan.  However, this integration plan would ultimately be scrapped.

78.     According to CW2, a former employee at Okta that was "intimately involved" with the Auth0 and Okta integration as a member of the "Tiger Team," the integration process began as promising, but ultimately "did not go well at all" and was a "complete nightmare."  CW2 continued to say that the integration was executed "very, very poorly."  CW2 explained that the first phase of the integration plan originally involved the integration of the go-to-market (GTM) teams at each company (this included the sales and marketing teams), which was set to occur on February 1, 2022, which was the beginning of the new fiscal year.  CW2 added, that in her conversations with IT, it appeared the Okta and Auth0's systems would be integrated in an additional quarter or quarter and a half.

79.     CW2 explained that the integration plan involved keeping the Auth0 employees on as "specialists" and, in this role they would help train and educate Okta employees on Auth0 for approximately one year, while exclusively selling Auth0 products. CW2 continued to say that Okta employees would continue selling Okta products with additional sales staff brought on to help meet goals.

80.     CW2 added that the plan had been signed off on by senior executives from both Okta and Auth0 and weekly calls occurred throughout the planning period.  CW2 explained that

financial models, budgets, return on investment projections, etc. were also included in the planning process.  CW2 continued to say that current Okta CEO Todd McKinnon was the "executive sponsor" on the Okta side for the plan and current Okta President, Worldwide Field Operations Susan St. Ledger and current Okta Chief Revenue Officer Steve Rowland were involved in the weekly status updates.  According to CW2, St. Ledger and Rowland "signed off on everything" and that neither she nor her team received any negative feedback throughout the process.

81.     CW2 explained that during a review late in 2021 by Okta's finance team that the integration model was "ripped out" at the "eleventh hour."  According to CW2, the finance team determined that there was "no way" that the integration plan was "humanly possible" for FY2024 and "completely shut it [the integration plan] down."  CW2 continued to explain that instead of hiring additional sales staff and keeping 200 – 300 Auth0 employees on as "specialists" that instead the Auth0 employees were made to be "generalists" and were expected to sell Okta products and vice versa.

82.     CW2 continued to say that neither Okta employees nor Auth0 employees had knowledge of each other's products and did not receive training or education on the other's products.  Additionally, CW2 explained that Auth0 had its own instance of Salesforce that would have to be operated separately for the time being from the Okta systems.

83.     CW2 recalled being informed of the decision to scrap the integration plan around December 2021, but employees were not informed until several weeks later in approximately mid-January 2022, two weeks before the integration was supposed to go into effect.  According to CW2, she was informed that this was done to not "disrupt" the fiscal year end and employees were informed of their new roles in January and that the Auth0 sales staff would instead be becoming "generalists."  CW2 explained that she elected to begin transitioning out of her role and the Company, as a result of the change in direction along was other senior Auth0 employees.

84.     In the midst of this integration plan nightmare, Okta announced its earnings results for the third quarter of fiscal year 2022.  On December 1, 2021, Okta issued a press

release containing its earnings results for the quarter that quotes Defendant McKinnon, stating

"*We're maintaining the momentum of both Okta and Auth0 and are making great progress on the integration*."

85.     Further, during an earnings call on the same day, Defendants Kerrest and McKinnon commented on Okta's integration plan:

**Jacques Frederic Kerrest:**

Yes. Absolutely. We do have a lot on our plate, and that's an exciting place to be, frankly.  And that's the kind of problem we like to have.  We are doing very well in the integration efforts. Obviously, when it comes to the back office, that's in really great shape. When it comes to a lot of the upsell, cross-sell motion, we got that figured out very quickly, as we highlighted.  *And now another key piece of the puzzle, as you just mentioned, is the sales forces.  They will be fully integrated come Feb 1, which is 2 short months from now when we kick off the new fiscal year. It'll all be under one umbrella. We're already doing -- as you can imagine, you don't just flip the switch when you have the size of the sales force as ours, especially how fast it's growing. We already are doing a lot of work around territory management, around education, around getting all the new folks ramped on now the broader suite of products that they're going to have to offer. But it's going very well*.

**Todd McKinnon:**

*We're in the midst of our strategic and financial planning process right now*. And as you mentioned, there's all kinds of things we could do or things people want to do. One thing that's been very clear through the whole thing, the #1 priority by far is executing on the customer identity access management opportunity. So making sure that over the next 12, 18, 24 months, we do an amazing job of winning and expanding our lead in that market. *And a big part of that is integrating Auth0, and we're off to a great start. And a big milestone comes, as Freddy mentioned, on Feb 1 when the sales teams are fully integrated. But it's very -- everyone at Okta knows that's the clear priority. We have to execute well on that, and we have to extend our lead in that market*. And then that really bodes well for anything else after that we want to do. Winning the SIEM market is going to set the stage for that.

86.     Defendants Kerrest and McKinnon failed to disclose that Okta was having severe problems with the Auth0 integration, as the Company had already lost senior Auth0 and key Okta employees.  Moreover, Defendants Kerrest and McKinnon failed to disclose that neither

Okta employees nor Auth0 employees had knowledge of each other's products, yet Auth0 employees would be forced to sell Okta products and vice versa.

### E. Unbeknownst to Investors, the Integration of the Companies' Sales Teams Is Stifled as Auth0 Employees Exit

87. Okta's decision to create one unified sales team where Okta and Auth0 employees were forced to sell each other's products, without proper training, was stifled by the continuous flood of Auth0 employee departures.

88. For example, CW3 explained that the Auth0 acquisition "did not go well at all" and reiterated that no one was selling Auth0 successfully and many legacy Auth0 employees departed the Company. According to CW3, the Auth0 employees who were integrated into Okta were shocked when they saw their territories decreased from an entire region to just one city or a portion of a city. CW3 explained that Okta's product was designed to be a one-size fits all or "out of the box" offering where Auth0's customers were "developer heavy" and offered a much more customizable customer identity access management (CIAM) product. CW3 noted that she received her "module" of accounts in February 2022 at the start of the fiscal year and following the integration of Auth0 sales staff. CW3 explained that everyone in sales was "struggling" and she only managed to achieve 20% of her quota during Okta's first quarter for fiscal year 2023 and only one or two team members did better. CW3 continued to say that she was placed on a performance plan for the second quarter with a number of subjective benchmarks to hit aside from a definite sales figure. According to CW3, while she started to get more sales opportunities in the Company's second quarter for fiscal year 2023, not enough closed in time to meet her objectives. CW3 added that a few customers were "biting" on Auth0 products, but "no one" was successfully selling Auth0 products during her tenure.

89. CW1 explained that Okta did not take into account how much time it would take to successfully integrate the companies. CW1 continued to say that Okta did not lessen the workloads and quarterly goals of the employees while also saddling them with integration tasks that as a result carried less incentive to complete. CW1 added that, in her opinion, Okta employees lacked an interest in the integration tasks, which were then placed on Auth0

employees.  CW1 explained that quarterly goal setting occurred every quarter and was not adjusted to reflect that there were now 1,100 more employees and additional systems integrations following the Auth0 acquisition.  CW1 stated that she would ask why the integration wasn't the top priority within the goals-setting process.  CW1 recalled that she was told by leadership that it was the top priority, but she felt that this was merely "lip service" and not reflected in their workloads.  CW1 believed that Okta touting Auth0's customer identity access management (CIAM) product as best in the industry and then keeping both Auth0's and Okta's products undermined Auth0's product.  Moreover, it is CW1's understanding that only about 15% of the Auth0 employees who moved to Okta during the acquisition are still at the Company, following the cultural changes and an acquisition that she described as a "bait and switch."

90.    CW5 stated that St. Ledger and Rowland changed the customer segment structure to 12 different levels, micro-managed sales staff and started limiting the visibility into revenue figures. According to CW5, deals were very transparent before their arrival and sales staff would often share details of deals and deal size on Slack.  CW5 continued to say that "maybe 20%" of sales representatives hit their quotas following the appointments of St. Ledger and Rowland and there was a "mass exodus" of employees.  CW5 further characterized the acquisition of Auth0 as a "shitshow."

91.    CW4 recalled that her customers were confused by the acquisition, since Okta and Auth0 were so similar.  CW4 suggested that customer confusion around the reasoning for the acquisition resulted in lost sales for prospective customers.  CW4 explained that so many Auth0 employees have left since the acquisition closed that Okta is now offering a retention bonus to employees that stay at Okta.  CW4 suggested that the retention bonus is 22% of employees' salaries.

92.    CW2 noted that neither Okta employees nor Auth0 employees had knowledge of each other's products and did not receive training or education on the other's products. According to CW2, there are "very, very few" Auth0 people left.

93.     While Okta is internally dealing with a mass exodus of Auth0 employees, Defendants touted the success of the Auth0 integration and the now unified sales team.  For example, on March 2, 2022, during Okta's earning call reporting on the financial results in the fourth quarter of 2022, Defendant Tighe stated:

> My second priority is ensuring that we continue the seamless integration of Auth0 across all facets of the company. Now that the back office and go-to-market teams have been fully integrated, we will continue to refine our systems and processes to ensure that the tremendous growth opportunity we see will be realized. ***We are off to a great start and recognize there is still a lot of work to do***.

94.     Analysts were very interested in the learning more about the sales team integration effort given Defendants' promise to fully integrate the companies' sales teams by February 1, 2022.  For example, during the earnings call, an analyst from William Blair asked the following question: "I just wanted to maybe start out with the integration of Auth0. And maybe can you talk a little bit about sort of that sales force integration effort and maybe where you're seeing some successes, things that have surprised you?"  In response, Defendants Kerrest and McKinnon downplayed the sales team integration issues that Okta was experiencing while touting the growth obtained by both companies' platforms for that reporting period:

> **Jacques Frederic Kerrest:**
>
> Yes. We are -- thanks a lot for the question, Jonathan. We are very excited about the integration of Auth0. We're very excited that it's been done in just under a year from where we are because we actually announced the acquisition a year ago tomorrow. As -- to start with, I think the most important point is the go-to-market organization, which we unified under Susan's leadership on February 1. You heard Todd talk about one team, which I think is a great position to be in. We've put together a lot of the core systems that we're using to run the business. Those are all running on one platform. ***So we have one pane of glass and good visibility into all that and how it's working. There's a couple more pieces we need to finish up in terms of ticking and tying some of the systems on the back end, but those are just making sure that we're working as one organization going forward***.

95.     Later, during the same earnings call, McKinnon doubled down on the success of the unified sales team, stating:

> ***What we're getting is we're getting synergy on the -- really on the sales side. So we have -- all of the Okta reps now can sell all the***

1

2

> *products. So we increased the capacity. We can -- we increased what they can actually sell. So there's tons of upside from that.*

96.     But, unbeknownst to investors, Okta's unified sales team experienced difficulties selling both companies' products, and there had already been a "mass exodus" of Auth0 employees.

### F.     The January 2022 Breach Is Made Public By Hackers

#### 1.     Unbeknownst to Investors, Okta Fails to Properly Secure Its Administrative Tools Resulting in a Security Breach

97.     During the Class Period, Defendants continuously stated that data security is Okta's priority.  For example, on October 13, 2021, Okta issued a press release titled "Okta Advances Customer Identity with Auth0 and New Okta Features," the Company's Vice President of Cloud Infrastructure, Atul Bahl, stated:

> *As a data-focused organization, security is of the utmost importance to us. Okta's Custom Administrator Roles allow us to follow the principle of least privilege and only grant admins access to the tasks they need to perform across our many business units.* We save time for our internal teams and *ensure the best-in-class security of our customer applications.*

98.     However, this statement failed to disclose that Okta was not properly securing its administrative tools for monitoring customer tenants.  For example, CW6 advised that Okta had a "SuperUser" tool that allowed pre-sale engineers and customer support employees to control and monitor customer tenants.[16]  CW6 stated that the SuperUser tool provided access to any customer in any Okta tenant anywhere in the world.  CW6 added that the only restrictions within Okta for the SuperUser were related to HIPAA compliance, for healthcare related customers and accounts.  CW6 characterized normal commercial accounts as the "wild west."

99.     CW6 went on to say that, when she was at Okta, there was no formal request or vetting process for becoming a SuperUser.  CW6 indicated that granting SuperUser access was up to the managers' discretion.  CW6 explained that good managers were careful about granting

---

[16] CW6 explained that "tenants" referred to a customer's space within Amazon Web Services.  CW6 compared tenants to virtual servers and said that Okta customer support personnel had access to the tenants for troubleshooting and monitoring purposes.

1   access, but as the company expanded, the newer and less experienced managers "handed it out

2   like candy."  CW6 further advised that, prior to June 2021, Okta had granted Solutions Engineers

3   full SuperUser access, meaning they had full read and write access to customer tenants.

4   However, CW6 recalled that Okta restricted Solutions Engineers' SuperUser access to read-only

5   after June 2021 because Solutions Engineers were giving customers free trials and other options

6   for a set number of days but forgetting to end the free trials when the days ran out.  CW6 advised

7   that other employees who weren't Solutions Engineers, such as Customer Support employees,

8   retained read and write access to customer tenants.

9       100.    CW6 went on to suggest that the SuperUser tool should have been more closely

10  guarded against hackers. CW6 advised that such a powerful tool "should be sandboxed" or there

11  should have been some strong role-based access control, or both.[17]  CW6 explained that

12  typically, employees should only be able to access such a tool from a secure administrative

13  station rather than from their home laptop.  CW6 explained that a designated administrative

14  station could be more closely guarded and alert people if it's compromised.  CW6 added that

15  alternatively, Okta should have put tighter controls around the home laptops.  CW6 explained

16  that these controls could have caused the application to shut down or somehow obfuscated the

17  information if it detected an intruder.  CW6 explained that such safeguards are "best practice" in

18  the industry.  CW6 referred to Okta as a "10-year-old startup," explaining that Okta lacked the

19  disciplinary and security controls of a more mature company.

20      101.    CW6 indicated, as an example, that if a system is not sandboxed, a hacker may be

21  able to access the system through breaching a user's VPN account.  Moreover, CW6 explained

22  that, if a hacker breached the SuperUser tool, the worst thing a hacker could do is create a new

23  user on the customer's system and give them admin access, shut down a user or application, or

24  give or take away access to certain features within a customer's system.

25

26

27  _____

28      [17] CW6 explained that sandboxing means adding additional access limitations and layers of security.

102.    Similarly, CW7 advised that, in her opinion, Okta did not properly secure its administrative tools for controlling different cloud tenants for the Company's identity solutions. CW7 explained that when users sign up for Okta, they're given a "cell" inside their Amazon Cloud, and they might share this cell with a couple other customers.  CW7 went on to say that certain "SuperUser" employees can access administrative tools that allow them to review what's happening in the cells and make adjustments as needed.  CW7 advised that it seemed too easy for anyone to access these administrative tools.  CW7 recalled that if an employee sent an email asking for access to the administrative tools for controlling the cells, they were granted access. CW7 explained that there wasn't much of a vetting process for these employees.  CW7 advised that the higher level of access didn't require any additional training or security measures, such as two factor authentication.  CW7 further advised that she "felt like I could impersonate someone to do what I needed to do."  CW7 then explained that a SuperUser was simply someone who had access to the cells.  CW7 advised that there wasn't much training around the meaning of SuperUser or the sensitivities that came with the title.  CW7 further recalled that there was no process to verify that a SuperUser was who they claimed to be.

103.    Moreover, Okta failed to require third parties, such as sub-processors and Solutions Engineers, to comply with the security requirements that are fundamental to Okta's business.  For example, Okta adopted, and strongly recommended that its customers adopt, a "Zero Trust" security architecture.  According to Okta's website, "Zero Trust security throws away the idea that we should have a 'trusted' internal network and an 'untrusted' external network. The adoption of mobile and cloud means that we can no longer have a network perimeter-centric view of security; instead, we need to securely enable access for the various users (employees, partners, contractors, etc.) regardless of their location, device or network." Okta also obviously pushes its IAM solutions on customers—which include the combination of technical systems, policies, and processes that create, define, and govern the utilization and safeguarding of identity information.  However, Okta did not require its sub-processors to confirm they comply with Okta's security requirements.

104.    As a result, on January 21, 2022, hackers known specifically as LAPSUS$ were able to access Okta resources after they compromised one of the Company's third-party support vendors, Sykes, a subsidiary of Sitel (the "January 2022 Breach").  Specifically, LAPSUS$ was able to access Okta resources to view information from the Company's active customer tenants.  However, as explained in greater detail *infra*, notwithstanding their knowledge of the data breach, Defendants failed to disclose the January 2022 Breach for another two months.

### 2.    Okta Fails to Disclose the Breach for Two Months, Resulting in Reputational Risk Due to Lack of Transparency

105.    On March 21, 2022, hackers known as LAPSUS$ posted screenshots on their telegram channel showing what they claimed was Okta's internal company environment.  This sent Okta's employees scrambling to come up with a response about the January 2022 Breach and its impact.

106.    On March 22, 2022 at 4:23 AM, Defendant McKinnon posted a statement on his Twitter account, disclosing the following information:

> In late January 2022, Okta detected an attempt to compromise the account of a third party customer support engineer working for one of our subprocessors. The matter was investigated and contained by the subprocessor. (1 of 2)

> We believe the screenshots shared online are connected to this January event. Based on our investigation to date, there is no evidence of ongoing malicious activity beyond the activity detected in January. (2 of 2)

107.    On this news, Okta's stock price fell $2.98 per share, or 1.76%, to close at $166.43 on March 22, 2022.

108.    Later that day, Okta's Chief Security Officer ("CSO") David Bradbury issued a blog post entitled "Official Okta Statement on LAPSUS$ Claims."  In this post, Bradbury admitted that Okta first detected the January 2022 Breach in January.  After further evaluation, Bradbury posted a follow-up post entitled "Updated Okta Statement on LAPSUS$."  In this post, Bradbury admitted that "approximately 2.5%" of Okta's customers had "potentially been impacted and whose data may have been viewed or acted upon."  Following Okta's updated statement, multiple news outlets reported that hundreds of the Company's clients were

1    potentially affected by the January 2022 Breach.  For example, on March 23, 2022, *CNN*

2    published an article entitled "Okta concedes hundreds of clients could be affected by breach,"

3    noting that, despite the Company's statement that "a small percentage of customers –

4    approximately 2.5% -- have potentially been impacted," the Company "has over 15,000

5    customers, according to its website."

6         109.    Separately, Raymond James downgraded Okta from "strong buy" to "market

7    perform," noting, among other things, that "[w]hile partners were willing to trust Okta's track

8    record, the handling of its latest security incident adds to our mounting concerns."

9         110.    As a result of Okta's update after market close and the Raymond James

10   downgrade, the Company's stock price fell $17.88 per share, or 10.74%, to close at $148.55 on

11   March 23, 2022.

12        111.    On March 25, 2022, Okta acknowledged that it sat on this information for almost

13   two months before stating, "We want to acknowledge that we made a mistake."

14        112.    Investors and analyst were rightfully concerned, as some of Okta's customers

15   publicly criticized the Company for its lack of transparency and for the months long delay to

16   notify its customers of the security breach.  For example, in a LinkedIn post dated March 26,

17   2022, the Chairman and CEO of Tenable questioned Okta's handling of the January 2022

18   Breach, stating "Two months is too long. This compromise should have been disclosed when

19   Okta detected it in January or after a competent and timely forensic analysis."

20          **3.**    **Okta's Injured Reputation Affects Sales and Growth**

21        113.    According to CW3, the data breach that occurred in January 2022 and was

22   disclosed in March 2022 was discussed at the first All-Hands Meeting following the breach

23   being publicized by news outlets.  CW3 noted that employees were informed that the event had

24   occurred when a hacker group infiltrated Okta just to "show they can" and CW3 recalled that the

25   hackers had been using Okta's internal Slack channel.  CW3 continued to say that employees

26   were informed that the Company had put together an investigation and through their "research"

27   they "quickly" knew a breach occurred and shut the compromised account down.  CW3 then

28

1   explained that the Company was saying that they were losing sales because of the breach, and

2   CW3 noted that the breach did come up with every customer she spoke with, and the Company

3   distributed "talking points" to employees on how to "downplay" the breach.  CW3 described the

4   breach as "one of the many hurdles" that were necessary to clear to achieve a successful sale.

5        114.    Similarly, CW4 recalled that prospective customers were deciding against doing

6   deals with Okta after the breach.

7        115.    CW8 advised that Okta customers reacted negatively to the data breach that Okta

8   disclosed in March 2022.  CW8 recalled that, after the data breach, customers were unwilling to

9   expand their contracts, meaning they did not want to increase the level of spend on their current

10  contracts.  CW8 recalled customers expressing that they were no longer comfortable spending

11  additional money with Okta after the breach.  CW8 could not recall whether customers were

12  canceling contracts outright.  CW8 recalled that the customers' negative reaction to the breach

13  impacted her ability to meet quotas.  CW8 could not quantify the amount of lost business, but

14  she suggested it might have been "tens of thousands of dollars" in lost business.

15       116.    Furthermore, Lead Plaintiff's independent investigation revealed that Okta has

16  experienced additional security breaches during the Class Period.  For example, CW9 recalled

17  that her boss suggested that Okta had been breached multiple times over the years.  CW9 advised

18  that her personal email, passwords, name, and salary information had been stolen while working

19  for Okta.  CW9 advised that an unidentified third party stole her information in October 2021,

20  then Okta notified her of the intrusion in the same month.  CW9 recalled that around the same

21  time as the Okta incident, in October 2021, her SurfShark VPN account was compromised.

22       117.    CW9 recalled that other Okta employees' information had been compromised as

23  well.  CW9 further recalled that Okta's VP of Cybersecurity Timothy McIntyre[18] reached out to

24  the HR departments or heads of regional offices in areas that had been affected.  CW9's regional

25  office was Australia, and the HR department there sent her a message asking to talk about the

---

[18] A commercially available database shows that McIntyre is Vice President & Associate General Counsel, Privacy & Product at Okta (November 2020 – Present).

1    incident.  CW9 was asked by HR and McIntyre to not tell anyone, including her boss, about the

2    incident.  CW9 recalled that she told her boss anyway.  CW9 went on to say that she was not

3    given details about the Okta intrusion until February 2022.  Before then, CW9 had asked

4    McIntyre what information had been compromised but was told that Okta was still investigating

5    the incident.  Specifically, CW9 recalled that she reached out to McIntyre seeking additional

6    details about the breach in November 2021.  CW9 advised that she emailed and spoke with

7    McIntyre, but she wasn't given any details.  CW9 recalled that she had "been chasing" McIntyre

8    for information every week since the incident until late December.  According to CW9, in

9    January, after she had left Okta, the Director of Cybersecurity informed her that her personal

10    email, passwords, name, and salary information had been stolen.

11         118.  CW9 recalled that the emails between her and the Director of Cybersecurity self-

12    destructed, but she retained screenshots of those and other emails about the incident.  CW9 has

13    provided Lead Plaintiff with screenshots of those emails.  A summary of the screenshots is as

14    follows:

15          &bull; On October 14, 2021 at 2:40 PM, CW9 received an email from "Air Den,"

16             stating, "Hello! I found your SurfSharkVPN account information on the internet

17             which likely came from a hacker or data leak (see below)." The email provided

18             CW9's email information and noted that "Hackers often sell this information on

19             the internet. Don't worry, I'm only here to help. I'm against what hackers do and

20             informing people of security breaches is my way of fighting back. I'm not asking

21             for money or anything in return, simply just passing along this information and

22             advising you to change your account password as soon as you can."

23          &bull; On February 25, 2022 at 6:09 AM, CW9 received an email from Amelia

24             Hukoveh, an Okta employee, stating, "I understand that you had reached out to an

25             Okta employee seeking some additional information. I would be happy to speak

26             with you at your convenience.  What would be a good time for you?"

27

28

- At 7:26 AM, Ms. Hukoveh sent CW9 another email, stating, "Thank you for taking the time to speak with me this morning.  As we discussed, the incident in question occurred between October 9 and 11, 2021.  An unauthorized third party gained access to a file that contained your name, email and some compensation information about you. This issue was the result of human error when a user reset credentials.  In response, we have tightened our processes to try to prevent this type of mistake happening in the future. Okta has conducted an investigation and we do not believe that this information will be misused by the unauthorized third party."

- At 7:32 AM, CW9 sent an email informing Ms. Hukoveh that CW9's information and email were already compromised, stating, "On the same week that this was informed to me initially, someone from the internet sent me an email to this email address telling me that my Surfshark VPN account was stolen. This person even included my password to Surfshark and told me that I should reset this."  CW9 then added, "it's hard to believe the part of your report that states 'we do not believe that this information will be misused by the unauthorized third party'. My information with my email was already compromised – and I use the email to a lot of apps."  CW9 concluded the email by asking, "How was the team in Okta able to identify that the information was or will not be misused?"

- CW9 then sent a follow-up email to Ms. Hukoveh, stating, "I got an email on October 14th, and as you noted, my personal information was accessed by an [*sic*] unauthorized third-party user from October 11th, 2022. (as you can see on the attached screenshot, the sender knew what email address and password I used for this VPN app (Surfshark), and fyi, i [*sic*] hid the password on this screenshot."  CW9 added, "So this is hard to accept that Okta [*sic*] doesn't believe that my information was not misused, when clearly, my information was stolen and sold, hence I got this email from someone on the 14th of October." To conclude, CW9

noted, "When I got this email, I panicked and changed all my password and email addresses from more than a dozen apps that I use – and some are banking apps. I don't need to say that this stressed me out. It's unbelievable that Okta sells an identity management product, which is marketed that it protects PII, and yet this incident happened to me as an employee of Okta at the time."[19]

119.  The January 2022 Breach should not have come as a surprise because Okta had experienced security vulnerabilities as early as October 2021, as a result of the Company's failure to safeguard its employees' data.

### 4.  Defendants Tout the Retention of Customers and Reaffirm Commitment to Revenue Target

120.  On June 2, 2022, during Okta's earnings call reporting on the financial results in the first quarter of 2022, an analyst asked Defendant McKinnon about the progress of the sales integration process with Auth0.  In response, Defendant McKinnon stated that "*we've made great progress*" and "*we're in good shape*":

> **Jonathan Frank Ho**
> **William Blair & Company L.L.C., Research Division - Technology Analyst**
>
> I just wanted to, I guess, maybe start out with trying to understand, I guess, your sales integration process. How has that gone? And can you give us a sense of maybe some of the incremental opportunities that have come out of that?
>
> **Todd McKinnon**
> **Okta, Inc. - Co-Founder, Chairman & CEO**
>
> Yes. Jonathan, it's nice to see you. We just celebrated the 1-year anniversary of joining forces with Auth0, which is great. And as we've said in the past, the key here is keeping the momentum going in both Okta and Auth0. Both businesses were doing very well, and that's the continued focus. *We've made a lot of progress as a combined company*. Many parts of the back office functions were integrated over the course of FY'22, which is great. *And we started Q1 with the combination of go to -- combining the go-to-market organizations*.
>
> I think there's no real finish line when it comes to integrations. But I think we're really focused on addressing this massive customer

---

[19] Although this screenshot reflects that this email was a draft, CW9 has confirmed that it was in fact sent.

identity access management market in a way that, frankly, no other vendor can in terms of independence and neutrality, we have the only 2 modern public cloud solutions and certainly no in-house IT can. **So I think we've made great progress. There's still a little bit to do, but we're in good shape**.

121. During the same call, Defendant Tighe also touted the success of the sales team integration, stating:

> **And any integration or acquisition and integration of 2 companies, the sales integration is one of the biggest milestones there are. And for this integration between Auth0 and Okta, 2 great sales teams being brought together, it's no different, right? It was a great milestone for us. It was a big one for us, and we're pleased with the progress, thus far**.

122. Unbeknownst to investors, there had already been a mass exodus of Auth0 employees from Okta and that, as a result, the Company could no longer maintain a team of specialized staff for Auth0 products.

123. Soon thereafter, on June 8, 2022, Defendant McKinnon was interviewed by Jim Cramer, who asked about Okta's ability to maintain trust with its customers after the January 2022 Breach. McKinnon's assured investors that Okta has regained customer trust despite lost sales:

> And anytime there's any kind of hack, whether it's to a third party or what any kind of talk of a breach, there's a lot of concerns in the [*sic*] in the customer base because this is about trust. So, the first thing we did is we had these conversations. We talked to over 1000 customers face to face over, [*sic*] over video and had these conversations. I personally talked over 400. And got a ton of feedback about what we could do better, how we could make sure that our support environment was not insecure, to make sure that we communicate better, **to make sure that we are instill this trust. At the end of the, I think we've been able to do that**.

124. Later, during the same interview, Defendant McKinnon reconfirmed the Company's commitment to achieving its growth targets, stating:

> We're committed to making this a $4 billion a year company by fiscal year, fiscal year 26. So, that's, that's coming up quickly. So, we have to invest to grow to that scale and we've always done it with a balance of efficiency. We've always made sure that our, that our growth rate and our [*sic*] and our cash flow generation was balanced towards that goal. So, we think we're drawing the right balance to capture this market opportunity. And I think over time you're going to see a very highly scaled profitable company that's

going to help customers and capitalize on this big market opportunity.

125.   Unbeknownst to investors, Okta was actually losing sales as a direct result of the January 2022 Breach, which compounded the severe problems that the Company was having with the Auth0 integration.

**G.     The Truth About Severe Problems with the Auth0 Integration and Okta's Slowed Growth Emerges**

126.   On August 31, 2022, after the close of the trading day, Okta held its earnings call for the Company's second quarter financial results for fiscal year 2023, during which Defendants finally disclosed issues related to the integration of Auth0.  For example, Defendant McKinnon noted that Okta's second quarter financial results were "mixed" due to challenges related to the integration of Auth0 and Okta sales organizations.  Specifically, McKinnon mentioned that Okta had experienced increased attrition:

> **And the third area we examined was impact from the integration of the Okta and Auth0 sales teams, which occurred at the beginning of this fiscal year**.  When talking about Auth0, it's important to revisit the strategic rationale of why we acquired Auth0.  Individually, Okta and Auth0 were leading identity providers.   Together, we offer the most comprehensive identity platform in the market that is unmatched competitively and creates powerful long-term network effects for us and for our customers.  Organizations around the globe are looking for scalable and secure ways to digitally interact with our customers.  Together with Auth0, we win the customer identity market faster and accelerate our vision of establishing Okta as a primary cloud.
>
> Integrations are always difficult and touch every part of an organization.  **While we are making progress, we've experienced heightened attrition within the go-to-market organization as well as some confusion in the field, both of which have impacted our business momentum.  In order to improve our performance going forward, we've implemented a number of action items.  For starters, we're committed to stem attrition within our go-to-market team.  This is a top priority for me and my staff, and we're in lockstep on actions to take.   This includes making changes to our organizational structure to better align on our strategy, increased sales training and enablement and also improving the comp structure for the go-to-market team to ensure they feel set up for success**.

127.     Defendant McKinnon later elaborated on the issues with the integration of the two companies' sales organization, noting that the Company's sales representatives were struggling to sell both Okta and Auth0 products:

> Yes, for sure. Thanks for the question.  I think there's -- in terms of -- I'll start first with sales organization.  The big change on the sales organization was at the beginning of this fiscal year, so Feb 1, and that's where we took the Auth0 sales team that sold as an independent group all through last year for the first three quarters of the -- after the acquisition and we combine them together with the Okta sales team.
>
> And so, **the idea there is that hundreds and hundreds of Okta reps sell the whole portfolio, Okta plus Auth0. And then the Auth0 reps that came over sold the Okta portfolio and Auth0 portfolio. So that was a really significant step in the integration**. In terms of -- one thing I want to clarify is that Freddy doesn't manage the sales team.
>
> *          *          *
>
> **I think the headwinds are really about how do you take those hundreds and hundreds of reps and make them productive selling both customer identity cloud and workforce identity cloud, and there's a couple of things that go into that**. The first thing is that we really have to reach a new buyer for Okta, which is -- Okta traditionally was about CIOs and CISOs.  But for customer identity to be successful, we have to reach VPs of technologies, CTOs, all of the chief marketing officers, chief digital officers, the whole suite of C-suite executives that will -- if we win them all and we have an identity platform for all those use cases, we can better achieve our goal of being the primary cloud and the primary piece of their strategic landscape going forward.

128.     Additionally, during the earnings call, Defendant McKinnon told investors that Okta needed to reevaluate its $4 billion in revenue FY'26 target, stating:

> **Andy Nowinski**
> **Wells Fargo Securities, LLC, Research Division - Senior Equity Analyst**
>
> I guess I just had a quick clarification first. Did you say you are reevaluating the fiscal '26 targets, so taking that $4 billion revenue target off the table for now until you reevaluate it? And then my question was, we're getting a lot of, I guess, questions from investors as to what actually triggered the need for these go-to-market refinements since -- over the last, call it, 12 months, whether it was the elevated attrition that perhaps you can make these changes or the recent macro changes that we're seeing with the extended deal cycles. Just kind of curious as to -- if you can point your finger to why now.

**Todd McKinnon**
**Okta, Inc. - Co-Founder, Chairman & CEO**

Yes, it's a great question. On the first part of your question, *so the $4 billion FY '26 target, if we're going to achieve that, when we're going to achieve that, we have to have a successful customer identity cloud. And so as we reevaluate in the short-term how to keep that momentum going, I think it's prudent to make sure that we reevaluate that target given the short-term changes that we're optimizing for the customer at a cloud.* And then -- and we're committed to coming back to everyone on the next earnings call with a very detailed refined version of that -- of those commitments and that target, I think it's very important. So, that's the first thing.

And then on the second thing, the sequence of events here, *I think, which is important for everyone to understand is that the sales teams were integrated this year. So, it's really 6 months of information and learnings that we have to iterate on this thing.*

It's not -- *last year, Auth0 ran as a separate sales team, and they had a great year. So, we know there's market fit. We know we can grow this thing. It's just about the integration of the sales teams and what that drove in terms of attrition, and some of the things we've talked about in terms of optimizing how we get that back on track to achieve this strategic imperative*, which is we have to be the winner and the opportunity is tremendous in this long-term customer identity market.

129.    Further, Defendant Tighe confirmed that Okta was reevaluating its FY'26 targets while also lowering its calculated bookings:

Next to help with your transition to modeling on current RPO. We will continue providing a full year billings outlook for FY '23 before discontinuing any reference to billings in FY '24. *We are lowering our calculated billings outlook for the year by approximately $140 million due to the outlook headwinds outlined earlier*. We now expect calculated billings for FY '23 to be approximately $2.04 billion to $2.05 billion, representing growth of 27% when viewed on a like-for-like basis or 19% on an as-reported basis.

*Given our near-term outlook, coupled with the uncertainties of the evolving macro environment, we are reevaluating our FY '26 targets at this time.* Having said that, we will continue to balance growth and profitability, and we look forward to updating you on our long-term outlook on the Q3 earnings call.

130.    On this news, the price of Okta's stock fell dramatically overnight to $22.25 per share, or *over 24.3%*, to open at $69.15 on September 1, 2022.

---

131.    The next day, Defendant McKinnon was interviewed on TechCheck, where he noted that Okta has to sort through near term challenges, such as sales to new customers, before they can meet their revenue target:

> What I talked about the long-term opportunity in the fiscal 2026 targets., when we are successful getting there we're going to have to execute well reaching these new buyers. We have to be able to sell to all these buyers and see sweet and really become this strategic platform for identity and technology for every organization in the world. ***I think it's prudent to make sure we can get through some of the near-term challenges as we think about marching towards that target***.

> \*    \*    \*

> ***Yeah, we have had a little bit of higher-than-average attrition in the sales team and that driving some of the near-term mixed results. I think when you look at the quarter though I think there are sales people being successful at Okta.  We had a record number of $1,000,000 plus deals in the quarter and so on we had great customer retention our net retention percussion which is really emblematic of customer success is 120% plus so there's a lot of success going on but when you think about trying to reach this new buyer and bringing two sales forces together and [sic] and sort of trying to broaden that appeal in this C suite of every organization in the world that's challenging [sic] in a little bit more challenging than we thought it would be so we're gonna work through those issues can move forward***.  I think on your macro question, we are seeing a little bit of macro change a little bit of lengthening sale cycles but, I think big picture wise that's [*sic*] that's a very small part of our mixed results, and we have a lot of these corrective actions we're taken in short term are going to yield to a lot of positive momentum in the future.

132.    As investors and analysts continued to digest this news, the price of Okta's stock fell an additional $8.55 per share, or ***over 12.3%***, to close at $60.60 by the close of trading on September 1, 2022.  Moreover, it was a startling admission that Okta had experienced significant attrition issues that started over twelve months earlier and directly affected Okta's growth.

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

133.    Lead Plaintiff alleges that Defendants' statements highlighted in bold and italics within this section were knowingly and materially false and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  As alleged herein, such statements inflated and maintained the price of Okta's publicly traded common

stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

## A.   September 1, 2021 – Press Release and 2Q 2022 Earnings Call

134.   On September 1, 2021, Okta filed a press release containing the Company's earnings results for the second quarter of fiscal year 2022 (the "September 1, 2021 Press Release").  The press release quotes Defendants McKinnon stating, "***In our first quarter as a combined company with Auth0, we're off to a fantastic start***."

135.   Similarly, during an earnings call on the same day, McKinnon stated "***[i]t's [sic] been less than four months since we closed the acquisition of Auth0, but we've already made a lot of progress and learned quite a bit***."  Defendant McKinnon then doubled down again on the progress of integrating Auth0, stating "***when you think about us plus Auth0, it is going very well***."

136.   During the same earnings call, an analyst asked Defendant McKinnon what he was doing retain essential employees:

> **Sterling Auty JPMorgan Chase & Co, Research Division - Senior Analyst**
>
> All right. Great. One quick one, Todd, for you. You mentioned the sales integration. You're going through the detailed planning now. This is the point where you get that uncertainty if you're a salesperson for Auth0, Okta, wondering what's going to happen to your territory, your job, et cetera. What are you doing to make sure that you retain the people that you really want to go forward with the combined organization between now and when you communicate the final details?
>
> **Todd McKinnon Okta, Inc. - Co-Founder, Chairman & CEO**
>
> Well, one of the things we're not doing is we're not announcing new territories on the earnings call.
>
> **Sterling Auty JPMorgan Chase & Co, Research Division - Senior Analyst**
>
> Well, that's good. That's a good starting point.
>
> **Todd McKinnon Okta, Inc. - Co-Founder, Chairman & CEO**
>
> But I think that the main thing is as we manage the company in general, ***there's a ton of openness and transparency internally***. As we walked through this integration process, ***we've worked really***

***hard to be open about it even when we didn't have all the answers***. And I think that helps a lot.

But I think the high order thing is that people see the opportunity. And particularly salespeople, they want to be able to -- their hard work and their talent as a salesperson translate into results. And what they see out there is they see the opportunity. They see a scaled vendor, they see all these people realizing they don't need to build the customer identity themselves. And that's compelling for them. On the Okta side, they see more products to sell. They see not just one CIAM platform, but two CIAM platforms that have distinct use cases and a way to deliver more value to the customer. So it's an important point you bring up, and those are some of the things we're thinking about as we go forward.

137.    These statements were false and misleading because Defendant McKinnon discussed, and even acknowledged the importance of, the retention of the Company's employees, but he knowingly or recklessly omitted materially relevant facts, including the Company's loss of senior Auth0 and key Okta employees, who were critical to the success of the Auth0 integration.

**B.    September 2, 2021 – 2Q 2022 10-Q**

138.    On September 2, 2021, Okta filed its Form 10-Q with the SEC for the Company's second quarter for fiscal year 2022 (the "September 2, 2021 10-Q").[20]  This filing contained risk language related to the integration of Auth0:

> **The acquisition of Auth0 may cause a disruption in our business.**
>
> ***The acquisition of Auth0 (the "Acquisition") could cause disruptions to our business or business relationships, which could have an adverse impact on results of operations.***  Parties with which we have business relationships may experience uncertainty as to the future of such relationships and may delay or defer certain business decisions, seek alternative relationships with third parties or seek to alter their present business relationships with us. Parties with whom we otherwise may have sought to establish business relationships may seek alternative relationships with third parties.

---

[20] Appended as an exhibit to each Form 10-Q and 10-K issued during the Class Period were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") wherein Defendants McKinnon and Tighe certified that the Form 10-Q or 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that the "information contained in the [report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

The transition and integration of Auth0 may place a significant burden on our management and internal resources. The diversion of management's attention away from day-to-day business concerns and any difficulties encountered in the transition and integration process could adversely affect our financial results.

We have incurred and expect to continue to incur significant costs, expenses and fees for professional services and other transaction costs in connection with the Acquisition. We may also incur unanticipated costs in the integration of Auth0's business with our business. The substantial majority of these costs will be non-recurring expenses relating to the Acquisition. We also could be subject to litigation related to the proposed Acquisition, which could result in significant costs and expenses.

**We may not realize potential benefits from the Acquisition because of difficulties related to integration, the achievement of synergies, and other challenges.**

Prior to the consummation of the Acquisition, we and Auth0 operated independently, and there can be no assurances that our businesses can be combined in a manner that allows for the achievement of substantial benefits. Any integration process may require significant time and resources, and we may not be able to manage the process successfully as our ability to acquire and integrate larger or more complex companies, products or technologies in a successful manner is unproven. If we are not able to successfully integrate Auth0's businesses with ours or pursue our customer and product strategy successfully, the anticipated benefits of the Acquisition may not be realized fully or may take longer than expected to be realized. ***Further, it is possible that there could be a loss of our and/or Auth0's key employees and customers, disruption of either company's or both companies' ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated***.

139.     These risk disclosures were false and misleading because Defendants knew or recklessly disregarded that these risks had already materialized.  Specifically, Defendants knew or recklessly disregarded the fact that senior Auth0 and key Okta employees had already left the Company.

C.       **September 14, 2021 – Piper Sandler Virtual Global Technology Conference**

140.     On September 14, 2021, Defendant Kerrest participated in the Piper Sandler Virtual Global Technology Conference.  During the conference, Kerrest touted the early success of the Auth0 integration:

**Robbie David Owens**
**Piper Sandler & Co., Research Division**

Absolutely. Maybe more so on a tactical level, what should investors think about over the next year as it's integrated in? And I think you recently announced sales integration building in some cushion relative to how you're bringing the sales force together. So help us understand just what to look for and potential benchmarks as you move forward with this integration?

**Jacques Frederic Kerrest**
**Co-Founder, Executive Vice Chairperson & COO**

Yes, absolutely. ***So the integration has gone very well. We're about 4 months in. We're pretty good at execution. So we had some pretty good goals for ourselves, but I think we've been beating even those, which is great***.

141.     These statements were false and misleading because Defendant Kerrest knowingly or recklessly failed to disclose materially relevant facts, including the loss of senior Auth0 and key Okta employees, who were critical to the success of the Auth0 integration.

**D.     September 15, 2021 – Citi Global Technology Virtual Conference**

142.     On September 15, 2021, Defendant McKinnon participated in the Citi Global Technology Virtual Conference.  During the conference, McKinnon touted the early success of the Auth0 integration stating, "***We're benefiting a lot on that from our -- we have the acquisition of Auth0, we completed back in May. We're really getting into the integration now***."

143.     Later, during the same conference, Defendant McKinnon discussed administration and super user accounts in the context of maintaining a secure Zero Trust environment, stating:

So if you really get to this -- to get to this real Zero Trust capability, one of the things you have to do is you have to make sure that you know, you have an inventory and you have an accurate representation of all the machines. So you have to have like a catalog of the machines. And then that's sometimes daunting enough. But then you have to make sure that you don't just -- you allow that machine to only do the minimum amount of things that it should be -- it should have to do.

You can't just access anything on the network. You can't just potentially be a launching-off point for other attacks throughout your network. It has to be locked down to exactly what it has to be able to do. And to do that, you -- 9 times out of 10, you have to know

the people that can do certain things from that machine. And that's the tricky part because a lot of these machines, they have a certain role that they do just in terms of processing kind of no user-related process and information around. ***But then they're left -- the administration accounts or the admin or the super user accounts are left open because it's easy for the engineers to drop in there and, like, do some admin things and maintain some network things***.

And that's why -- that specific problem. Imagine the server in the server closet. You did a good job at Zero Trust. You took an inventory of the assets. You know this machine only should be able to access this other physical area of the network. You've really locked it down. But then you can log into that with an admin count and get anywhere.

144.   These statements were false and misleading because they omitted the material facts that Okta was not properly securing its administrative tools for monitoring customer tenants and that the Company failed to require its sub-processors to comply with the Company's fundamental security requirements.

**E.   October 13, 2021 – Press Release "Okta Advances Customer Identity with Auth0 and New Okta Features"**

145.   On October 13, 2021, Okta issued a press release entitled "Okta Advances Customer Identity with Auth0 and New Okta Features" (the "October 13, 2021 Press Release"). The press release quotes Okta's Vice President of Cloud Infrastructure, Atul Bahl, stating:

> ***As a data-focused organization, security is of the utmost importance to us. Okta's Custom Administrator Roles allow us to follow the principle of least privilege and only grant admins access to the tasks they need to perform across our many business units.*** We save time for our internal teams ***and ensure the best-in-class security of our customer applications.***

146.   The statements in the October 13, 2021 Press Release were false and misleading because they omitted the fact that Okta was not properly securing its administrative tools for monitoring customer tenants and that Okta failed to require its sub-processors to comply with the Company's fundamental security requirements.  For example, CW6 advised that Okta had a "SuperUser" tool that allowed pre-sale engineers and customer support employees to control and monitor customer tenants.  CW6 stated that the SuperUser tool provided access to any customer

in any Okta tenant anywhere in the world.  CW6 added that the only restrictions within Okta for the SuperUser were related to HIPAA compliance, for healthcare related customers and accounts.  CW6 characterized normal commercial accounts as the "wild west."

147.    CW6 went on to say that, when she was at Okta, there was no formal request or vetting process for becoming a SuperUser.  CW6 indicated that granting SuperUser access was up to the managers' discretion.  CW6 explained that good managers were careful about granting access, but as the company expanded, the newer and less experienced managers "handed it out like candy."  CW6 further advised that, prior to June 2021, Okta had granted Solutions Engineers full SuperUser access, meaning they had full read and write access to customer tenants. However, CW6 recalled that Okta restricted Solutions Engineers' SuperUser access to read-only after June 2021 because Solutions Engineers were giving customers free trials and other options for a set number of days but forgetting to end the free trials when the days ran out.  CW6 advised that other employees who weren't Solutions Engineers, such as Customer Support employees, retained read and write access to customer tenants.

148.    CW6 went on to suggest that the SuperUser tool should have been more closely guarded against hackers. CW6 advised that such a powerful tool "should be sandboxed" or there should have been some strong role-based access control, or both.  CW6 explained that typically, employees should only be able to access such a tool from a secure administrative station rather than from their home laptop.  CW6 explained that a designated administrative station could be more closely guarded and alert people if it's compromised.  CW6 added that alternatively, Okta should have put tighter controls around the home laptops.  CW6 explained that these controls could have caused the application to shut down or somehow obfuscated the information if it detected an intruder.  CW6 explained that such safeguards are "best practice" in the industry. CW6 referred to Okta as a "10-year-old startup," explaining that Okta lacked the disciplinary and security controls of a more mature company.

149.    Similarly, CW7 advised that, in his opinion, Okta did not properly secure its administrative tools for controlling different cloud tenants for the Company's identity solutions.

CW7 explained that when users sign up for Okta, they're given a "cell" inside their Amazon Cloud, and they might share this cell with a couple other customers.  CW7 went on to say that certain "SuperUser" employees can access administrative tools that allow them to review what's happening in the cells and make adjustments as needed.  CW7 advised that it seemed too easy for anyone to access these administrative tools.  CW7 recalled that if an employee sent an email asking for access to the administrative tools for controlling the cells, they were granted access.  CW7 explained that there wasn't much of a vetting process for these employees.  CW7 advised that the higher level of access didn't require any additional training or security measures, such as two factor authentication.  CW7 further advised that he "felt like I could impersonate someone to do what I needed to do."  CW7 then explained that a SuperUser was simply someone who had access to the cells.  CW7 advised that there wasn't much training around the meaning of SuperUser or the sensitivities that came with the title.  CW7 further recalled that there was no process to verify that a SuperUser was who they claimed to be.  However, CW7 further explained that SuperUsers didn't have universal access to all of Okta's cells; they could only access some of them.

### F.     December 1, 2021 – Press Release and 3Q 2022 Earnings Call

150.     On December 1, 2021, Okta filed a press release containing the Company's earnings results for the second quarter of fiscal year 2022 (the "December 1, 2021 Press Release").  The press release quotes Defendants McKinnon, stating "***We're maintaining the momentum of both Okta and Auth0 and are making great progress on the integration***."

151.     Similarly, during an earnings call on the same day, Defendants Kerrest and McKinnon commented on Okta's integration plan, stating:

**Jacques Frederic Kerrest:**

Yes. Absolutely. We do have a lot on our plate, and that's an exciting place to be, frankly. And that's the kind of problem we like to have. We are doing very well in the integration efforts. Obviously, when it comes to the back office, that's in really great shape. When it comes to a lot of the upsell, cross-sell motion, we got that figured out very quickly, as we highlighted. ***And now another key piece of the puzzle, as you just mentioned, is the sales forces. They will be fully integrated come Feb 1, which is 2 short months from now when we kick off the new fiscal year. It'll all be under one***

*umbrella. We're already doing -- as you can imagine, you don't just flip the switch when you have the size of the sales force as ours, especially how fast it's growing. We already are doing a lot of work around territory management, around education, around getting all the new folks ramped on now the broader suite of products that they're going to have to offer. But it's going very well*.

**Todd McKinnon:**

*We're in the midst of our strategic and financial planning process right now*. And as you mentioned, there's all kinds of things we could do or things people want to do. One thing that's been very clear through the whole thing, the #1 priority by far is executing on the customer identity access management opportunity. So making sure that over the next 12, 18, 24 months, we do an amazing job of winning and expanding our lead in that market. And a big part of that is integrating Auth0, and we're off to a great start. And a big milestone comes, as Freddy mentioned, on Feb 1 when the sales teams are fully integrated. But it's very -- everyone at Okta knows that's the clear priority. We have to execute well on that, and we have to extend our lead in that market. And then that really bodes well for anything else after that we want to do. Winning the SIEM market is going to set the stage for that.

152.    Defendants' December 1, 2021 statements were false and misleading because they failed to disclose the loss of senior Auth0 and key Okta employees, who were critical to the Auth0 integration and that, as a result, the Company could no longer maintain a team of specialized staff for Auth0 products.  Moreover, Defendants Kerrest and McKinnon failed to disclose that neither Okta employees nor Auth0 employees had knowledge of each other's products, yet Auth0 employees would be forced to sell Okta products and vice versa.

**G.    December 2, 2021 – 3Q 2022 10-Q**

153.    On December 2, 2021, Okta filed its Form 10-Q with the SEC for the Company's third quarter for fiscal year 2022 (the "December 2, 2021 10-Q").  This filing contained risk language related to the integration of Auth0:

**The acquisition of Auth0 may cause a disruption in our business.**

***The acquisition of Auth0 (the "Acquisition") could cause disruptions to our business or business relationships, which could have an adverse impact on results of operations.***  Parties with which we have business relationships may experience uncertainty as to the future of such relationships and may delay or defer certain business decisions, seek alternative relationships with third parties or seek to alter their present business relationships with us. Parties

with whom we otherwise may have sought to establish business relationships may seek alternative relationships with third parties.

The integration of Auth0 may place a significant burden on our management and internal resources. The diversion of management's attention away from day-to-day business concerns and any difficulties encountered in the integration process could adversely affect our financial results.

We have incurred and expect to continue to incur significant costs, expenses and fees for professional services and other transaction costs in connection with the Acquisition. We may also incur unanticipated costs in the integration of Auth0's business with our business. The substantial majority of these costs will be non-recurring expenses relating to the Acquisition. We also could be subject to litigation related to the Acquisition, which could result in significant costs and expenses.

**We may not realize potential benefits from the Acquisition because of difficulties related to integration, the achievement of synergies, and other challenges.**

Prior to the consummation of the Acquisition, we and Auth0 operated independently, and there can be no assurances that our businesses can be combined in a manner that allows for the achievement of substantial benefits. Any integration process may require significant time and resources, and we may not be able to manage the process successfully as our ability to acquire and integrate larger or more complex companies, products or technologies in a successful manner is unproven. If we are not able to successfully integrate Auth0's businesses with ours or pursue our customer and product strategy successfully, the anticipated benefits of the Acquisition may not be realized fully or may take longer than expected to be realized. ***Further, it is possible that there could be a loss of our and/or Auth0's key employees and customers, disruption of either company's or both companies' ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated***.

154.    These risk disclosures were false and misleading because Defendants knew or recklessly disregarded that these risks had already materialized.  Specifically, Defendants knew or recklessly disregarded the fact that the Company had lost senior Auth0 and key Okta employees, who were critical to the Auth0 integration and that, as a result, the Company could no longer maintain a team of specialized staff for Auth0 products.

H.    **March 2, 2022 – 4Q 2022 Earnings Call**

155.    On March 2, 2022, during Okta's earning call reporting on the financial results in the fourth quarter of 2022, Defendant Tighe touted the success of the Auth0 integration and the now unified sales form, stating:

> My second priority is ensuring that we continue the seamless integration of Auth0 across all facets of the company. Now that the back office and go-to-market teams have been fully integrated, we will continue to refine our systems and processes to ensure that the tremendous growth opportunity we see will be realized. ***We are off to a great start and recognize there is still a lot of work to do.***

156.    Analysts were very interested in the learning more about the sales force integration effort given Defendants' promise to fully integrate the companies' sales teams by February 1, 2022.  For example, during the earnings call, an analyst from William Blair asked the following question: "I just wanted to maybe start out with the integration of Auth0. And maybe can you talk a little bit about sort of that sales force integration effort and maybe where you're seeing some successes, things that have surprised you?"  In response, Defendants Kerrest and McKinnon downplayed the salesforce integration issues that Okta was experiencing while touting the growth obtain on both companies' platforms for that reporting period

**Jacques Frederic Kerrest:**

> Yes. We are -- thanks a lot for the question, Jonathan.  We are very excited about the integration of Auth0.  We're very excited that it's been done in just under a year from where we are because we actually announced the acquisition a year ago tomorrow.  As -- to start with, I think the most important point is the go-to-market organization, which we unified under Susan's leadership on February 1.  You heard Todd talk about one team, which I think is a great position to be in.  We've put together a lot of the core systems that we're using to run the business. Those are all running on one platform.  ***So we have one pane of glass and good visibility into all that and how it's working.  There's a couple more pieces we need to finish up in terms of ticking and tying some of the systems on the back end, but those are just making sure that we're working as one organization going forward.***

157.    Later, during the same earnings call, McKinnon doubled down on the success of the unified sales force, stating:

> ***What we're getting is we're getting synergy on the -- really on the sales side. So we have -- all of the Okta reps now can sell all the products.  So we increased the capacity. We can -- we increased***

*what they can actually sell.  So there's tons of upside from that*.
But Eugenio has a big job to do with the Auth0 product unit, driving
that.  They just delivered -- you heard the results.  They delivered
over 80% growth, and we expect them to produce a lot in the year
ahead.

158.    Defendants' March 2, 2022 statements were materially false and misleading

because they knew or were reckless in not knowing that, at this time, Okta was dealing with a

mass exodus of Auth0 employees, who were critical to the Auth0 integration and that, as a result,

the Company could no longer maintain a team of specialized staff for Auth0 products.

Moreover, Defendants failed to disclose that neither Okta employees nor Auth0 employees had

knowledge of each other's products, yet Auth0 employees would be forced to sell Okta products

and vice versa.

**I.      March 7, 2022 – 2022 Form 10-K**

159.    On March 7, 2022, Okta filed its Form 10-K with the SEC for the Company's

financial results for fiscal year 2022 (the "2022 10-K").  This filing contained risk language

related to the security and the integration of Auth0:

*Security is a mission-critical issue for Okta and for our customers.*
Our approach to security spans day-to-day operational practices
from the design and development of our software to how customer
data is segmented and secured within our multi-tenant platform. *We
ensure that access to our platform is securely delegated across an
organization*. Okta's source code is updated weekly, and there are
audited and verifiable security checkpoints to ensure source code
fidelity and continuous security review. We have attained multiple
SOC 2 Type II Attestations, CSA Star Level 2 Attestation, ISO/IEC
27001:2013, ISO/IEC 27018:2019 and Health Insurance Portability
and Accountability Act ("HIPAA") certifications and multiple
agency Federal Risk and Authorization Management Program
("FedRAMP") Moderate Authorities to Operate. We also support
FIPS 140-2 validated encryption in our Okta Verify MFA product.

Scalability and Uptime

Our technical operations and engineering teams are designed around
the concept of an always-on, highly redundant and available
platform that we can upgrade without customer disruption. Our
products and architecture were built entirely in and for the cloud
with availability and scalability at the center of the design and were
built to be agnostic with respect to the underlying infrastructure. Our
maintenance windows do not require any downtime.

Okta's proprietary cell architecture includes redundant, active-
active availability zones with cross-continental disaster recovery

centers, real-time database replication and geo-distributed storage. If one of our systems goes down, another is quickly promoted. Our architecture is designed to scale both vertically by increasing the size of the application tiers and horizontally by adding new geo-distributed cells.

***The Okta Identity Cloud is monitored not only at the infrastructure level but also at the application and third-party integration level. Synthetic transaction monitoring allows our technical operations team to detect and resolve issues proactively***.

\*       \*       \*

This risk factor summary contains a high-level summary of risks associated with our business. It does not contain all of the information that may be important to you, and you should read this risk factor summary together with the more detailed discussion of risks and uncertainties set forth following this summary A summary of our risks includes, but is not limited to, the following:

- Adverse general economic and market conditions and reductions in workforce identity and customer identity spending may reduce demand for our products, which could harm our revenue, results of operations and cash flows.

- We have experienced rapid growth in recent periods, which makes it difficult to forecast our revenue and evaluate our business and future prospects.

- Our recent growth rates may not be indicative of our future growth. As our costs increase, we may not be able to generate sufficient revenue to achieve and, if achieved, maintain profitability.

- We have a history of losses, and we expect to incur losses for the foreseeable future.

- If we fail to manage our growth effectively, we may be unable to execute our business plan, maintain high levels of service and customer satisfaction or adequately address competitive challenges.

- Our business depends on our customers renewing their subscriptions and purchasing additional licenses or subscriptions from us. Any material decline in our Dollar-Based Net Retention Rate would harm our future results of operations.

- Customer growth could fall below expectations.

- We may experience quarterly fluctuations in our results of operations due to a number of factors that make our future results difficult to predict and could cause our results of operations to fall below analyst or investor expectations.

- ***There are risks related to our ability to successfully integrate Auth0 and realize potential benefits from the acquisition***.

- ***An application, data security or network incident may allow unauthorized access to our systems or data or our customers' data, disable access to our service, harm our reputation, create additional liability and adversely impact our financial results***.

- Any actual or perceived failure by us to comply with the privacy or security provisions of our privacy policy, our contracts and/or legal or regulatory requirements could result in proceedings, actions or penalties against us. . . .

**Risks Related to the Acquisition of Auth0**

***The ongoing integration of Auth0 may cause a disruption in our business***.

***The ongoing integration following the acquisition of Auth0 (the "Acquisition") could cause disruptions to our business or business relationships, which could have an adverse impact on results of operations***. Parties with which we have business relationships may experience uncertainty as to the future of such relationships and may delay or defer certain business decisions, seek alternative relationships with third parties or seek to alter their present business relationships with us. Parties with whom we otherwise may have sought to establish business relationships may seek alternative relationships with third parties.

***The ongoing integration of Auth0 may place a significant burden on our management and internal resources***. The diversion of management's attention away from day-to-day business concerns and any difficulties encountered in the integration process could adversely affect our financial results.

We have incurred and expect to continue to incur significant costs, expenses and fees for professional services and other transaction costs in connection with the Acquisition. ***We may also incur unanticipated costs in the integration of Auth0's business with our business***. The substantial majority of these costs will be non-recurring expenses relating to the Acquisition. We also could be subject to litigation related to the Acquisition, which could result in significant costs and expenses.

***We may not realize potential benefits from the Acquisition because of difficulties related to integration, the achievement of synergies, and other challenges***.

Prior to the consummation of the Acquisition, we and Auth0 operated independently, and *there can be no assurances that our businesses can be combined in a manner that allows for the achievement of substantial benefits. The ongoing integration process may require significant time and resources, and we may not be able to manage the process successfully as our ability to acquire and integrate larger or more complex companies, products or technologies in a successful manner is unproven. If we are not able to successfully integrate Auth0's businesses with ours or pursue our customer and product strategy successfully, the anticipated benefits of the Acquisition may not be realized fully or may take longer than expected to be realized. Further, it is possible that there could be a loss of our and/or Auth0's key employees and customers, disruption of either company's or both companies' ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated.* Specifically, the following issues, among others, must be addressed in combining Auth0's operations with ours in order to realize the anticipated benefits of the Acquisition:

- combining the companies' corporate functions;

- *combining Auth0's business with our business in a manner that permits us to achieve the synergies anticipated to result from the Acquisition, the failure of which would result in the anticipated benefits of the Acquisition not being realized in the timeframe currently anticipated or at all*;

- maintaining existing agreements with customers, distributors, providers, talent and vendors and avoiding delays in entering into new agreements with prospective customers, distributors, providers, talent and vendors;

- determining whether and how to address possible differences in corporate cultures and management philosophies;

- integrating the companies' administrative and information technology infrastructure;

- developing products and technology that allow value to be unlocked in the future; and

- evaluating and forecasting the financial impact of the Acquisition transaction.

*In addition, at times the attention of certain members of our management and resources may be focused on integration of the businesses of the two companies and diverted from day-to-day*

*business operations, which may disrupt our ongoing business and the business of the combined company.*

*We may incur significant, non-recurring costs in connection with the Acquisition and integrating the operations of Okta and Auth0, including costs to maintain employee morale and to retain key employees.* Management cannot ensure that the elimination of duplicative costs or the realization of other efficiencies will offset the transaction and integration costs in the long term or at all.

160. The March 7, 2022 risk disclosures were materially false and misleading because these risks had already materialized. Specifically, Okta had experienced the January 2022 Breach due to unsecured administrative tools used for monitoring cloud tenants and the failure to require sub-processors to comply with Okta's fundamental security requirements. Further, the Company was already experiencing integration issues with Auth0, specifically the loss of Auth0 employees, who were critical to the Auth0 integration.

161. In addition, Defendants' risk disclosures discuss the importance of security for Okta, but they knowingly or recklessly omitted materially relevant facts including the January 2022 Breach. As discussed herein, Defendants admitted that they were aware of this breach in January 2022.

**J.      June 2, 2022 – 1Q 2023 Earnings Call**

162. On June 2, 2022, during Okta's earnings call reporting on the financial results in the first quarter of 2022, an analyst asked Defendant McKinnon about the progress of the sales integration process with Auth0. In response Defendant McKinnon stated that "we've made great progress" and "we're in good shape":

**Jonathan Frank Ho William Blair & Company L.L.C., Research Division - Technology Analyst**

I just wanted to, I guess, maybe start out with trying to understand, I guess, your sales integration process. How has that gone? And can you give us a sense of maybe some of the incremental opportunities that have come out of that?

**Todd McKinnon Okta, Inc. - Co-Founder, Chairman & CEO**

Yes. Jonathan, it's nice to see you. We just celebrated the 1-year anniversary of joining forces with Auth0, which is great. And as we've said in the past, the key here is keeping the momentum going in both Okta and Auth0. Both businesses were doing very well, and that's the continued focus. *We've made a lot of progress as a*

***combined company***. Many parts of the back office functions were integrated over the course of FY'22, which is great. ***And we started Q1 with the combination of go to -- combining the go-to-market organizations***.

I think there's no real finish line when it comes to integrations. But I think we're really focused on addressing this massive customer identity access management market in a way that, frankly, no other vendor can in terms of independence and neutrality, we have the only 2 modern public cloud solutions and certainly no in-house IT can. ***So I think we've made great progress. There's still a little bit to do, but we're in good shape***.

163.    During the same call, Defendant Tighe also touted the success of the sales team integration, stating:

> ***And any integration or acquisition and integration of 2 companies, the sales integration is one of the biggest milestones there are. And for this integration between Auth0 and Okta, 2 great sales teams being brought together, it's no different, right? It was a great milestone for us. It was a big one for us, and we're pleased with the progress, thus far***.

164.    Defendants' statements were materially false and misleading because they knew or were reckless in not knowing that, at this time, Okta was dealing with a mass exodus of Auth0 employees, who were critical to the Auth0 integration and that, as a result, the Company could no longer maintain a team of specialized staff for Auth0 products.  Moreover, Defendants failed to disclose that neither Okta employees nor Auth0 employees had knowledge of each other's products, yet Auth0 employees would be forced to sell Okta products and vice versa.

**K.    June 3, 2022 - 1Q 2023 10-Q**

165.    On June 3, 2022, Okta filed its Form 10-Q with the SEC for the Company's first quarter for fiscal year 2023 (the "June 3, 2022 10-Q").  This filing contained risk language related to the integration of Auth0:

> **The ongoing integration of Auth0 may cause a disruption in our business.**
>
> ***The ongoing integration following the acquisition of Auth0 (the "Acquisition") could cause disruptions to our business or business relationships, which could have an adverse impact on results of operations***. Parties with which we have business relationships may experience uncertainty as to the future of such relationships and may delay or defer certain business decisions, seek alternative relationships with third parties or seek to alter their present business relationships with us. Parties with whom we otherwise may have

sought to establish business relationships may seek alternative relationships with third parties.

The ongoing integration of Auth0 may place a significant burden on our management and internal resources. The diversion of management's attention away from day-to-day business concerns and any difficulties encountered in the integration process could adversely affect our financial results.

We have incurred and expect to continue to incur significant costs, expenses and fees for professional services and other transaction costs in connection with the Acquisition. We may also incur unanticipated costs in the integration of Auth0's business with our business. The substantial majority of these costs will be non-recurring expenses relating to the Acquisition. We also could be subject to litigation related to the Acquisition, which could result in significant costs and expenses.

**We may not realize potential benefits from the Acquisition because of difficulties related to integration, the achievement of synergies, and other challenges.**

Prior to the consummation of the Acquisition, we and Auth0 operated independently, and there can be no assurances that our businesses can be combined in a manner that allows for the achievement of substantial benefits. The ongoing integration process may require significant time and resources, and we may not be able to manage the process successfully as our ability to acquire and integrate larger or more complex companies, products or technologies in a successful manner is unproven. If we are not able to successfully integrate Auth0's businesses with ours and pursue our customer and product strategy successfully, the anticipated benefits of the Acquisition may not be realized fully or may take longer than expected to be realized. ***Further, it is possible that there could be a loss of our and/or Auth0's key employees and customers, disruption of either company's or both companies' ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated.***

166.    These risk disclosures were false and misleading because Defendants knew or recklessly disregarded that these risks had already materialized.  Specifically, Defendants knew or recklessly disregarded the fact that the Company had lost senior Auth0 and key Okta employees, who were critical to the Auth0 integration and that, as a result, the Company could no longer maintain a team of specialized staff for Auth0 products.

L.   **June 8, 2022 – CNBC Jim Cramer Interview with Todd McKinnon**

167.   On June 8, 2022, Defendant McKinnon was interviewed by Jim Cramer on *CNBC* and asked about Okta's ability to maintain trust with its customers after the January 2022 Breach. McKinnon responded:

> And anytime there's any kind of hack, whether it's to a third party or what any kind of talk of a breach, there's a lot of concerns in the [*sic*] in the customer base because this is about trust. So, the first thing we did is we had these conversations. We talked to over 1000 customers face to face over, [*sic*] over video and had these conversations. I personally talked over 400. ***And got a ton of feedback about what we could do better, how we could make sure that our support environment was not insecure, to make sure that we communicate better, to make sure that we are instill this trust. At the end of the, I think we've been able to do that***.

168.   Later, during the same interview, Defendant McKinnon reconfirmed the Company's commitment to achieving its growth targets, stating:

> ***We're committed to making this a $4 billion a year company by fiscal year, fiscal year 26. So, that's, that's coming up quickly. So, we have to invest to grow to that scale and we've always done it with a balance of efficiency***. We've always made sure that our, that our growth rate and our [*sic*] and our cash flow generation was balanced towards that goal. ***So, we think we're drawing the right balance to capture this market opportunity***. And I think over time you're going to see a very highly scaled profitable company that's going to help customers and capitalize on this big market opportunity.

169.   Defendant McKinnon's June 8, 2022 statements were false and misleading because Okta was actually losing sales as a direct result of the January 2022 Breach, which only compounded the severe problems the Company was having with the Auth0 integration.

VI.   **LOSS CAUSATION**

170.   During the Class Period, as detailed herein, Defendants made material misrepresentations and omissions and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Okta's publicly traded common stock and operated as a fraud or deceit on Class Period purchasers of Okta common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

171. Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Okta common stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased Okta stock at the artificially inflated prices at which it traded during the Class Period.

172. The relevant truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between September 1, 2021 and September 1, 2022. During this period, Okta's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Okta's stock price. It was not until the final corrective disclosure and/or materialization of concealed risk on September 1, 2022, that the full truth was known to the market, such that there was no longer any artificial inflation in Okta's stock price attributable to the fraud.

173. The declines in Okta's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

174. As a result of their purchases of Okta common stock during the Class Period, Lead Plaintiff and other Class Members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused Okta common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $276.30 per share on September 3, 2021.

175. By concealing from investors, the adverse facts detailed herein, Defendants presented a misleading picture of Okta's business. As the truth about the Company and the extent of the fraud was revealed to the market, the price of Okta common stock fell significantly. These declines removed the inflation from the price of Okta common stock, causing real economic loss to investors who had purchased Okta common stock during the Class Period.

176.    Each decline in the price of Okta common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

177.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Okta common stock and the subsequent decline in the value of Okta common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

178.    The market for Okta common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 2,455,659 shares during the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, Okta's common stock traded at artificially inflated prices.  Lead Plaintiff and other Class members purchased Okta common stock relying upon the integrity of the market relating to Okta common stock and suffered economic losses as a result thereof.

179.    The declines in Okta's common stock price on March 22, 2022, March 23, 2022, August 31, 2022, and September 1, 2022 were a direct and foreseeable result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors before the market opened on March 22, 2022, after the market closed on March 22, 2022, after the market closed on August 31, 2022, and during market hours on September 1, 2022.  The timing and magnitude of Okta's stock price declines evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

A.    **March 22, 2022 – First Partial Corrective Disclosure/Materialization of the Risk**

180.    On March 22, 2022, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions during the Class Period were revealed and/or partially materialized when Defendant McKinnon posted a

1    statement on his Twitter account in response to the LAPSUS$ screenshots, by which the hackers

2    claimed to have access to Okta's internal company environment.

3         181.   Defendant McKinnon's Twitter post referenced the January 2022 Breach, which

4    dealt with the compromise of a third-party customer support engineer working for one of Okta's

5    sub-processors.  McKinnon's Twitter post noted that Okta believes the screenshots LAPSUS$

6    shared online were connected to this event.  This revealed to the market for the first time that

7    Okta had failed to properly secure its administrative tools used for monitoring customer tenants

8    and that Okta had failed to inform its customers of the January 2022 Breach for over two months.

9         182.   The March 22, 2022 disclosures regarding Okta's insufficient security practices

10   for administrative tools and the reasons therefore were foreseeable consequences of, and within

11   the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the

12   Okta's "best-in-class security" and the Company's security practices for administrative tools

13   used for monitoring customer tenants.

14        183.   Moreover, Defendant McKinnon's Twitter post revealed new information that

15   Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed

16   and/or obscured from the market.  McKinnon's Twitter post partially (but incompletely) revealed

17   some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and

18   omissions concerning the Company's prioritization of transparency with its customers.

19        184.   As a direct and proximate result of this partial corrective disclosure and/or

20   foreseeable risk concealed by Defendants' fraud, the price of Okta's common stock fell $2.98 per

21   share, or 1.76%, to close at $166.43 on March 22, 2022.

22        185.   Analysts were shocked by this news.  For example, on March 22, 2022,

23   Guggenheim issued an analyst report concerning the January 2022 Breach, stating:

24            OKTA has stated that it uncovered an attempted breach in January,
             which was contained. There were no disclosures of this incident, and
25            we understand that there might not have been a requirement of any
             disclosures if this was an attempt. However, based on the
26            screenshots that have been posted, it appears that the attackers had
             access to OKTA's systems.

27

28

186.     Still, the Company's stock price remained artificially inflated, even after this news, as Defendants continued to reassure the market that Okta's service had not been breached and that the potential impact to Okta customers was limited.  For example, on March 22, 2022 at 12 PM, CSO Bradbury issued a blog post assured the market that "[t]he Okta service has not been breached" and "[t]he potential impact to Okta customers is limited to the access that support engineers have."  Moreover, investors were still left unaware of the severe problems with the Auth0 integration.

**B.     March 22, 2022 – Second Partial Corrective Disclosure/Materialization of the Risk**

187.     Later that same day, after market close, CSO Bradbury issued a follow up blog post entitled "Updated Okta Statement on LAPSUS$."  In this post, Bradbury admitted that "a small percentage of customers – approximately 2.5% - have potentially been impacted and whose data may have been viewed or acted upon."  Bradbury added, "We have identified those customers and already reached out directly by email.  We are sharing this interim update, consistent with our values of customer success, integrity, and transparency."

188.     The March 22, 2022 disclosures about the exposure of Okta customer information was a foreseeable consequence of, and within the zone of risk concealed by, Defendants misrepresentations and omissions concerning Okta's "best-in-class security" and the Company's security practices for administrative tools used for monitoring customer tenants.

189.     Following Okta's updated statement, multiple news outlets reported that hundreds of the Company's clients were potentially affected by the January 2022 Breach.  For example, on March 23, 2022, *CNN* published an article entitled "Okta concedes hundreds of clients could be affected by breach," noting that, despite the Company's statement that "a small percentage of customers – approximately 2.5% -- have potentially been impacted," the Company "has over 15,000 customers, according to its website."

190.     Separately, Raymond James downgraded Okta from "strong buy" to "market perform," noting, among other things, that "the handling of its latest security incident adds to our mounting concerns" and "is likely to cause customers to pause in consolidating additional

1   functionality onto Okta's platform."  Raymond James added that "customer feedback we've

2   heard thus far still suggests some level of disclosure in January alongside a suggestion to reset

3   credentials/review logs was warranted.  This creates a **lack of trust as customers contemplate**

4   **consolidating important functions like Privileged Access and Governance via Okta's new**

5   **products and may push out the timeline to consolidation**."  (Emphasis in original.)

6        191.    Raymond James also noted concerns about "a continually disconnected CIAM go-

7   to market strategy," including "still separate reps for Auth0/Okta, no communication to incent

8   channel cross-sell, [and] no evidence of improved technology/integration . . . ."

9        192.    As the market continued to digest the above disclosures, including, for example,

10   as reflected in CSO Bradbury's blog post, news reports, and analyst downgrades discussing the

11   extent of the January 2022 Breach and its potential impact on Okta's sales and reputation,

12   investors continued to react negatively to the news, causing Okta's stock price to fall another

13   $17.88 per share, ***or 10.74%***, to close at $148.55 on March 23, 2022.

14        193.    However, the Company's stock remained inflated, even after this news, as

15   investors were still unaware that Okta was experiencing severe problems with the integration of

16   Auth0.

17        **C.    August 31, 2022 – Final Corrective Disclosure/Materialization of the Risk**

18        194.    On the same day, after the close of the trading day, the relevant truth and

19   foreseeable risks concealed by Defendants' misconduct and their false and misleading

20   representations and omissions during the Class Period were fully revealed and/or materialized.

21   Specifically, on August 31, 2022 at 5:00 PM ET, Okta held its earnings call for the Company's

22   second quarter financial results for fiscal year 2023, during which Defendants finally disclosed

23   issues related to the integration of Auth0.  For example, Defendant McKinnon mentioned that

24   Okta had experienced increased attrition:

25        **And the third area we examined was impact from the**
     **integration of the Okta and Auth0 sales teams, which occurred**
26        **at the beginning of this fiscal year**. When talking about Auth0, it's
     important to revisit the strategic rationale of why we acquired
27        Auth0. Individually, Okta and Auth0 were leading identity
     providers. Together, we offer the most comprehensive identity
28        platform in the market that is unmatched competitively and creates

powerful long-term network effects for us and for our customers. Organizations around the globe are looking for scalable and secure ways to digitally interact with our customers. Together with Auth0, we win the customer identity market faster and accelerate our vision of establishing Okta as a primary cloud.

Integrations are always difficult and touch every part of an organization. **While we are making progress, we've experienced heightened attrition within the go-to-market organization as well as some confusion in the field, both of which have impacted our business momentum. In order to improve our performance going forward, we've implemented a number of action items. For starters, we're committed to stem nutrition within our go-to-market team. This is a top priority for me and my staff, and we're in lockstep on actions to take. This includes making changes to our organizational structure to better align on our strategy, increased sales training and enablement and also improving the comp structure for the go-to-market team to ensure they feel set up for success**.

195.    Defendant McKinnon later elaborated on the issues Okta experienced with its sales organization:

Yes, for sure. Thanks for the question. I think there's -- in terms of -- I'll start first with sales organization. The big change on the sales organization was at the beginning of this fiscal year, so Feb 1, and that's where we took the [*sic*] of the Auth0 sales team that sold as an independent group all through last year for the first three quarters of the -- after the acquisition and we combine them together with the Okta sales team.

And so, **the idea there is that hundreds and hundreds of Okta reps sell the whole portfolio, Okta plus Auth0. And then the Auth0 reps that came over, sold the Okta portfolio and Auth0 portfolio. So, that was a really significant step in the integration**. In terms of -- one thing I want to clarify is that Freddy doesn't manage the sales team.

\*       \*       \*

**I think the headwinds are really about how do you take those hundreds and hundreds of reps and make them productive selling both customer identity cloud and workforce identity cloud, and there's a couple of things that go into that**. The first thing is that we really have to reach a new buyer for Okta, which is -- Okta traditionally was about CIOs and CISOs. But for customer identity to be successful, we have to reach VPs of technologies, CTOs, all of the chief marketing officers, chief digital officers, the whole suite of C-suite executives that will -- if we win them all and we have an identity platform for all those use cases, we can better achieve our goal of being the primary cloud and the primary piece of their strategic landscape going forward.

196.     Additionally, during the earnings call, Defendant McKinnon told investors that Okta needed to reevaluate its $4 billion in revenue FY'26 target, stating:

> **Andy Nowinski**
> **Wells Fargo Securities, LLC, Research Division - Senior**
> **Equity Analyst**
>
> I guess I just had a quick clarification first. Did you say you are reevaluating the fiscal '26 targets, so taking that $4 billion revenue target off the table for now until you reevaluate it? And then my question was, we're getting a lot of, I guess, questions from investors as to what actually triggered the need for these go-to-market refinements since -- over the last, call it, 12 months, whether it was the elevated attrition that perhaps you can make these changes or the recent macro changes that we're seeing with the extended deal cycles. Just kind of curious as to -- if you can point your finger to why now.
>
> **Todd McKinnon**
> **Okta, Inc. - Co-Founder, Chairman & CEO**
>
> Yes, it's a great question. On the first part of your question**, so the $4 billion FY '26 target, if we're going to achieve that, when we're going to achieve that, we have to have a successful customer identity cloud. And so, as we reevaluate in the short-term, how to keep that momentum going, I think it's prudent to make sure that we reevaluate that target given the short-term changes that we're optimizing for the customer at a cloud.** And then -- and we're committed to coming back to everyone on the next earnings call with a very detailed refined version of that, of those commitments and that target, I think it's very important. So, that's the first thing...
>
> And then on the second thing, the sequence of events here, **I think, which is important for everyone to understand is that the sales teams were integrated this year. So, it's really 6 months of information and learnings that we have to iterate on this thing.**
>
> It's not -- **last year, Auth0 ran as a separate sales team, and they had a great year. So, we know there's market fit. We know we can grow this thing. It's just about the integration of the sales teams and what that drove in terms of attrition, and some of the things we've talked about in terms of optimizing how we get that back on track to achieve this strategic imperative**, which is we have to be the winner and the opportunity is tremendous in this long-term customer identity market.

197.     Further, Defendant Tighe confirmed that Okta was reevaluating its FY'26 targets while also lowering its calculated bookings:

> Next to help with your transition to modeling on current RPO. We will continue providing a full year billings outlook for FY '23 before discontinuing any reference to billings in FY '24. **We are lowering**

**our calculated billings outlook for the year by approximately $140 million due to the outlook headwinds outlined earlier**. We now expect calculated billings for FY '23 to be approximately $2.04 billion to $2.05 billion, representing growth of 27% when viewed on a like-for-like basis or 19% on an as-reported basis.

**Given our near-term outlook, coupled with the uncertainties of the evolving macro environment, we are reevaluating our FY '26 targets at this time**.

198.   The August 31, 2022 after hours disclosures about the Auth0 integration issues related to the unified sales force and the reevaluation of Okta's FY'26 growth targets were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning material facts relating to severe problems with the Auth0 integration, and the impact of the January 2022 Breach on Okta's sales and reputation as a data security company.

199.   Moreover, the August 31, 2022 after hours disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.   These disclosures partially revealed the relevant truth concerning the Company's increased attrition and other issues related to the integration of Auth0, the January 2022 Breach's impact on the Company's sales and reputation, and Okta's stunted growth.

200.    On this news, the price of Okta's stock fell dramatically overnight by $22.25 per share, or ***over 24.3%***, to open at $69.15 on September 1, 2022.

201.   Analysts were shocked by this news.   For example, Morgan Stanley issued an analyst report on September 1, 2022, downgrading Okta stock from "Overweight" to "Equal-Weight."   Specifically, the Morgan Stanley analyst report stated "[s]ales execution issues, challenges with M&A integration and a tough macro backdrop contributed to a lower growth outlook for OKTA.   While positive on the LT market opportunity and valuation is at a discount to peers, we have limited visibility on a return to stabilization."   Moreover, the analyst report noted that "recent sales execution issues and ongoing challenges in integrating the Auth0

1    acquisition from last year leave the company without an effective GTM vehicle, which will take

2    time to recover."

3        202.    On September 1, 2022, Defendant McKinnon was interviewed on TechCheck,

4    where he reaffirmed that Okta was having issues obtaining new customers:

> What I talked about the long-term opportunity in the fiscal 2026 targets., when we are successful getting there we're going to have to execute well reaching these new buyers. We have to be able to sell to all these buyers and see sweet and really become this strategic platform for identity and technology for every organization in the world. **I think it's prudent to make sure we can get through some of the near-term challenges as we think about marching towards that target**.
>
>                             *        *        *
>
> **Yeah, we have had a little bit of higher-than-average attrition in the sales team and that driving some of the near-term mixed results. I think when you look at the quarter though I think there are sales people being successful at Okta. We had a record number of $1,000,000 plus deals in the quarter and so on we had great customer retention our net retention percussion which is really emblematic of customer success is 120% plus so there's a lot of success going on but when you think about trying to reach this new buyer and bringing two sales forces together and [*sic*] and sort of trying to broaden that appeal in this C suite of every organization in the world that's challenging in [*sic*] a little bit more challenging than we thought it would be so we're gonna work through those issues can move forward**. I think on your macro question, we are seeing a little bit of macro change a little bit of lengthening sale cycles but, I think big picture wise that's [*sic*] that's a very small part of our mixed results, and we have a lot of these corrective actions we're taken in short term are going to yield to a lot of positive momentum in the future.

20       203.    The September 1, 2022 disclosures concerning Okta's struggle to obtain new

21   customers and issues related to the Company's unified sales force were foreseeable

22   consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and

23   omissions concerning the integration of Auth0, the January 2022 Breach's impact on the

24   Company's sales and reputation, and Okta's stunted growth.

25       204.    Analysts were again surprised by the Company's disclosure of the Auth0

26   integration issues and disappointed to hear that Okta was reevaluating its FY'26 growth targets.

27   For example, Citi issued an analyst report on September 1, 2022 stating:

28

---

OKTA delivered underwhelming results against tepid expectations, with perhaps the most objectively weak fundamental performance in all of cybersecurity we've seen this reporting season. Elevated sales capacity attrition stemming from Auth0 GTM integration challenges were exacerbated by an increasingly uncertain macro backdrop impacting business activity, which along with a continued spate of executive departures, and telegraphed risk to FY26 targets create a tough picture / fundamental set-up for the stock, despite ~5x EV/S'CY23E.

205.    As the market continued to digest the above disclosures, including, for example, as reflected in related analyst commentary and downgrades discussing the extent of the Auth0 integration issues and growth problems facing Okta, investors continued to react negatively to the news, causing the price of Okta's stock fell $8.55 per share, or ***over 12.3%***, to close at $60.60 by the close of trading on September 1, 2022.

## VII.    ADDITIONAL INDICIA OF SCIENTER

206.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Okta's and their materially false or misleading statements and omissions.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A.    The Auth0 Acquisition Was a Critical Transaction for the Company, and Its Successful Integration Was Essential to Okta's Growth

207.    The Individual Defendants' knowledge of the problems with the Auth0 Acquisition and subsequent integration failures can be inferred because these facts were critical to Okta's operations and growth.  Notably, the Company had to tie up a significant portion of its assets to complete the Auth0 Acquisition, where Okta paid approximately $6.5 billion in stock transaction that that represented, at the time, about 21% of the Company's market cap. Moreover, the Auth0 acquisition was expected to (and did) increase Okta's operating expenses significantly.

208.    The purpose of the Auth0 acquisition was for Okta to leverage Auth0's solutions and customer base to grow organically.  Moreover, as Okta noted in a press release dated March 3, 2021, the combination of the two companies was intended to "accelerate Okta's growth in the $55 billion identity market."

209.    Further, because of the serious competition in the identity and access management market, the Auth0 acquisition was crucial to the Company's continued viability as it represented an opportunity to eliminate a competitor and accelerate growth to become a profitable company.  For reference, Okta's primary competitor is Microsoft, who has the benefit of having significantly greater resources to deploy for sales and marketing and to make strategic acquisitions.  In addition, Okta also faces competition from smaller companies such as Ping Identity, who is a direct competitor of Auth0 operating in the identity management space.

210.    For these reasons, the integration of Auth0 was critical to Okta's success because Okta needed to efficiently integrate Auth0 or risk losing the benefit of the merger, specifically, to grow in the massive market for identity management products as its competitors continued to gain ground.

211.    For example, on May 26, 2021, during Okta's earnings call for the Company's first quarter financial results for fiscal year 2022, Defendant McKinnon explicitly stated that the integration Auth0 is "critical for the success of the company," stating:

> I think the points you mentioned are definitely part of the equation. I would add that a significant M&A integration is -- **the integration with Auth0 is very early, and it's very, very critical for the success of the company**. So experience with that, it will be helpful. And I also think just high-growth dynamic, adaptable to change, because one thing about our industry, we're defining the future of identity. We're working hard to make sure that identity has its rightful place as a primary cloud in the ecosystem of every organization in the world. And that's something that hasn't been done before. And past generations of technology, identity was really a part of other platforms. It was a part of Windows or it was a part of Oracle. We're making this first-class primary cloud, and that's different and unique. And so I think not just the CFO but the entire team has to be up for that challenge. And it's what invigorates me, and it's what invigorates the whole team. So that's an important part of it as well.

*        *        *

The competitive landscape has largely been vis-à-vis the major platform players like Google and Amazon and Microsoft, has largely been consistent the last 5 or 6 years. **Ever since Microsoft launched a product, I think -- it's going on now 7 years now, 7 or 8 years ago. And not -- for Okta, when they launched their competing product, it was scary at the time, but it was really the best thing that ever happened to us. It really validated this concept of identity being this primary system that people had to invest in.** So we haven't seen a change there. . . . The question about Auth0, the competitive dynamic on customer identity is really it's a build versus buy conversation. And one of the – if you think about the market's $30 billion, we're going to get to some of it with our low-code approach with Okta organic SIEM, but a lot of that $30 billion was -- would have gone to people building their own solutions. . . . So not only as Brett was saying that **the developer approach with Auth0 helped us in that $30 billion customer identity TAM. It also gives us a foothold to provide more customer value and sell more products then over time**.

212.    Further, during a *CNBC* interview on December 2, 2021, Defendant McKinnon again reaffirmed that the Auth0 acquisition was a "very critical part" of the Company, stating:

**Auth0 is the acquisition we completed a couple quarters ago and it's a very, very critical part of our company moving forward and that's because we are building the leading independent at scale identity company.** And that means we have to provide identity use cases for both employees who come to work login make it easy make it secure give your employees choice biology but also for customers. So, when your customers come to your website you're trying to launch new mobile app state competitive you're trying to build new products online identity is at the heart of that as well if you want to give your customers a great customer experience and a great secure experience Auth0 helps us do that. **So, the idea here is that companies have a lot of complexity and identity they're like how do I solve these problems how do what vendor is gonna help me who has the scale and the region that solve these problems for me and that [sic] that is Okta and Auth0 is a part of that**.

213.    In addition, Defendant McKinnon issued a post through his Twitter account on February 18, 2022 that included a short video clip from an "Okta Kickoff."  In the post, Defendant McKinnon states "We presented a lot of good content, but my favorite moment from the keynote might have been our epic exit…. [sic] because 'capturing an $80B market opportunity is just like riding a 3-person bike:  you can't do it alone."  Within the video clip, Eugenio Pace states "we started as two separate companies riding our own bikes.  Now we are

one company riding one bike."  In response, Defendant McKinnon states, "yeah . . . capturing an $80 billion opportunity is exactly like riding a three-person bike."

214.    Similarly, throughout the Class Period, analysts commented on how important Auth0 was to Okta's overall business.  For example, on March 3, 2022, Truist Securities issued an analyst report, stating "Okta's acquisition of Auth0, along with its platform centric approach and entry into the PAM and IAG markets, position Okta as the leading independent identity platform. We increase our revenue estimates and reiterate our Buy rating and $270 PT."

215.    Given the importance of the Auth0 acquisition to Okta's business, knowledge of the integration problems can therefore be imputed to the Individual Defendants.

**B.    Defendants' Personal Involvement in the Okta-Auth0 Integration Efforts Supports Their Scienter**

216.    The Individual Defendants were personally responsible for Okta's efforts to integrate Auth0, supporting a strong inference of scienter.  Indeed, there is no question that the Individual Defendants were directly and personally involved in the Auth0 acquisition and its integration efforts.

217.    For example, CW2, who was "intimately involved" with the Auth0 and Okta integration as a member of the "Tiger Team" and spent six or seven months putting together the integration plan, explained that the plan had been signed off on by senior executives from both Okta and Auth0 and that weekly calls occurred throughout the planning period.  CW2 explained that financial models, budgets, return on investment projections, etc. were also included in the planning process.  CW2 continued to say that current Okta CEO Todd McKinnon was the "executive sponsor" on the Okta side for the plan and current Okta President, Worldwide Field Operations Susan St. Ledger and current Okta Chief Revenue Officer Steve Rowland were involved in the weekly status updates.  CW2, explained that St. Ledger and Rowland "signed off on everything" and that neither her nor her team received any negative feedback throughout the process.  Accordingly, such CW statements indicate that senior executives, whose scienter is imputable to the Company, knew about significant Auth0 integration problems.

218.    According to CW3, there was an All-Hands Meeting led by current CEO Todd McKinnon every week that he treated like an "interview" and would have another member of the Company present, including members of leadership.  CW3 recalled that during three or four All-Hands Meetings that occurred in January/February 2022, McKinnon and a guest discussed the Auth0 acquisition.  CW3 added that she would have meetings with her sales group once or twice per week and additional one-on-one meetings with her superiors.

219.    CW5 indicated that Todd McKinnon held weekly all-hands team meetings during which integration issues were discussed.  According to CW5, initially, these discussions were more "organic," meaning that employees submitted questions in writing to which McKinnon responded, later, these meetings became far more scripted.  CW5 recalled that there were discussions during these meetings about problems making sales for Auth0.  CW5 described Auth0 as a premium, custom-designed product; while Okta's sales cycle was more rigorous and focused on customer education.

220.    Furthermore, Lead Plaintiff's investigation showed that Eugenio Pace remained Auth0's CEO and Co-Founder after Auth0 was acquired by Okta and for the majority of the Class Period and reported directly to Defendant McKinnon.  As the CEO of Auth0, there is no question that Pace would be aware of the integration issues described herein, especially the increased attrition for Auth0 employees.  Pace's strong relationship with Defendant McKinnon and their respective roles at Okta, further support an inference of scienter.  For reference, on June 21, 2021, Pace issued a blog post on Okta's website noting that he had known Defendant McKinnon for over eight years—since McKinnon approached Pace about a potential merger.

221.    Moreover, CW1 recalled that CEO Todd McKinnon had a relationship with former Auth0 CEO and current President of Customer Identity at Okta, Eugenio Pace. According to CW1 it was a regular joke at Auth0 that "Todd McKinnon tried to buy us again." CW1 advised that Pace reported to McKinnon.  CW1 went on to say that she was "confident" McKinnon and Pace were having discussions about the integration of Okta and Auth0.  CW1 also recalled hearing that the board was reviewing attrition figures in light of the companies'

1   cultural differences and was "very concerned."  CW1 clarified that this probably happened

2   around the fall of 2021.  Accordingly, Eugenio Pace's knowledge is imputable to Defendant

3   McKinnon.

4          222.    Defendants' direct involvement in the integration process thus supports a strong

5   inference of scienter.

6          223.    Additionally, CW accounts confirm that Defendants had access to Customer

7   Relationship Management tools that closely monitored sales to new customers.  For example,

8   CW5 explained that Okta used Salesforce, a Customer Relationship Management tool (CRM), to

9   track deal cycles, opportunities, contacts, contract terms, and related information.  CW5 added

10  that Auth0 had its own CRM tool.  CW5 confirmed that everyone, including Okta's senior

11  executives, could view opportunities in the CRM.  CW5 noted in particular that CEO Todd

12  McKinnon and former Auth0 president Eugenio Pace had access to the CRM information.  CW5

13  further indicated that one could figure out revenue from deals by analyzing the information in the

14  CRM.

15         **C.    Corporate Scienter**

16         224.    Further, Okta knowingly and/or with deliberate recklessness made, controlled, or

17  had ultimate authority over the materially false and/or misleading statements and omissions

18  alleged herein based on the fact that Individual Defendants knew and/or were deliberately

19  reckless in not knowing or disregarding that the Company's statements set forth in Section V

20  were materially false and/or misleading, and/or omitted material facts at the times that such

21  statements were made.  Each of the Individual Defendants was among the most senior employees

22  of the Company throughout the Class Period, was acting within the scope of their authority, and

23  was a member of the Company's senior management.  Their scienter may therefore be imputed

24  to the Company.

25         225.    Further, the scienter of other senior-level executives, including current Okta

26  President, Worldwide Field Operations Susan St. Ledger and current Okta Chief Revenue

27  Officer Steve Rowland, may be imputed to Okta under agency principles.  Finally, the scienter of

28

1  any other employees who ordered or approved the misstatements or their making or issuance, or

2  who furnished information or language for inclusion therein, or the like, may be imputed to the

3  Company

4  **D.    Defendants' Statements Themselves Support Scienter**

5  226.    Throughout the Class Period, Defendants spoke repeatedly on Okta's integration

6  with Auth0 and the unified sales organizations.  These false and misleading statements

7  themselves provide a strong inference that Defendants were aware of or, at the very least, were

8  reckless in not knowing that Okta was experiencing significant issues regarding the integration

9  of Auth0 and that the Company would not be able to maintain its high growth rate.  Accordingly,

10  Defendants breached their duty under the federal securities laws by speaking about these topics

11  and failing to disclose all relevant material information while doing so.

12  227.    For instance, in the December 1, 2021 Press Release, a quote is attributed to

13  Defendant McKinnon, stating "***We're maintaining the momentum of both Okta and Auth0 and***

14  ***are making great progress on the integration***."

15  228.    Defendants made similar assurances throughout the Class Period.  For example,

16  during an earnings call the same day, Defendant Kerrest commented on the companies' unified

17  sales teams, stating "We already are doing a lot of work around territory management, around

18  education, around getting all the new folks ramped on now the broader suite of products that

19  they're going to have to offer. But ***it's going very well***."  Similarly, on March 2, 2022, during the

20  Company's earning call reporting financial results for the fourth quarter of 2023, Defendant

21  Tighe touted the success of the Auth0 integration and the unified sales organizations, stating "***We***

22  ***are off to a great start and recognize there is still a lot of work to do***."

23  229.    Defendants' assurances to investors that they were "making great progress on the

24  integration" of Auth0 and their sales organizations—when they had been apprised of the

25  integration problems as previously described—demonstrate that they either knew that the

26  Company was experiencing substantial integration problems ***or*** were reckless in not knowing or

27

28

1    investigation that this was the case.  In either scenario, there is a strong inference that Defendants

2    made these statements with scienter.

3    **VIII.   CONTROL PERSON ALLEGATIONS**

4            230.    The Individual Defendants, by virtue of their high-level and controlling positions

5    at Okta, directly participated in the management of the Company, were directly involved in the

6    day-to-day operations of the Company at the highest levels and were privy to confidential

7    proprietary information about the Company, its business, operations, internal controls, growth,

8    financial statements, and financial condition as alleged herein. As set forth below, the materially

9    misstated information conveyed to the public was the result of the collective actions of these

10   individuals.

11           231.    Defendants McKinnon, Tighe, and Kerrest, as senior executive officers of Okta—

12   a publicly-held company whose common stock was, and is, traded on the NASDAQ, and

13   governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful

14   information with respect to the Company's business, operations, internal controls, growth,

15   financial statements, and financial condition, and to correct any previously issued statements that

16   had become materially misleading or untrue, so that the market price of Okta's publicly traded

17   common stock would be based on accurate information.  Each of the Individual Defendants

18   violated these requirements and obligations during the Class Period.

19           232.    Defendants McKinnon, Tighe, and Kerrest, because of their positions of control

20   and authority as senior executive officers of Okta, were able to and did control the content of

21   Okta's SEC filings, press releases, and other public statements issued by or on behalf of Okta

22   during the Class Period.  Each would have been provided with copies of the statements made in

23   the SEC filings at issue in this action before they were issued to the public and would have had

24   the ability to prevent their issuance or cause them to be corrected.  Accordingly, the Individual

25   Defendants were responsible for the accuracy of the public statements alleged herein.

26           233.    The Individual Defendants are liable as participants in a fraudulent scheme and

27   course of conduct that operated as a fraud or deceit on purchasers of Okta common stock by

28

1  disseminating materially false and misleading information and concealing and omitting material

2  adverse facts. The scheme deceived the investing public regarding Okta's business, operations,

3  and management, and the intrinsic value of Okta's common stock, and caused Lead Plaintiff and

4  members of the Class to purchase Okta common stock at artificially inflated prices.

5  **IX.    THE STATUTORY SAFE HARBOR IS INAPPLICABLE**

6        234.    The statutory safe harbor provided by the PSLRA for forward-looking statements

7  under certain circumstances does not apply to any of the materially false and misleading

8  statements alleged in this pleading.  First, many of the statements alleged to be false and

9  misleading relate to historical facts or existing conditions.  Second, to the extent any of the

10  allegedly false and misleading statements may be characterized as forward-looking, they were

11  not adequately identified as "forward-looking" statements when made.  Third, any purported

12  forward-looking statements were not accompanied by meaningful cautionary language because,

13  among other reasons, the risks that Defendants warned of had already come to pass.

14        235.    To the extent any statements alleged to be false and misleading may be construed

15  to discuss future intent, they are mixed statements of present or historical facts and future intent

16  and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the

17  statement that refers to the present.

18        236.    In addition, the PSLRA imposes an additional burden on oral forward-looking

19  statements, requiring Defendants to include a cautionary statement that the particular oral

20  statement is a forward-looking statement, and that "actual results might differ materially from

21  those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii).

22  Defendants failed to both identify certain oral statements as forward-looking and include the

23  cautionary language required by the PSLRA.

24        237.    Furthermore, Defendants did not accompany their statements with meaningful

25  cautionary language identifying important factors that could cause actual results to differ

26  materially from any results projected.  To the extent Defendants included any cautionary

27

28

language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested.

238.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Okta who knew that the statement was false when made.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

239.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Lead Plaintiff and other members of the Class purchased Okta's publicly traded Class A common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

240.    At all relevant times, the market for Okta shares was efficient for the following reasons, among others:

(a)    Okta's Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Okta filed periodic public reports with the SEC and the NASDAQ;

(c)    Okta regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d)    Okta was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

241.    As a result of the foregoing, the market for Okta's securities promptly digested current information regarding Okta from publicly available sources and reflected such information in Okta's securities price(s).  Under these circumstances, all persons and entities who or which purchased or otherwise acquired Okta's Class A common stock during the Class Period suffered similar injuries through their purchase of Okta common stock at artificially inflated prices and thus, the presumption of reliance applies.

242.    The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Okta common stock.

243.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Okta's Class A common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

244.    To the extent that Defendants concealed or improperly failed to disclose material facts with respect to Okta's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

XI.    CLASS ACTION ALLEGATIONS

245.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the publicly traded Class A common stock of Okta during the period from September 1, 2021 and September 1, 2022, inclusive, and were damaged thereby.  Excluded from the Class are Defendants; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); the officers and directors of the Company and its subsidiaries and affiliates during the Class Period; members of the immediate family of any excluded person; the legal representatives, heirs, successors, and assigns of any excluded person; and any entity in which any excluded person has or had a controlling interest.

246.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Okta had between approximately 153,050,000 and 158,870,000 million shares of common stock outstanding, which were actively traded on the NASDAQ.  The average daily trading volume during the Class Period was more than 2,455,659 million shares. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Okta or its transfer agent and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in securities class actions.

247.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

248.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

249.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

       (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

       (b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Okta;

       (c)    whether the prices of Okta's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

       (d)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

250.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expenses and burden of individual litigation make it practically impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

251.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed in Section X, *supra*.

252.    Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## FIRST CLAIM FOR RELIEF

### (For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

253.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

254.     This Count is asserted against Okta and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(b) promulgated thereunder by the SEC.

255.     During the Class Period, Okta and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded or were deliberately reckless in disregarding were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

256.     Okta and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

257.     Okta and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Okta were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Okta, their control over, and/or receipt and/or modification of Okta's allegedly materially misleading statements, and/or their associations with the Company which made them privy to material concerning Okta, participated in the fraudulent scheme alleged herein.

258.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the

1  Class, or, in the alternative, acted with reckless disregard for the truth when they failed to

2  ascertain and disclose the true facts in the statements made by them or other Okta personnel to

3  members of the investing public, including Lead Plaintiff and the Class.

4       259.    As a result of the foregoing, the market price of Okta securities was artificially

5  inflated during the Class Period. In ignorance of the falsity of Okta's and the Individual

6  Defendants' statements, Lead Plaintiff and the other members of the Class relied on the

7  statements described above and/or the integrity of the market price of Okta securities during the

8  Class Period in purchasing Okta securities at prices that were artificially inflated as a result of

9  Okta's and the Individual Defendants' false and misleading statements.

10       260.    Had Lead Plaintiff and the other members of the Class been aware that the market

11  price of Okta securities had been artificially and falsely inflated by Okta's and the Individual

12  Defendants' misleading statements and by the material adverse information which Okta's and the

13  Individual Defendants did not adequately disclose to market professionals, they would not have

14  purchased Okta's securities at the artificially inflated prices that they did, or at all.

15       261.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other

16  members of the Class have suffered damages in an amount to be established at trial.

17       262.    By reason of the foregoing, Okta and the Individual Defendants have violated

18  Section 10(b) of the 1934 Act and Rules 10b-5(b) promulgated thereunder and are liable to the

19  Lead Plaintiff and the other members of the Class for substantial damages which they suffered in

20  connection with their purchase of Okta securities during the Class Period.

21                          **SECOND CLAIM FOR RELIEF**

22               **(For Violation of Section 20(a) of the Exchange Act**

23                    **Against the Individual Defendants)**

24       263.    Lead Plaintiff repeats and realleges each and every allegation contained in the

25  foregoing paragraphs as if fully set forth herein.

26       264.    During the Class Period, the Individual Defendants participated in the operation

27  and management of Okta. The Individual Defendants conducted and participated, directly and

28

indirectly, in the conduct of Okta's business affairs. Because of their senior positions, they knew the material information regarding the Company's operations including in its clinical trial program.

265.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Okta's financial condition and results of operations, and to correct promptly any public statements issued by Okta which had become materially false or misleading.

266.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Okta disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Okta to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Okta within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Okta securities.

267.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Okta.

## XII.   REQUEST FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment on behalf of itself and the Class, as follows:

        (a)   Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

        (b)   Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

1            (c)      Awarding Lead Plaintiff and the Class their reasonable costs and expenses

2                    incurred in this action, including counsel fees and expert fees; and

3            (d)      Such other and further relief as the Court may deem just and proper.

## XIII.   JURY DEMAND

Lead Plaintiff demands a jury trial as to all issues so triable.

Dated: October 13, 2022            Respectfully submitted,

By:  */s/ Michael P. Canty*
Michael P. Canty (*pro hac vice*)
Thomas G. Hoffman, Jr. (*pro hac vice*)
Charles J. Stiene (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mcanty@labaton.com
thoffman@labaton.com
cstiene@labaton.com

*Attorneys for Lead Plaintiff and the Class*

James M. Wagstaffe (#95535)
Frank Busch (#258288)
**WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**
100 Pine Street, Suite 2250
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 371-0500
Email: wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for the Class*