Michael P. Canty (*pro hac vice*)
Thomas G. Hoffman, Jr. (*pro hac vice*)
Nicholas Manningham (*pro hac vice*)
Charles J. Stiene (*pro hac vice*)

**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mcanty@labaton.com
thoffman@labaton.com
nmanningham@labaton.com
cstiene@labaton.com

*Attorneys for Lead Plaintiff and the Class*

James M. Wagstaffe (#95535)
Frank Busch (#258288)

**WAGSTAFFE, VON LOEWENFELDT,
BUSCH & RADWICK, LLP**
100 Pine Street, Suite 2250
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 371-0500
Email: wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for the Class*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE OKTA, INC. SECURITIES LITIGATION | Case No.: 3:22-cv-02990-SI **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** CLASS ACTION **HEARING**: Date:   March 10, 2023 Time   10:00 a.m. Judge:  Hon. Susan Illston Courtroom:   1, 17th Floor |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................................iii

STATEMENT OF ISSUES TO BE DECIDED ...............................................................................1

I.    INTRODUCTION ................................................................................................................1

II.   STATEMENT OF FACTS ...................................................................................................4

      A.    Okta is a Growth Company that Provides Data Security Services .............................4

      B.    Unbeknownst to Investors, Okta Lost Senior Employees Immediately After
            the Auth0 Acquisition ...............................................................................................5

      C.    Okta's Integration Issues Escalate ...........................................................................6

      D.    Unbeknownst to Investors, Okta Employees Struggled to Sell Auth0 Products .........7

      E.    While Defendants Experienced Problems Integrating Auth0, the Company
            Experienced a Data Security Breach..........................................................................7

      F.    The Truth Regarding Okta's Integration Issues and Inability to Maintain
            Customer Trust is Revealed .....................................................................................10

III.  ARGUMENT .....................................................................................................................11

      A.    The Complaint Adequately Pleads Falsity................................................................11

            1.    Defendants Made False and Misleading Statements Regarding the
                  Auth0 Integration .........................................................................................12

                  (a)    The Complaint's CW Allegations Demonstrate the Falsity of
                         Defendants' Statements About the Auth0 Integration .......................13

                  (b)    Defendants' Statements Are Not Mere Corporate Optimism or
                         Opinions ........................................................................................14

                  (c)    Defendants' Risk Disclosures Regarding the Auth0 Integration
                         Were False and Misleading...............................................................16

                  (d)    Defendants' Truth-on-the-Market Defense Fails ...............................17

            2.    Defendants Made False and Misleading Statements Relating to Okta's
                  Inadequate Data Security Practices and the January 2022 Breach ...............18

                  (a)    Statements Regarding Data Security.................................................18

                  (b)    Risk Factor Disclosure Regarding Data Security.............................20

                  (c)    McKinnon's June 8, 2022 Misstatements .......................................23

B.      The Complaint Adequately Pleads Scienter...............................................................24

    1.      The Complaint's CW Allegations Plead a Strong Inference of Scienter.......25

        (a)      The CW Allegations Support an Inference of Scienter with Respect to the Auth0 Integration Misstatements ..............................27

        (b)      The CW Allegations Support an Inference of Scienter with Respect to the Data Security Misstatements ....................................28

    2.      The Core Operations Doctrine Supports Scienter........................................30

        (a)      The Auth0 Acquisition and Successful Integration Were Critical to Okta's Success and Growth ..............................................30

        (b)      Data Security and Customer Trust Were Critical to Okta's Survival .......................................................................................32

    3.      Defendants' Statements Themselves Support Scienter.................................32

    4.      The Complaint Pleads Corporate Scienter ..................................................34

    5.      Viewing Allegations Holistically, Defendants' Innocent Inference Fails............................................................................................................34

CONCLUSION ............................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
    340 F.3d 1083 (9th Cir. 2015)..................................................................................................33-34

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ......................................................................................................21-23

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........................................................................ 34

*Anderson v. Peregrine Pharms. Inc.*,
    2013 WL 4780059 (C.D. Cal. Aug. 23, 2013)........................................................................ 31

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017).................................................................................................... 11

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008).............................................................................................. 12, 31

*In re BioMarin Pharm., Inc. Sec. Litig.*,
    2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ............................................................................ 34

*Bos. Ret. Sys. v. Uber Techs, Inc.*,
    2020 WL 4569846 (N.D. Cal. Aug. 7, 2020)......................................................................... 17

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
    660 F.3d 1170 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) .................................................. 17

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................. 17

*In re Diebold Nixdorf, Inc. Securities Litigation*,
    2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ...................................................................... 27

*In re Extreme Networks, Inc. Sec. Litig.*,
    2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)....................................................................... 12

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) ..................................................................... 12, 14, 28

*In re Intrexon Corp. Securities Litigation*,
    2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ......................................................................... 26

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)................................................................................................................. 18

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018)..................................................................................................22-23

*Kovtun v. VIVUS, Inc.*,
  2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ................................................................ 30

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ........................................................................................ 28

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................... 11, 27

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) .......................................................................... 33

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................................. 15

*In re Nash Finch Co. Sec. Litig.*,
  502 F. Supp. 2d 861 (D. Minn. 2007) ............................................................................ 13

*Nguyen v. Radient Pharms. Corp.*,
  946 F. Supp. 2d 1025 (C.D. Cal. 2013) .......................................................................... 17

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) .......................................................................................... 35

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ........................................................................................ 13

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................................................................................. 16, 24

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) .................................................................................... 24, 29

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ........................................................................................ 17

*In re Qualcomm Inc. Sec. Litig.*,
  2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ................................................................ 33

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ................................................................................. *passim*

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ...................................................................... 11, 19

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ............................................................................... 30, 31, 32

*Robb v. Fitbit, Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) .................................................................. 32

*Roberts v. Zuora, Inc.*,
  2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ..................................................... 14, 25, 26

*S. Ferry LP # 2 v. Killinger*,
　399 F. Supp. 2d 1121 (W.D. Wash. 2005),
　*vacated in part on other grounds*, 542 F.3d 776 (9th Cir. 2008)............................................ 18

*S. Ferry LP, # 2 v. Killinger*,
　542 F.3d 776 (9th Cir. 2008)..............................................................................................24-25

*S. Ferry LP #2 v. Killinger*,
　687 F. Supp. 2d 1248 (W.D. Wash. 2009)........................................................................... 33

*Schueneman v. Arena Pharms., Inc.*,
　840 F.3d 698 (9th Cir. 2016)........................................................................................ 11, 24

*Siracusano v. Matrixx Intiatives, Inc.*,
　585 F.3d 1167 (9th Cir. 2009)...................................................................................... 16, 23

*In re STEC Inc. Sec. Litig.*,
　2011 WL 2669217 (C.D. Cal. June 17, 2011) ..................................................................... 18

*Tellabs Inc. v. Makor Issuers & Rights, Ltd.*,
　551 U.S. 308 (2007)............................................................................... 10, 24, 25, 34

*Thomas v. Magnachip Semiconductor Corp.*,
　167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................................................. 33

*Turocy v. El Pollo Loco Holdings, Inc.*,
　2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)............................................................. 11, 15

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
　2017 WL 3097184 (N.D. Cal. June 22, 2017) ..................................................................... 14

*In re VeriFone Holdings, Inc. Sec. Litig.*,
　704 F.3d 694 (9th Cir. 2012)..............................................................................................32-33

*Warshaw v. Xoma Corp.*,
　74 F.3d 955 (9th Cir. 1996)............................................................................................. 11

*Zucco Partners, LLC v. Digimarc Corp.*,
　552 F.3d 981 (9th Cir. 2009).......................................................................................... 26

**Statutes**

15 U.S.C. § 78u–4(b)(1)(B) ......................................................................................... 11

15 U.S.C. § 78u-4(b)(2)(A)............................................................................................ 24

Exchange Act Section 10(b), 15 U.S.C. §78j(b)............................................................. 11

PSLRA, Pub. L. 104–67, 109 Stat. 737 (1995)............................................................. 24

**Rules**

Rule 10b–5, 17 C.F.R. § 240.10b-5 ........................................................................ 11

Court-appointed Lead Plaintiff Nebraska Investment Council ("Lead Plaintiff") respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss Amended Complaint (ECF No. 56).[1]

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Complaint alleges facts that, considered holistically, state claims under §10(b) and Rule 10b-5 promulgated thereunder, including that Plaintiffs adequately pled falsity and scienter, and §20(a), i.e., the Individual Defendants' control person liability.

## I.    INTRODUCTION

This securities fraud action arises from Defendants' repeated efforts to hide the truth about Okta's business from investors. First, Defendants misled investors about Okta's efforts to integrate Auth0, Inc. ("Auth0"), a highly touted acquisition that Defendants claimed would accelerate Okta's growth in the lucrative customer identity and access management ("CIAM") market and sustain the Company's high growth rate. But to do that, Okta needed to succeed in integrating Auth0 and retaining its employees. That did not happen. Shortly after the acquisition, and before the Class Period, Okta started losing an alarming number of Auth0 employees, including salespeople and many senior-level executives with invaluable knowledge of Auth0's business and go-to-market strategy. Worse, sales of Auth0 products began grinding to a halt because Okta's salespeople were not knowledgeable about or trained to sell Auth0 products but were told to do so anyway. At one point during the Class Period, Defendants had to scrap the original integration plan and start from scratch.

Despite these substantial setbacks, Defendants said nothing of the challenges they faced and instead publicly touted Okta's integration efforts—portraying it as a roaring success with no complications. For example, Defendants claimed they were "***making great progress on the integration***," that the integration was "***going very well***," and had "***already made a lot of progress***." This was false because, by that point, Okta had already lost key Auth0 employees, including several high-level executives. Nonetheless, throughout the failed integration, Defendants continued telling

---

[1] Capitalized terms herein have the same meaning as set forth in the Amended Class Action Complaint (ECF No. 48) (the "Complaint"). Citations to "¶ __" refer to paragraphs of the Complaint. References to "MTD at __" are to the Defendants' Notice of Motion and Motion to Dismiss Amended Complaint; Memorandum of Points and Authorities in Support Thereof (ECF No. 56).

investors that everything was great, and did not even hint that they had experienced significant integration challenges. Indeed, Defendants did the opposite—falsely warning investors of the hypothetical risk that they "*could*" lose key Auth0 employees when that risk had already occurred.

Then, while Defendants were struggling with the Auth0 integration—which investors knew nothing about—hackers gained unauthorized access to Okta's systems in January 2022 (the "January 2022 Breach"). Although Defendants knew about the breach in January (and were aware of at least one other data security breach since October 2021), they hid it from the public for as long as possible. For example, on March 7, 2022, Defendants warned investors that their data security practices "*may* allow unauthorized access to [Okta's] systems or data or customers' data," when such a risk had already occurred less than two months prior. Investors finally learned the truth on March 21, 2022, when the hackers responsible for the January 2022 Breach posted screenshots online showing what they claimed was Okta's internal company environment. Forced to come clean, Defendant McKinnon responded the next day and admitted that Defendants knew about the breach in January. Soon thereafter, Okta struggled to obtain new customers, as potential customers lost faith in Okta for failing to disclose the breach promptly and only admitting that there was a breach after hackers publicly exposed the Company.

Faced with compelling and particularized allegations of securities fraud, Defendants attempt to frame this case as yet another in a long line of data breach cases that have been dismissed. Defendants are wrong. This case is about more than the January 2022 Breach. First, the Complaint clearly alleges that *in addition to* misleading investors about the January 2022 Breach, Defendants also misled investors about the Auth0 integration.[2] Thus, this case is distinguishable from the cases Defendants rely on in support of their argument for dismissal. As explained in more detail below, the Complaint adequately alleges claims for securities fraud under both the integration and data security theory, and Defendants' attempt to avoid liability for such misstatements fail.

---

[2] Defendants claim that Lead Plaintiff "pivoted to devise a completely different theory" of fraud from the original complaint. MTD at 1. However, as this Court knows, Court-appointed Lead Plaintiff and Lead Counsel are different than the plaintiff and counsel that filed the original complaint. After the Court appointed class leadership in this Action, *see* ECF No. 39, Lead Plaintiff and Lead Counsel engaged in an extensive investigation that uncovered allegations of fraud related to both the Auth0 integration and data security theories.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    2
AMENDED COMPLAINT
CASE NO.: 3:22-CV-02990-SI

Defendants first argue that the Complaint fails to plead a material misstatement under either theory. Again, Defendants are wrong. For the integration statements, the Complaint adequately alleges that Defendants misled investors by conveying to them that the implementation was a success when, in reality, they experienced significant, project-altering challenges from the start that impacted the Company's sales. Contrary to Defendants' arguments, the challenged misstatements are not merely corporate optimism or opinions because they were unqualified, concrete assurances about the existing state of the Auth0 integration that were highly material to investors. Indeed, analysts routinely asked about the Auth0 integration and issued reports discussing the importance of it for Okta, stating, for example, that Okta "must show that it can integrate [Auth0], retain the Auth0 team and know-how, and, most importantly, successfully execute two different go-to-market strategies with two different product platforms." Moreover, Defendants cannot hide behind their purported risk disclosures about the Auth0 integration because they only warned of ***potential*** risks when Defendants knew those risks had already come to fruition. As such, the so-called risk disclosures do not protect Defendants from liability.

As for the data security statements, the Complaint adequately alleges that Defendants misled investors about the Company's data security practices and failed to disclose the January 2022 Breach until they were forced to do so. For example, although Defendants knew about the breach in January, they issued a misleading risk disclosure on March 7, 2022, telling investors that there ***may*** be unauthorized access to their systems when, in reality, they knew that risk had already materialized. Perhaps recognizing this risk disclosure was misleading, Defendants argue that they had no duty to disclose the breach because it was immaterial. Not so. The breach was highly material to investors because, as a data security company, protecting its customers from data security breaches and maintaining customer trust was critical to Okta's success. Indeed, Defendants admitted this, stating that the Company's number one priority was customer trust and that "[n]othing matters more than customer trust." Likewise, Okta's customers and investors alike were alarmed by the cover-up of the breach and noted the impact it would have on the Company's reputation in the data security industry.

Defendants then argue that even if they misled investors, they should not be held liable because the Complaint pleads no facts giving rise to a strong inference that any Defendant acted with

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AMENDED COMPLAINT
Case No.: 3:22-CV-02990-SI

3

scienter. Defendants' arguments are unpersuasive. For example, regarding the integration statements, Defendants argue they knew ***nothing*** about the Auth0 integration challenges, despite the fact that they paid $6.5 billion for Auth0—which represented 21% of Okta's market capitalization at that time—and despite the fact that Defendants consistently explained to investors that "the integration with Auth0 is . . . very, very critical for the success of the company." This is simply not plausible.

The more plausible inference—and the correct one—is that Defendants knew of the Auth0 integration challenges given the importance of the acquisition. This inference is further supported by CW allegations demonstrating Defendants participated in weekly calls discussing the integration challenges. Moreover, Defendants routinely discussed the progress of the Auth0 integration, often in response to direct questions from analysts. Thus, Defendants either knew the integration was failing and still made positive statements to the market or did not know about the status of the integration and nonetheless recklessly told investors that everything was going great. Either way, the Complaint establishes that Defendants made the integration statements with the requisite scienter.

Defendants' scienter arguments regarding the data security statements are even less plausible, as Defendants themselves admitted they knew about the breach in January 2022—two months before they were forced to disclose it. Indeed, on March 22, 2022, McKinnon admitted that in late January 2022, Okta "detected" and "investigated" the breach. Moreover, the Complaint's CW allegations contribute to a strong inference of scienter, as they allege that Defendants attended weekly meetings where the January 2022 Breach was discussed. Based on these well-pled facts, the Court should swiftly reject Defendants' scienter arguments.

For all these reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.

## II.    STATEMENT OF FACTS

### A.    Okta is a Growth Company that Provides Data Security Services

Okta is a data security company that provides identity and access management ("IAM") software that purportedly helps companies secure user authentication for applications and allows developers to build identity controls into applications and devices. ¶¶2, 47. The Company's flagship product, the Okta Identity Cloud, is marketed as a one-stop solution that provides identity solutions for an organization's workforce and its customers. *Id.*

Okta is a growth company, meaning it prioritizes growth over profit. ¶51. Although it has yet to report a profit as a public company, Okta has garnered investor attention over the past few years by reporting impressive revenue and year-over-year growth. *Id.* As part of its growth plan, Okta acquired Auth0 in May 2021 to sustain its high rate of growth. ¶58. Auth0 provided CIAM software, as opposed to the IAM software that Okta primarily provided for an employer's workforce. ¶5. Thus, according to Defendants, the Auth0 acquisition was an opportunity to grow Okta's business in the lucrative CIAM market and "accelerate Okta's growth in the $55 billion identity market." *Id.*, ¶¶58-59. As such, the Auth0 acquisition and successful integration were, as Defendant McKinnon repeatedly told investors, "very critical for the success of the company." ¶¶211-12.

Investors embraced the acquisition as a growth opportunity but understood that the successful integration of Auth0 required the retention of Auth0 employees who could help sell Auth0's CIAM software. ¶62. For example, a JMP analyst noted that Okta "must show that it can integrate these businesses, retain the Auth0 team and know-how, and, most importantly, successfully execute two different go-to-market strategies with two different product platforms." *Id.*

**B.    Unbeknownst to Investors, Okta Lost Senior Employees Immediately After the Auth0 Acquisition**

Immediately after the acquisition of Auth0, Okta began losing senior employees. ¶63. According to CW1, who was part of the Okta M&A team, many senior Auth0 employees departed after the acquisition while others were put into roles they did not want or were below the level of seniority they held at Auth0. *Id.* CW1 added that Eugenio Pace—Auth0's CEO and Co-Founder who remained as Okta's President of Customer Identity after the acquisition—explained in an internal letter that senior leadership was leaving the Company around August 2021, including Auth0's Chief Legal Officer ("CLO"), Chief Human Resources Officer ("CHRO"), and Chief Financial Officer ("CFO"). ¶65. Similarly, CW5 noted that 75-80% of Okta's VPs and SVPs were "pushed out" of the Company, and CW6 recalled there was a "mass exodus" of salespeople—both Okta and Auth0 employees—around fall 2021. ¶¶67-68.

CWs 1, 2, 4, and 5 confirmed that there was a mass exodus of employees from the Company. ¶¶89-92. Specifically, CWs 1 and 2 confirmed that there were very few Auth0 employees left at the

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS                    5
AMENDED COMPLAINT
CASE NO.: 3:22-CV-02990-SI

Company. ¶¶89, 92. Indeed, CW4 explained that so many employees had left since the acquisition closed that Okta began offering a retention bonus to employees that stay at Okta. ¶91.

The loss of senior Auth0 employees, along with key Okta employees, jeopardized the plan for a successful integration from the outset of the acquisition. ¶69. Nevertheless, Defendants concealed the loss of these senior Auth0 employees from investors, while at the same time touting that the progress of the integration. ¶9. For example, in a September 1, 2021 Okta press release, Defendant McKinnon touted that the Auth0 integration was "off to a fantastic start" and, on an Okta earnings call that day, McKinnon stated that the Company had "already made a lot of progress." ¶¶134-35.

### C.    Okta's Integration Issues Escalate

The severe problems with the Auth0 integration worsened throughout the Class Period, as Auth0 employees continued to leave Okta and the Company was forced to scrap its original integration plan. ¶77. According to CW2, a former Okta employee who was deeply involved with the integration of Auth0, the original integration plan involved keeping the Auth0 employees on as "specialists" who would exclusively sell Auth0 products and help train Okta employees on Auth0's product for approximately one year. ¶79. During this time, Okta employees would continue selling Okta products with additional sales staff brought on to help meet goals. *Id.*

However, the original integration plan was "ripped out" at the "eleventh hour" by Okta's finance team in late 2021 because there was "no way" that the integration plan was "humanly possible" for FY2024. ¶81. CW2 explained that instead of hiring additional sales staff and keeping 200 to 300 Auth0 employees on as "specialists," the Auth0 employees would be "generalists" that were expected to sell Okta products and Auth0 products (and the Okta employees were expected to sell both products). *Id.* CW2 added that Okta and Auth0 employees did not have knowledge of, nor did they receive training or education on, each other's products. ¶82. CW2 recalled being informed of the decision to scrap the integration plan around December 2021, but employees were not informed until several weeks later, in approximately mid-January 2022, just two weeks before the integration was supposed to go into effect. ¶83.

However, Defendants did not so much as hint at any integration challenges. Rather, amid this integration nightmare, Defendants continued to reassure investors about the integration using nearly

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    6
AMENDED COMPLAINT
CASE NO.: 3:22-CV-02990-SI

identical language despite facing increasingly dire circumstances. For example, on December 1, 2021, Defendant McKinnon continued to assure investors that "*We're . . . making great progress on the integration*." ¶84. During an earnings call on the same day, Defendants Kerrest and McKinnon assured investors that Okta and Auth0's sales teams would be fully integrated by February 1, 2022 and reiterated that the integration was "*going very well*," and that the Company was "*off to a great start*." ¶85.

> **D.      Unbeknownst to Investors, Okta Employees Struggled to Sell Auth0 Products**

The combination of the loss of Auth0 employees and Okta's last second decision to create one unified sales team, which forced Okta and Auth0 employees to sell each other's products without proper training, led to significant sales challenges. ¶87. While Okta and Auth0 offered similar products, Auth0's products were inherently different, given their developer focus and customizability. ¶69. According to CW6, Auth0 had a completely different platform that was like "night and day" compared to Okta. ¶68. Similarly, CW3 explained that Okta's product was designed to be a one-size fits all or "out of the box" offering; where Auth0's customers were "developer heavy" and offered a much more customizable CIAM product. ¶88.

As a result, the remaining Okta employees had difficulty selling Auth0's products. For example, CW3 stated that nobody was selling Auth0 products. ¶88. CW3 noted that she received her "module" of accounts in February 2022 at the start of the fiscal year and following the integration of Auth0 sales staff. *Id.* CW3 explained that everyone in sales was "struggling," and she only managed to achieve 20% of her quota during Okta's first quarter for fiscal year 2023 and only one or two team members did better. *Id.*

> **E.      While Defendants Experienced Problems Integrating Auth0, the Company Experienced a Data Security Breach**

While Okta was trying to deal with the failure of the Auth0 integration, the Company experienced a significant data security breach that was caused by Okta's failure to secure its administrative tools, such as the "SuperUser" tool, for monitoring customer tenants. *See* ¶¶98-104.

CW6 explained that Okta's SuperUser tool allowed pre-sale engineers and customer support employees to control and monitor customer tenants. ¶98. CW6 stated that the SuperUser tool provided

access to any customer in any Okta tenant anywhere in the world. *Id.* Despite this higher level of access, Defendants did not have adequate data security measures in place for controlling different cloud tenants for the Company's identity solutions. For example, CW6 explained that there was no formal request or vetting process for becoming a SuperUser. ¶99. Similarly, CW7 stated that it was too easy for anyone to access these administrative tools and recalled that there was no process to verify that a SuperUser was who they claimed to be. ¶102.

CW6 stated that the SuperUser tool should have been more closely guarded against hackers. ¶100. CW6 advised that such a powerful tool "should be sandboxed," or there should have been some strong role-based access control, or both. *Id.* CW6 explained that typically, employees should only be able to access such a tool from a secure administrative station rather than from their home laptop. *Id.* CW6 explained that a designated administrative station could be more closely guarded and alert people if it is compromised. *Id.* CW6 explained that these controls could have caused the application to shut down or somehow obfuscated the information if it detected an intruder. *Id.* CW6 explained that such safeguards are "best practice" in the industry. *Id.*

CW6 stated, as an example, that if a system is not sandboxed, a hacker may be able to access the system by breaching a user's VPN account. ¶101. Moreover, CW6 explained that, if a hacker breached the SuperUser tool, a hacker could create a new user on the customer's system and give them admin access, shut down a user or application, or give or take away access to certain features within a customer's system. *Id.*

Moreover, Okta failed to require third parties, such as sub-processors and Solutions Engineers, to comply with the data security requirements that are fundamental to Okta's business. ¶103. Okta adopted, and strongly recommended that its customers adopt, a "Zero Trust" data security architecture. *Id.* According to Okta's website:

> Zero Trust security throws away the idea that we should have a 'trusted' internal network and an 'untrusted' external network. The adoption of mobile and cloud means that we can no longer have a network perimeter-centric view of security; instead, we need to securely enable access for the various users (employees, partners, contractors, etc.) regardless of their location, device or network.

*Id.* Okta also obviously pushes its IAM solutions on customers—which include the combination of technical systems, policies, and processes that create, define, and govern the utilization and safeguarding of identity information. *Id.* However, Okta did not require its sub-processors to confirm that they comply with the Company's data security requirements. *Id.*

As a result, on January 21, 2022, hackers known as LAPSUS$ were able to access Okta resources after they compromised one of the Company's third-party support vendors, Sykes, a subsidiary of Sitel (the January 2022 Breach). ¶104. Specifically, LAPSUS$ was able to access Okta resources and view information from the Company's active customer tenants, i.e., a customer's space within Amazon Web Services. ¶¶98, 104. Defendants did not disclose the breach for nearly two months. ¶104. Then, on March 21, 2022, the hackers posted screenshots on a blog claiming to have accessed Okta's internal systems and Defendants were forced to come clean. ¶105. The next day, March 22, 2022, Defendant McKinnon confirmed that the Company had been breached and admitted that Okta had known about it since January 2022. ¶106. On this news, Okta's stock price declined 1.76%. ¶107.

The following day, the market continued to digest this news through articles and analyst reports. ¶14. Multiple news outlets, including *CNN*, reported that hundreds of Okta's clients were potentially affected by the January 2022 Breach. *Id.* In addition, Raymond James downgraded Okta from "strong buy" to "market perform," noting that "the handling of its latest security incident adds to our mounting concerns." ¶15. As a result, investors continued to react negatively, causing Okta's stock price to decline ***over 10%*** on March 23, 2022. ¶16.

Soon thereafter, Defendants engaged in damage control efforts, including public apologies for their lack of transparency and calling hundreds of customers in a vain attempt to regain their trust. ¶17. But Okta struggled to obtain new customers as a result of the negative reputational impact the Company suffered due to the January 2022 Breach. ¶¶113-114. Specifically, potential customers lost faith in Okta for failing to disclose the breach promptly, and only admitting there was a breach after hackers publicly exposed it. ¶17.Thus, Okta lost sales as a direct result of the January 2022 Breach, which only compounded the sales issues that Okta was experiencing from the Auth0 acquisition and integration issues. ¶18.

Nevertheless, Defendants assured investors that Okta was able to maintain customer trust. ¶19. For example, on June 8, 2022, Defendant McKinnon was interviewed by Jim Cramer, who asked about Okta's ability to maintain trust with its customers after the January 2022 Breach. *Id.* In response, Defendant McKinnon stated:

> We talked to over 1000 customers face to face over, over video and had these conversations. I personally talked over 400. And got a ton of feedback about what we could do better, how we could make sure that our support environment was not insecure, to make sure that we communicate better, to make sure that we are instill this trust. ***At the end of the [sic], I think we've been able to do that.***

*Id.*

### F.    The Truth Regarding Okta's Integration Issues and Inability to Maintain Customer Trust is Revealed

The truth fully emerged on August 31, 2022, during Okta's earnings call for its second quarter of fiscal year 2023. ¶20. During the call, Defendants finally disclosed the severe problems with the Auth0 integration. *Id.* For example, Defendant McKinnon revealed that Okta's second quarter financial results were "mixed" due to challenges related to the integration of Auth0 and Okta sales organizations. *Id.* Specifically, McKinnon stated that Okta "experienced ***heightened attrition*** within the go-to-market organization as well as some confusion in the field, both of which have impacted our business momentum." *Id.* Defendant McKinnon later elaborated on other issues related to the integration of the companies' sales teams, noting that Okta employees had trouble selling products in Auth0's portfolio and vice versa. *Id.* Critically, Defendant Tighe confirmed that Okta was reevaluating its FY'26 growth targets and emphasized that the Company was also lowering its calculated billings "by approximately $140 million due to the outlook headwinds outlined earlier." ¶21. On this news, Okta's stock price fell dramatically overnight by ***over 24.3%***. ¶22.

The next day, Defendant McKinnon was interviewed on TechCheck, where he confirmed that Okta had to sort through near-term challenges, such as sales to new customers, before they could meet their revenue target. ¶23. As investors and analysts continued to digest this news, the price of Okta's stock fell an additional ***12.3%*** on September 1, 2022. ¶24.

III.    ARGUMENT

On a "motion to dismiss a § 10(b) action, courts must . . . consider the complaint *in its entirety*." *Tellabs Inc. v. Makor Issuers & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court must "accept[] the plaintiff's allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 729 (N.D. Cal. 2022). "Even under the [PSLRA], plaintiffs are only required to plead facts, not to produce admissible evidence." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, the plaintiff must allege: "(1) a material misrepresentation or omission [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017). Here, Defendants only challenge falsity and scienter and thus concede the remaining elements. As demonstrated below, the Complaint adequately alleges falsity and scienter. The Court should deny Defendants' motion to dismiss in its entirety.

A.    The Complaint Adequately Pleads Falsity

A complaint pleads falsity when it "specif[ies] each statement alleged to have been [false and] misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). A public statement is "materially false or misleading" if it is "inconsistent with" internal information. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). "[O]nce defendants cho[o]se to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). A court should dismiss a complaint "*only if* reasonable minds could not disagree that the challenged statements were not misleading." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996). Otherwise, "at the motion to dismiss stage the Court draws a reasonable inference that Plaintiffs' interpretation of [a statement] is correct." *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 n.2 (C.D. Cal. Aug. 4, 2017).

Here, the Complaint's specific allegations plausibly establish that Defendants intentionally made material misstatements and omissions regarding: (1) the Auth0 integration (¶¶134-36, 138, 140, 142, 150-51, 153, 155-57, 162-63, 165); and (2) Okta's data security (¶¶143, 145, 159, 167-68).

### 1. Defendants Made False and Misleading Statements Regarding the Auth0 Integration

Throughout the Class Period, Defendants repeatedly represented that they were "making great progress" on integrating Auth0 and told investors that things were "going very well" at every stage of the integration. *See* ¶¶135, 140, 150-51, 162. However, these statements were false and misleading because the integration was not "going very well." For example, soon after the close of the acquisition, Okta began experiencing severe problems integrating Auth0, including losing several senior Auth0 employees. ¶¶65-69. Then, in December 2021, Defendants scrapped Okta's initial integration plan— i.e., keeping Auth0 employees as "specialists" to help train Okta employees while exclusively selling Auth0 products—for a new plan where all employees were forced to sell Auth0 and Okta products with no training. ¶¶77, 79, 81-82. As a result, everyone in sales was struggling and, according to CW3, no one was successfully selling Auth0's products. ¶88.

After February 1, 2022, when the sales forces were supposed to be "fully" integrated, Defendants continued misleading investors by touting the success of the purportedly "unified" sales force, stating, "[W]e're getting synergy on the . . . sales side." ¶157. But, again, this was not true. In reality, Okta did not see the "synerg[ies] . . . on the sales side," as the heightened attrition, combined with Okta's last-minute shift in integration strategy, harmed the Company's sales effort. ¶88. Therefore, Defendants' statements about the Auth0 integration were false and misleading because they gave an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

Contrary to Defendants' arguments, *see* MTD at 16-20, courts routinely find similar statements to be actionable. *See In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *17 (N.D. Cal. 2018) (statements that integration was "on track" held materially misleading in light of multiple CW accounts confirming the opposite); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1158-59 (N.D. Cal. Mar. 21, 2015) (statements that defendants were "in line with

[their] expectations" and that their yields were "on target" held materially false and misleading because several CWs confirmed that they were "struggling" to improve yields); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230–33 (9th Cir. 2004) (optimistic statements regarding growth estimates and pipeline strength were actionable based on witness statements of "a severe slowdown" and that some projections "would miss . . . by at least 50%"); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 877, 880-81 (D. Minn. 2007) (statements, *e.g.*, that the "'[i]ntegration … is *proceeding according to plan*," held materially false and misleading given CWs "recount[ing] numerous problems . . . that caused . . . the integration process to not proceed smoothly").

### (a)    The Complaint's CW Allegations Demonstrate the Falsity of Defendants' Statements About the Auth0 Integration

Multiple CW allegations demonstrate that Defendants' statements about the Auth0 integration were false and misleading for failing to disclose the loss of Auth0 employees. For example, CWs 1, 2, 4, and 5 all confirmed that there was a mass exodus of employees from the Company after the acquisition. ¶¶89-92. This mass exodus included senior Auth0 employees, as CW1 explained that Auth0's CLO, CHRO, and CFO all left around August 2021. ¶65. Indeed, CWs 1 and 2 explained that there were very few Auth0 employees left at the Company following the acquisition. ¶¶89, 92. According to CW1, only about 15% of the Auth0 employees remained at Okta. ¶89. CW4 explained that so many employees left that Okta began offering a retention bonus to employees that stay at Okta, which CW4 suggested was 22% of an employee's salary. ¶91.

Defendants concede that CW1's allegations concern "specific employee departures," but they nevertheless argue that her allegations are not indicative of falsity because the departures had no bearing on the problems Okta experienced integrating the sales teams the following year. MTD at 18. Not so. The Complaint alleges that the loss of Auth0 employees directly led to problems selling Auth0's products after the acquisition. The Auth0 employees had institutional knowledge of Auth0's product platform and how to execute on its go-to-market strategy. Without them, the remaining Okta employees struggled to sell Auth0. ¶88. Indeed, investors understood that retaining Auth0 employees was necessary for a successful integration. For example, on May 27, 2021, a JMP analyst explained

that Okta must show that it can successfully integrate Auth0 by "retain[ing] the Auth0 team and know-how, and, most importantly, successfully execute [on] two different go-to-market strategies with two different product platforms." ¶¶7, 62.

Defendants' remaining attacks on CWs 4 and 5 also fail. They argue that the allegations of CW4 and CW5 "lack[] specific facts demonstrating" falsity. MTD at 18. This is wrong. CW4 explained that employees started to leave Okta "not long after May or June" 2021, and CW5 explained that approximately 75-80% of the VPs and SVPs left the Company, which caused other departures. ¶¶66-67. These particularized allegations, demonstrating the loss of several key employees, strongly indicate that Defendants' Class Period statements touting Okta's purported successful integration were materially false and misleading when made. *See* ¶¶134-36, 138, 140, 142, 150-51, 153, 155-57, 159, 162-63, and 165. Moreover, the falsity of these statements is corroborated by Defendants' later ***admissions*** that the "heightened attrition," as described by CW4 and CW 5, harmed Okta's integration efforts. ¶126. *See Hatamian*, 87 F. Supp. 3d at 1160 ("later admissions" supported falsity of statements that "issues were ***not 'behind' the Company***" when made).

### (b)    Defendants' Statements Are Not Mere Corporate Optimism or Opinions

Defendants attempt to avoid liability for their misstatements by broadly arguing that the challenged statements "relate to generic statements of optimism regarding the progress of the Auth0 integration," i.e., are inactionable puffery. MTD at 16. However, Defendants' statements are not puffery because they were concrete assurances about the then-existing state of the Auth0 integration that were highly material to investors. Indeed, Defendants' statements touting the progress and success of Okta's integration are precisely the sort of statements that courts regularly sustain as actionable because of their materiality to investors given the context in which they were made. *See, e.g.*, *Union Asset Mgmt. Holding AG v. SanDisk LLC*, 2017 WL 3097184, at *1-2 (N.D. Cal. June 22, 2017) (statements that integration was "going quite well" and "largely completed" not puffery); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *9-10 (N.D. Cal. Apr. 28, 2020) (rejecting similar puffery challenge); *Quality Sys.,* 865 F.3d at 1143-44 ("non-forward-looking statements about the state of [] sales pipeline," *e.g.*, "'there is nothing slowing down,'" not puffery).

The materiality of the Auth0 integration statements is further evidenced by analysts' repeated questions on the topic. *See, e.g.*, ¶¶62, 74, 94, 120, 136, 156, 162. *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 (C.D. Cal. Aug. 4, 2017) (statement material "[a]s evidenced by repeated questions posed by analysts"). Indeed, analysts asked Defendants specifically about retaining Auth0 employees. ¶74 (question from JP Morgan analyst asking McKinnon, "What are you doing to make sure that you retain the people that you really want to go forward with the combined organization"). Moreover, analysts routinely issued reports discussing the importance of the Auth0 acquisition and integration. *See, e.g.*, ¶60 (analyst report discussing the importance of the Auth0 acquisition for Okta's growth prospects); ¶62 (analyst report discussing the importance of successfully integrating Auth0). Given such "context," Defendants' statements about the Auth0 integration are not puffery. *Quality Sys.,* 865 F.3d at 1143 ("even 'general statements of optimism,' when taken in context,'" are actionable if they "address specific aspects of a company's operation that the speaker knows to be performing poorly"); *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) ("What might be innocuous 'puffery'. . . standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation").[3]

Defendants then argue, in a footnote, that the statements in ¶¶140, 162-63 are inactionable statements of opinion. MTD at 17 n.9.[4] However, this argument fails for several reasons. First, Defendants selectively quote only certain portions of those statements, omitting other parts that are not couched with any prefatory opinion language, such as "I think," but rather expressed certainty on the state of the Auth0 integration. For example, Kerrest unequivocally stated, *based on what he saw up to that point* (September 14, 2021), that "the integration has gone well." ¶140. Similarly, on June 2, 2022, McKinnon stated that "we've made a lot of progress as a combined company," and Tighe stated that integrating the two companies was "a great milestone for us." ¶¶162-63. These statements

---

[3] Because puffery assesses whether a reasonable investor would find Defendants' statements material, such a determination should be left to the trier of fact. *See Mulligan,* 36 F. Supp. 3d at 966 (whether a given statement is material "entail[s] fact-intensive assessments that are more properly left to the jury").

[4] Defendants thereby concede that the other statements are not opinions.

were not mere opinions, but rather unqualified statements of present fact. But even if the Court construes any of these statements as opinions—which they are not—they are still actionable because a "pure statement[] of opinion" is still actionable if it "omits material facts" that "conflict with what a reasonable investor would take from the statement itself." *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 189 (2015). Here, Defendants' statements omitted numerous conflicting, material facts—particularly, the loss of numerous senior Auth0 employees— as discussed above.

### (c)    Defendants' Risk Disclosures Regarding the Auth0 Integration Were False and Misleading

Defendants' purported risk disclosures were false and misleading because they warned of *potential* risks that had already come to fruition. For example, Defendants repeatedly warned investors that "there *could* be a loss of our and/or Auth0's key employees and customers," ¶¶138, 153, 159, 165, when, by that point, Okta had already lost numerous senior Auth0 employees. *See* ¶¶63, 65-68.

Defendants argue that the risk disclosures were not false or misleading because there are no allegations that the risk had come to fruition when the supposed risk warnings were made in September 2021, December 2021, March 2022, and June 2022. MTD at 20. This argument ignores several allegations demonstrating Okta lost Auth0 employees shortly after the acquisition and before the first misleading risk disclosure in September 2021. As explained above, CW1 stated that Auth0's CLO, CHRO, and CFO all left around August 2021—a month before Defendants issued the first misleading risk disclosure. ¶65. Moreover, CW1's statement is corroborated by CW4, who stated that Auth0 employees left "not long after May or June" 2021, as well as CW6, who noted that there was a "mass exodus" of employees around the fall of 2021. ¶¶66, 68.

Defendants argue they should not be held liable for their misleading risk disclosures because they "explained to investors . . . that it would take time for the integration process to play out." MTD at 20. However, for the same reasons discussed below, Defendants have not met their "heavy burden" in proving such a truth-on-the-market defense. *See* Section III(A)(1)(d). Moreover, and more importantly, this argument is a red herring. It does not matter if Defendants made other statements

about the integration taking time to play out. What matters is Defendants warned of the risk that Okta *might* lose key employees when that risk had already materialized. Accordingly, Defendants' misleading risk disclosures are actionable. *See Siracusano v. Matrixx Intiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (misleading "risk factors" actionable); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 n.62 (C.D. Cal. 2008) ("cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").[5]

### (d)   Defendants' Truth-on-the-Market Defense Fails

Defendants argue that the statements about integrating Auth0 were not false and misleading in light of their statements that integrating the sales team was difficult, that there was still work to be done, and that the process would take time. MTD at 17. But Defendants' argument is simply a thinly veiled truth-on-the-market defense. *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1174 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) ("[a] showing that the market was already aware of the truth behind the defendant's supposed falsehoods … [is] the so-called 'truth-on-the-market' defense"); *Nguyen v. Radient Pharms. Corp.*, 946 F. Supp. 2d 1025, 1035 (C.D. Cal. 2013) (arguing statements "were not misleading in light of other statements Defendants made is an attempt to argue the affirmative defense of truth-on-the-market"). Defendants have a "heavy burden" of proving such a defense, particularly on a motion to dismiss.[6] *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996). They must prove that the truth "was 'transmitted to the public *with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression* created by . . . [the] representations.'" *Id.*

Defendants do not meet their heavy burden here. Defendants' vague suggestions that they "didn't have all the answers," that "there is no real finish line," and that "[t]here's still a little bit to do" are a far cry from informing investors of the specific integration challenges Defendants faced,

---

[5] Contrary to Defendants' argument, CW3's allegations do not contradict the Complaint's theory of falsity. MTD at 20. CW3's allegations relate to issues Okta employees had making sales after the acquisition, in part because of the loss of Auth0 employees. ¶88. Nothing about CW3's allegations change the fact that numerous high-level Auth0 employees left after the acquisition, which Defendants did not disclose.

[6] Indeed, some courts have found that this this defense "is not available at the motion to dismiss stage." *Bos. Ret. Sys. v. Uber Tech., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020).

including the loss of numerous Auth0 senior employees. For every statement Defendants made about the integration not being completed, they falsely reassured investors that the integration was "going very well" (¶¶135, 151), that the sales forces would be "fully integrated come Feb[ruary] 1" (¶151), and that they were "getting synergy on the . . . sales side" (¶157). Thus, Defendants' vague statements that there was still work to be done did not counterbalance the unmistakable impression created by Defendants' positive statements about the integration, which created the misleading impression that everything was going according to plan—when, in reality, Defendants experienced significant challenges. *See S. Ferry LP # 2 v. Killinger*, 399 F. Supp. 2d 1121, 1138 (W.D. Wash. 2005), *vacated in part on other grounds*, 542 F.3d 776 (9th Cir. 2008) (statements about "progress … ***integrating***" materially misleading as "Defendant [] disclosed … challenges" but "reassured investors that 'we … ***are back on track***'"). This is especially true at the motion to dismiss stage, where "whether a . . . statement is misleading . . . is appropriately resolved as a matter of law ***only if*** the adequacy of the disclosure . . . is so obvious that reasonable minds [could] not differ." *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *7-9 (C.D. Cal. June 17, 2011).

## 2.  Defendants Made False and Misleading Statements Relating to Okta's Inadequate Data Security Practices and the January 2022 Breach

### (a)  Statements Regarding Data Security

As a data security company, maintaining customer trust in the security of Okta's products was critical to the Company's success and set it apart from other companies that experience data breaches.[7] That is why, on October 13, 2021, Okta promoted a quote from one of its customers explaining that "[a]s ***a data-focused organization, security is of the utmost importance to us***" and that Okta's products allow them "to follow the principle of least privilege and only grant admins

---

[7] In their Motion, Defendants include a list of eight cases that were purportedly dismissed based on data breaches. MTD at 8 n.3. As an initial matter, those cases did not also allege a distinct theory of falsity based on a company's positive statements about integration that were false and misleading because the company had experienced significant integration challenges resulting from, *inter alia*, the loss of senior-level employees of the acquired company. Moreover, this case is starkly different than those cases because here Okta's success as a business hinged on its ability to protect individual's data. Indeed, unlike the companies in any of the cited cases, Okta provides software to companies to keep access to its data and information secure. Any data security breach could undermine Okta's authority in the IAM market and threaten the Company's survival—a fact that is glaringly missing from Defendants' cases.

access to the tasks they need to perform."[8] ¶145. Similarly, a month earlier, on September 15, 2021, McKinnon explained the importance of maintaining a secure "ZeroTrust" environment, stating, among other things, that "the administration accounts or the admin or the super user accounts are left open because it's easy for the engineers to drop in there and, like, do some admin things and maintain some network things." ¶143.

These statements were false and misleading because they hid from investors that the Company's data security practices were inadequate. Specifically, the statements were misleading because they omitted the material fact that Okta was not properly securing its administrative tools, such as its SuperUser tool, and that Okta failed to require its sub-processors to comply with the Company's fundamental data security requirements. *See* ¶¶98-103, 146-49.

Despite Defendants' arguments, *see* MTD at 11, the Complaint's CW allegations demonstrate why the statements in ¶¶143 and 145 were false and misleading. Specifically, the Complaint alleges that Okta did not adequately secure the Company's administrator tools, leading to the January 2022 Breach. For example, CW6 and CW7 explained that access to the SuperUser tool was granted to practically any Okta employee without any vetting process. ¶¶99, 102. This created a massive risk to data privacy because, according to CW6, employees could access this tool from their personal laptops, as opposed to a secure administrative station, without any controls that could have shut down the application or somehow obfuscate the information if it detected an intruder. ¶100. Moreover, this higher level of access required no additional training or security measures, such as two-factor authentication. ¶102. Similarly, Okta did not require third parties to comply with the Company's data security policies Defendants claimed were fundamental to its business, such as a Zero Trust security architecture. ¶103. These inadequate data security measures directly led to the January 2022 Breach, when hackers gained unauthorized access to Okta resources after compromising one of the Company's third-party vendors. ¶104. Although Defendants argue that the January 2022 Breach had

---

[8] Although Defendants are correct that this quotation was from an Okta customer, they ignore that the Company chose to include this quote in one of its press releases. ¶145. Therefore, the Company can be held liable as makers of the statement since they had "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

nothing to do with Okta's inadequate data security measures, *see* MTD at 11, the Court must reject this unsubstantiated statement and credit the Complaint's well-pled allegations. *See QuantumScape*, 580 F. Supp. 3d at 729 (Court must "accept[] the plaintiff's allegations as true and draw[] all reasonable inferences in favor of the plaintiff").

Defendants' attacks on CW6 and CW7 fall flat. Defendants argue, without support, that the Complaint does not allege any facts demonstrating that CW6 and CW7 were qualified to assess whether Okta properly secured its administrative tools. MTD at 11. First, this is not the standard. Despite Defendants' suggestion, the Complaint need not allege the CWs' qualifications as experts. Rather, the Complaint need only establish the CWs' reliability and personal knowledge of the facts alleged by them. *See* Section III(B)(1), *infra*. The Complaint meets that standard, as it alleges that CW6 and CW7 were both Senior Solutions Engineers at Okta and thus were well-positioned to know the information attributed to them in the Complaint. ¶¶43-44. Second, CW6 and CW7 both provided detailed, mutually corroborating accounts of what made the SuperUser tool vulnerable to attack—for example, that any employee could access it from any location, including a less-secure personal computer—which supported their conclusion that Okta did not properly secure its administrative tools. ¶¶98-103.

### (b)    Risk Factor Disclosure Regarding Data Security

These data security vulnerabilities, which were known to Defendants, ultimately led to the January 2022 Breach, which Defendants also hid from investors. Despite having known about the breach since January 2022, Defendants did not disclose the breach until they were forced to do so. Indeed, on March 7, 2022—two months after the breach—Defendants filed the Company's 2022 Annual Report with false and misleading risk disclosures. For example, the 2022 10-K stated that "[a]n application, data security or network incident *may* allow unauthorized access to our systems or data or our customers' data, disable access to our service, harm our reputation, create additional liability and adversely impact our financial results." ¶159. This statement was false and misleading because it presented the risk as hypothetical—that their "data security . . . *may* allow unauthorized access to [Okta's] systems or data or customers' data"—when that risk had already come to fruition. Such risk disclosures, which "'speak[] entirely of as-yet-unrealized risks and contingencies', and do

not 'alert[] the reader that some of these risks may already have come to fruition', can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021).

Recognizing this well-settled Ninth Circuit authority, Defendants attempt to distinguish *Alphabet* in their Motion. MTD at 14. This endeavor fails. Contrary to Defendants' suggestion, nothing in *Alphabet* requires that, as a matter of law, the undisclosed data security vulnerability must last a certain number of years or affect a certain number of customers before Defendants have a duty to disclose it.[9] Rather, "[t]he standard is whether there is a 'substantial likelihood' that the information at issue 'would have been viewed by the reasonable investors as having significantly altered the total mix of information made available for the purpose of decisionmaking by stockholders concerning their investments.'" *Alphabet*, 1 F.4th at 704-05. As in *Alphabet*, "[t]he likelihood is particularly substantial here, given the nature of [Okta's] business." *Id.* at 705. As a data security company, Okta's reputation for keeping data safe is vital to the Company's survival—and thus equally critical to investors' assessment of the Company. Indeed, McKinnon explained that the Company's number one priority was customer trust and that "[n]othing matters more than customer trust." ¶57.

Moreover, like in *Alphabet*, here the Complaint alleges that the revelation of the breach resulted in "a swift stock price decline" and negative "public reaction," which both "support the allegation that the [breach] was material even absent a release of sensitive information or revenue decline." *Alphabet*, 1 F.4th at 705. After the breach was revealed, analysts downgraded the Company and noted that the breach "***creates a lack of trust*** as customers contemplate consolidating important functions . . . via Okta's new products and may push out the timeline to consolidation." ¶190. As a result, Okta's stock price plummeted by 10.74% on March 23, 2022. ¶192. Moreover, some of Okta's customers publicly criticized the Company for hiding the breach. For example, on March 16, 2022, the Chairman and CEO of Tenable stated, "Two months is too long. This compromise should have

---

[9] To be sure, the scale of the data-privacy and security vulnerability in *Alphabet* was a factor in the Court's determination that Alphabet's omission was material. *See Alphabet*, 1 F.4th at 703. However, here, Okta's omission of the January 2022 Breach was also material to investors—even though it was not as large as the data security vulnerability alleged in *Alphabet*—given that Okta was a data security company and the Company's entire business hinges on its ability to keep data secure. Indeed, like in *Alphabet*, Okta made public statements that "demonstrated the importance of user trust and public perceptions of security and privacy practices for the products and services central to [Okta's] business." *Id.*

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AMENDED COMPLAINT
CASE NO.: 3:22-CV-02990-SI

21

been disclosed when Okta detected it in January or after a competent and timely forensic analysis." ¶112. Therefore, like in *Alphabet*, Defendants' failure to disclose the January 2022 Breach was material and made their March 7, 2022 risk disclosures false and misleading.

Defendants' remaining efforts to avoid liability for this misstatement fail. First, Defendants argue that the Complaint alleges no facts demonstrating the risk had materialized by March 7, 2022. MTD at 12. Not so. The risk that a "data security . . . incident may allow ***unauthorized access*** to [the Company's] systems or data or our customers' data" had materialized in January 2022—two months before Defendants issued the misleading risk disclosure—when hackers gained ***unauthorized access*** to Okta's internal system and customers' data. ¶¶12, 105-08, 159. Defendants are also wrong that that the Complaint alleges no facts demonstrating Defendants knew that the risk had come to fruition by March 7, 2022. MTD at 12. According to the Complaint, once the hackers posted screenshots of the breach, McKinnon admitted that the Company "detected" and "investigated" the breach "[i]n late January 2022" and "believe[d] the screenshots shared online are connected to this January event." ¶106. Thus, Defendants confirmed they knew about the breach in January 2022, and as such, they knew the risk had already materialized by the time they issued the false and misleading risk disclosures.

Equally unpersuasive is Defendants' argument that Lead Plaintiff's omission theory is premised on a fundamental mischaracterization of the data security incident. MTD at 12-13. Citing one of their extraneous exhibits, Exhibit 6,[10] Defendants argue that Defendants "did not know the extent" of the breach and "didn't recognize that there was a risk to Okta and [its] customers," and thus, had no duty to disclose the breach before they did. MTD at 13. Similarly, Defendants argue that they had no duty to disclose the data security incident because it was not material to investors. MTD at 13-14. At bottom, both arguments raise questions of materiality—i.e., whether a reasonable investors would have found that disclosure of the breach would have altered the total mix of information about Okta. Both arguments fail.

---

[10] Lead Plaintiff takes take no position with respect to Defendants' Exhibits 1 through 9, attached to the Declaration of Brian M. Lutz (ECF No. 58) except to the extent Defendants offer Exhibits 1 through 9 for the truth of the matter asserted therein.

As an initial matter, Defendants' use of Exhibit 6 is improper because it is used solely to dispute the Complaint's factual allegations. Although the Court may consider this document for the limited purpose of determining what was disclosed to investors, it cannot consider the document for its truth—i.e., that Defendants did not know of the extent of the breach or any risk from it—because it directly contradicts the Complaint's well-pled allegations that Defendants knew about the breach and associated risks in January 2022. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) ("it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint.").[11]

Moreover, Defendants' argument is premature, as determining materiality is a factual issue better reserved for summary judgment. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009) (materiality is a "fact-specific inquiry" that "should ordinarily be left to the trier of fact"). But should the Court consider this argument, it still fails. As explained above, the January 2022 Breach was material to investors, and thus, Defendants' risk disclosures were false and misleading because they spoke of yet-unrealized risks without warning investors that some of those risks had already come to fruition. *See Alphabet*, 1 F.4th at 703.

### (c)    McKinnon's June 8, 2022 Misstatements

Defendants continued misleading investors by telling them they had maintained customer trust following the January 2022 Breach. For example, on June 8, 2022, McKinnon publicly appeared in a CNBC interview and downplayed any negative customer feedback from the breach. McKinnon told CNBC host Jim Cramer that he spoke to hundreds of customers himself "to make sure that we are instill[ing] this trust," and according to McKinnon, "***we've been able to do that***." ¶167. McKinnon then explained that the Company was still on track to achieve its growth targets, quelling any investor concerns that the breach negatively impacted sales. ¶168.

However, these statements were false and misleading because, in reality, the January 2022 Breach had harmed Okta's reputation and sales, as customers no longer trusted the Company and were unwilling to increase their contracts or spend more money with Okta. ¶¶113-15. Indeed, during

---

[11] Indeed, in *Khoja*, the Ninth Circuit admonished that the "inferences a court may draw from an incorporated document" should "be approached with caution." 899 F.3d at 1003.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS                23
AMENDED COMPLAINT
CASE NO.: 3:22-CV-02990-SI

an internal All-Hands meeting following public news of the breach, Defendants discussed losing sales as a result of the breach and even distributed talking points to employees explaining how to downplay the breach and avoid further sales declines. ¶113. Therefore, Defendants had a duty to disclose the sales challenges because, by "choos[ing] to tout positive information" about customer feedback they received, Defendants were "bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information," such as the fact that Okta was losing sales as a result of the breach, which "cut[] against the positive information." *Schueneman*, 840 F.3d at 706.[12]

Moreover, contrary to Defendants' argument, these statements are not inactionable puffery and opinion. MTD at 15. They were concrete assurances about existing customer trust and the Company's then-current growth estimates based on this customer trust. Given such "context," these statements are not puffery. *Quality Sys.,* 865 F.3d at 1143 ("even general statements of optimism, when taken in context," are actionable if they "address specific aspects of a company's operation that the speaker knows to be performing poorly"). Further, even if considered opinions, such statements are actionable. A "pure statement[] of opinion" is actionable if it "omits material facts" that "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 186, 189. Here, Defendants' statements omitted conflicting, material facts, as discussed above. And contrary to Defendants' argument, the Complaint alleges facts showing McKinnon did not believe what he said—specifically, McKinnon led the All-Hands Meeting where Defendants discussed losing sales after the breach and provided employees with talking points with customers to mitigate the harm done to the Company's reputation. ¶¶113, 218.

### B.    The Complaint Adequately Pleads Scienter

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In the Ninth Circuit, the "required state of mind" is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705. One "is reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted,

---

[12] Therefore, Defendants' argument that the statement in ¶168 is not false or misleading because it has "nothing to do with data security" is misplaced. *See* MTD at 15-16.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS                                24
AMENDED COMPLAINT
CASE NO.: 3:22-CV-02990-SI

but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010).

When analyzing scienter, the Court must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310; *see also S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation"). The inference that the defendant acted with scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre.'" *Tellabs*, 551 U.S. at 324. Rather, "it must be cogent and *at least as* compelling as any opposing inference." *Id.* at 314. Further, in analyzing scienter, the court must assess "*all* of the facts alleged, taken *collectively*." *Id.* at 310.

The Complaint readily satisfies these standards. Contrary to Defendants' argument, the Complaint alleges far more than "the bare assertion" that Defendants acted with scienter "simply because data security and the Auth0 acquisition were important to Okta." MTD at 21. Although Defendants are correct that data security and the Auth0 acquisition were both critically important to Okta, these facts are not the sum total of the Complaint's allegations which, taken collectively, establish that Defendants made misstatements with the requisite scienter.

**1.      The Complaint's CW Allegations Plead a Strong Inference of Scienter**

A complaint can establish a strong inference of scienter through CW allegations by satisfying a two-part test: (1) the CWs "must be described with sufficient particularity to establish their reliability and personal knowledge;" and (2) their "statements . . . must themselves be indicative of scienter." *Quality Sys.,* 865 F.3d at 1144-45.

**Basis of Knowledge:** To satisfy the first prong, a complaint must describe the CWs "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 1145. Defendants do not argue that the CW descriptions are insufficient to support the probability that they possessed the information alleged (and thus waive any such argument). Rather, Defendants argue that the CWs are unreliable because none of them had any personal "knowledge of the Individual Defendants' state of mind." MTD at 22-23. However, this

is not the applicable standard. CWs are not required to have knowledge of the Individual Defendants' state of mind, nor are CWs required to have direct contact with the Individual Defendants. *See Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10 (N.D. Cal. Apr. 28, 2020) (scienter pled based on CWs who had no "direct contact with the defendants"). Rather, the Complaint need only describe the CWs with sufficient particularity to establish their knowledge of the alleged information. *Quality Sys.*, 865 F.3d at 1145. Here the Complaint pleads enough details about the CWs' job descriptions, including their roles, duties, and tenures (and, in many cases, exact titles and reporting structure), to show that they were positioned to know the information attributed to them. ¶¶38-46. This is sufficient to establish their reliability.

Moreover, the Court should reject Defendants' argument that some of the CWs are of no value because they left Okta before the challenge statements concerning the January 2022 Breach. MTD at 22. These CWs were employed during the Class Period, and thus their statements are relevant to the Defendants' scienter during the Class Period.[13] As other courts have acknowledged, the fact that "none of the CWs was employed at [the company] during the *entire* Class Period does not in itself render their statements unreliable as a matter of law." *Roberts*, 2020 WL 2042244, at *11 (emphasis in original).

**Indicative of Scienter:** In assessing the second prong, courts "look to 'the level of detail provided by the [CWs], the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Here, multiple CWs offer specific, corroborative details establishing Defendants had knew of: (a) the challenges that Defendants faced integrating Auth0; and (b) Okta's inadequate data security and the January 2022 Breach.

---

[13] Thus, Defendants' citation to *In re Intrexon Corp. Securities Litigation*, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017) is not relevant, as that case dealt with allegations from CWs that were not employed during any part of the Class Period. MTD at 22, 23.

**(a)      The CW Allegations Support an Inference of Scienter with Respect to the Auth0 Integration Misstatements**

The CW allegations support the inference that Defendants were aware of the Auth0 integration problems. CW2, who spent six or seven months working on the Auth0 integration plan, participated in weekly status updates about the integration with Defendant McKinnon,[14] Chief Revenue Officer Steve Rowland, and President, Worldwide Field Operations Susan St. Ledger. ¶¶80, 217.

Defendants' argument that the Complaint does not plead what was discussed during these weekly calls or when exactly they occurred should be rejected. MTD at 23-24. Defendants attempt to impose a higher burden than is applicable at this procedural stage, as Lead Plaintiff is not required to plead "admissible evidence." *McKesson HBOC,* 126 F. Supp. 2d at 1272. Moreover, Defendants are wrong. The CW allegations confirm that Defendants discussed the Auth0 integration challenges during the Company's All-Hands Meetings. For example, CW3 explained that during three or four of these meetings in January and February 2022, McKinnon discussed the Auth0 acquisition. ¶218. CW5 also stated that integration challenges were specifically discussed during these meetings. ¶219. CW5 also explained that during these meetings, which McKinnon attended, attendees discussed the fact that employees were struggling to sell Auth0. ¶219. Thus, contrary to Defendants' argument, MTD at 24, CW5's allegations demonstrate that McKinnon learned of information that contradicted several of his statements during the Class Period. *See* Section III(A)(1), *supra*.

The allegations of CW3 and CW5 are corroborated by CW2's allegations that McKinnon and other senior management met weekly to discuss the Auth0 integration. Indeed, during one of the reviews in late 2021, Okta's finance team determined that there was no way the integration plan could be completed by FY2024 and completely scrapped the plan of hiring additional sales staff and keeping Auth0 employees as specialists to sell Auth0 products only. ¶¶80-81. Defendants argue that this "change in business strategy" does not render any of their statements false or misleading. MTD at 24.[15] But this is beside the point. Defendants knew or were reckless in not being aware of a drastic

---

[14] Thus, Defendants' suggestion that "Plaintiff pleads no facts . . . that any of the Individual Defendants participated in these [weekly] calls" is wrong and should be rejected. *See* MTD at 23-24.

[15] The case cited by Defendants, *In re Diebold Nixdorf, Inc. Securities Litigation.*, 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021), is distinguishable. There, the Court found that the change in

Footnote continued on next page

shift in strategy—which directly followed alongside the integration challenges—especially considering that Rowland and St. Ledger "signed off on everything" related to the integration plan. ¶¶80, 217.

Finally, the Complaint's other CW allegations further support the inference that Defendants knew of the significant integration challenges since Defendants knew, or at least were reckless in not knowing, about the mass exodus of both Okta and Auth0 employees after the acquisition. ¶¶63-70. This mass exodus included senior management from both companies. For example, CW1 explained that Auth0's CLO, CHRO, and CFO all left after the acquisition, and CW5 explained that approximately 75-80% of Okta's VPs and SVPs left the Company after it acquired Auth0. ¶¶65, 67. Similarly, CW1 explained that in the fall of 2021, Okta's Board of Directors reviewed the attrition figures and was very concerned.[16] ¶221. These accounts support an inference of scienter, especially since they are corroborated by Defendants' later admission that—contrary to their prior assurances— they "experienced heightened attrition . . . which [] impacted our business momentum." *See* Section III(A)(1)(a), *infra*.

### (b)　　The CW Allegations Support an Inference of Scienter with Respect to the Data Security Misstatements

The Complaint's CW allegations demonstrate that Defendants knew of the January 2022 Breach in January—two months before admitting such a breach occurred. For example, CW3 explained that during an All-Hands Meeting following the January 2022 Breach, Defendants informed Okta employees that Okta "quickly" knew the breach occurred and shut the compromised account down. ¶113. According to CW3, these All-Hands Meetings were led by Defendant McKinnon. ¶218. McKinnon's attendance at these meetings, where Defendants discussed the January

---

business strategy ***by itself*** was not enough to establish falsity or scienter. The court found that "[c]ritically, Plaintiff points to no data . . . suggesting that Defendants' statements . . . were false and misleading when made." *Id.* at *11. But here, the Complaint alleges that Okta lost a significant number of Auth0 employees after the acquisition, including several high-level executives, which made their statements about the Auth0 integration false and misleading when made.

[16] Defendants argue that this statement is unreliable hearsay. MTD at 25. However, there is no per se bar to hearsay allegations at the pleading stage. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (crediting CW hearsay). The Court should credit this allegation, even if considered hearsay, because it is corroborated by several other facts demonstrating Defendants had knowledge of the attrition numbers.

2022 breach—and admitted that they "quickly" knew about it—supports a strong inference of scienter with respect to the data security statements. *See Hatamian*, 87 F. Supp. 3d at 1163 (attendance at meetings where the relevant issues were discussed held sufficient to allege scienter).

Similarly, Defendants knew about Okta's data security vulnerabilities before January 2022. Multiple CWs offer corroborative accounts detailing how, both prior to and during the Class Period, Okta failed to properly secure its administrative tools, which led to the January 2022 Breach. For example, CW6 explained how the Company's SuperUser tool—which gave access to customers in any Okta tenant worldwide—was not properly guarded against hackers. ¶¶98-101. CW6 explained that SuperUser access was granted to Okta employees without any vetting process, and employees could access the tool from their home laptop, which was far less secure than a designated administrative station. *Id.* Similarly, CW7 stated that employees could get SuperUser access by merely sending an email, without any vetting process or training for these employees. ¶102.

Similarly, CW9 provided detailed accounts of breaches that occurred at the Company during the Class Period. CW9 explained that Okta advised her in October 2021 that her personal email, passwords, name, and salary information had been stolen while working for Okta. ¶116. According to CW9, the Director of Cybersecurity told her directly about this security breach in January 2022. ¶117. Moreover, Okta's VP of Cybersecurity, Timothy McIntyre, told CW9 not tell anyone about the security incidents, including her boss. *Id.* Thus, the January 2022 Breach should not have come as a surprise since Defendants knew about Okta's data security vulnerabilities as early as October 2021 due to the Company's failure to safeguard its own employees' data.[17]

These CW allegations demonstrate that Defendants knew, or were reckless in not knowing, of Okta's data security vulnerabilities given the importance of data security to the Company's survival and the fact that senior-level management, like the Director of Cybersecurity, were aware of the previous breaches. Indeed, because red flags were accessible to Defendants "without extraordinary

---

[17] Given that Okta is a company that specializes in providing software for companies to deliver secure networks, any data breach puts the Company on notice of the inadequacy of its data protection systems. Accordingly, Defendants' argument that there is no connection between CW9's allegations and the January 2022 Breach misses the point because both incidents were breaches of Okta's security systems.

effort[,]" Defendants were, at the least, deliberately reckless in "fail[ing] to obtain and disclose such facts." *Oracle*, 627 F.3d at 390.

Finally, the CWs' accounts that Okta's data security breaches were widely known internally within the Company, including to senior management, are corroborated by Defendants' own later public admissions, which also support scienter. *See* ¶106 (Defendant McKinnon admitting that the Company "detected" the breach in January 2022).

### 2.    The Core Operations Doctrine Supports Scienter

The "knowledge of facts critical to a business's core operations or an important transaction" may be "impute[d] to a company's key officers." *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *19 (N.D. Cal. Sep. 27, 2012). Core operations allegations establish scienter where they: (1) "along with other allegations . . . raise a strong inference of scienter under the *Tellabs* standard;" (2) "independently satisfy the PSLRA" by suggesting "that defendants had actual access to the disputed information;" or (3) on their own show "that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese v. Malone,* 747 F.3d 557, 575-76 (9th Cir. 2014). Here, knowledge of the integration issues and data security breaches can be imputed to Defendants since they are both critical to the Company's business.

### (a)    The Auth0 Acquisition and Successful Integration Were Critical to Okta's Success and Growth

The Auth0 acquisition was a massive deal for Okta, as Okta paid approximately $6.5 billion in stock, which represented 21% of Okta's market cap. ¶207. The deal was also critical to maintaining Okta's high growth rate, as it allowed Okta to further penetrate the CIAM market, which at that time, represented only 25% of Okta's revenue. ¶¶58-60. As such, the successful integration of Auth0 was essential to Okta's growth prospects. Indeed, McKinnon stated on multiple occasions that the Auth0 acquisition is "a very, very critical part of our company moving forward" and "the integration with Auth0 is . . . ***very, very critical for the success of the Company***." ¶¶211-12. According to McKinnon, the successful integration of Auth0 would allow Okta to capture an $80 billion market opportunity. ¶213. Based on these representations, investors understood the importance of successful integrating Auth0. As one JMP analyst wrote, in order to achieve a successful integration, Okta must "retain the

Auth0 team and know-how, and, most importantly, successfully execute two different go-to-market strategies with two different product platforms." ¶62.

Defendants concede the critical importance of the Auth0 acquisition to Okta's business. Nonetheless they argue that the Complaint does not allege an inference of scienter under the core operations doctrine because "[a]ll Plaintiff has alleged is that the Individual Defendants were aware of and involved in the integration of Auth0." MTD at 27-28. Not so. As outlined above, the Complaint alleges that Defendants knew about specific integration challenges, such as the loss of senior Auth0 employees, not just that they knew about the integration generally. ¶¶63-70, 218-19.

Moreover, because the Auth0 acquisition was such a prominent part of Okta's business, and because the successful integration was necessary to achieve the any benefits from the acquisition, this case presents a situation in which it "would be absurd to suggest" that Defendants were not aware of the integration challenges. *See Reese,* 747 F.3d at 576 (core operations support scienter when "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter"); *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 988 (9th Cir. 2008) (scienter pled solely via core operations given "[t]he size of the contract and the prominence of the client"); *Anderson v. Peregrine Pharms. Inc.*, 2013 WL 4780059, at \*12 (C.D. Cal. Aug. 23, 2013) ("The core operations doctrine applies . . . to ***transactions worth millions of dollars or that represent a significant portion of the company's revenue***.").

Defendants' circular argument that Lead Plaintiff cannot plead scienter under a core operations theory because the challenged statements are puffery misses the mark. MTD at 27. As discussed above, the misstatements are not puffery because investors understood the importance of the Auth0 acquisition to Okta's success and growth prospects and, as such, was pivotal to investors' decision whether to invest in Okta or not. Indeed, investors cared deeply about both the Auth0 acquisition and its integration with Okta, and analysts regularly reported on the status of the integration. *See, e.g.*, ¶60 (analyst report discussing the importance of the Auth0 acquisition for Okta's growth prospects); ¶62 (analyst report discussing the importance of successfully integrating Auth0). Such allegations establish both that the Auth0 acquisition was a core operation of Okta and that the misstatements related to it are not mere puffery.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS                31
AMENDED COMPLAINT
CASE NO.: 3:22-CV-02990-SI

Moreover, contrary to Defendants' argument, the Complaint alleges more to support its core operations argument. For example, CWs 2, 3, and 5 all stated that the Auth0 integration challenges were discussed during the Company's weekly All-Hands Meetings, which were attended by at least Defendant McKinnon. ¶¶81, 218-19. According to CW5, the Company's sales issues were discussed during the meetings. ¶219. Finally, CW accounts confirm that Defendants had actual access to CRM tools that closely monitored sales to new customers and thus would have shown declining sales. ¶223.

**(b)     Data Security and Customer Trust Were Critical to Okta's Survival**

As a data security customer that provides platforms for its clients to securely access their network, data, and applications, Okta's success is wholly dependent on obtaining and maintaining customer trust to secure proprietary information and user data. ¶¶55-57. As McKinnon himself stated, customer trust is Okta's "***number one continuous ongoing priority***." ¶57. Loss of customer trust in Okta's data security practices could jeopardize Okta's ability to retain its customers and convince new customers to subscribe to its services. ¶55-56. Thus, the Company's data security practices were of such importance that it would be absurd to suggest that management was without knowledge" of the January 2022 Breach, even absent other scienter allegations. *Reese*, 747 F.3d at 577.

Nevertheless, the Complaint alleges more to support its core operations argument. Contrary to Defendants' argument, *see* MTD at 26, the Complaint alleges the Individual Defendants knew about the January 2022 Breach before March 21, 2022. Most notably, Defendants later ***admitted*** that they knew about the breach in January 2022 and sat on the information for two months. ¶¶108-112. Even if not sufficient standing alone, these core operations allegations strengthen scienter when read with other allegations. *See Robb v. Fitbit, Inc.*, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017).

**3.     Defendants' Statements Themselves Support Scienter**

As the Ninth Circuit has explained, where defendants make misstatements about specific matters they purport to know, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [they] had access to [the] information [they] discussed publicly." *Reese*, 747 F.3d at 572. This is particularly true here. Defendants made specific representations about Okta's integration and sales force. For example, McKinnon told investors that they were "making great

progress on the integration," and Kerrest explained that the integration of the sales forces was a "key piece of the puzzle" and would "be fully integrated come Feb[ruary] 1." ¶¶150-51. Similarly, Kerrest also told investors that the Company "had some pretty good goals for ourselves, but I think we've been beating even those, which is great." ¶140. Defendants' specific misstatements about specific matters they purportedly knew about strongly support scienter. *Reese*, 747 F.3d at 572; *see also In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("public statements celebrating the merger as an unprecedented success" support scienter).

Moreover, several of Defendants' statements were made in response to analyst questions and were clearly intended to quell concerns about integration risks. For example, on September 1, 2021, an analyst asked McKinnon about the sales integration and retaining essential employees, and McKinnon responded by reiterating the importance of integration but failing to disclose the issues Defendants were having retaining essential employees. ¶74. This response adds to the strong inference that Defendants knew about the integration challenges. *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (that defendants "issued specific [statements] … in response to questions from analysts and investors" contributed to a strong scienter inference); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (that defendant "repeatedly reassured investors—in the face of *direct questioning*" evidenced "knowledge of the integration [problems]") (emphasis in original).

Any doubt about Defendants' scienter is erased by their post-Class Period statements admitting they experienced challenges integrating Auth0. For example, on August 31, 2022, when the truth about the Auth0 integration finally emerged, McKinnon explained that Okta's second quarter results were "mixed" due to challenges integrating Auth0 and Okta's sales organizations. ¶126. McKinnon explained, "we've experienced heightened attrition . . . which ha[s] impacted our business momentum." *Id.* These later admissions, which contradict the earlier misstatements, support scienter—especially when considered with the Complaint's other scienter allegations. *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016); *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("a later statement may suggest

that a defendant had . . . knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement").

### 4.    The Complaint Pleads Corporate Scienter

In the Ninth Circuit, the "scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (9th Cir. 2015). Defendants argue that the scienter of Susan St. Ledger and Steve Rowland cannot be imputed to the Company because there are no allegations that either person was aware that Okta's public statements were false and misleading. MTD at 29. This is wrong. The Complaint alleges that both St. Ledger and Rowland were involved in the weekly All-Hands Meeting and "signed off on everything" related to the integration plan. ¶80. Moreover, both St. Ledger and Rowland pushed out Okta's founders and other employees that helped build the Company, and thus they knew of the attrition during the Class Period. ¶67.

Defendants also make a half-hearted attempt at arguing that St. Ledger and Rowland's scienter cannot be attributed to Okta because the Complaint alleges no facts demonstrating they had the authority to speak for Okta or control its statements. This misconstrues the standard that scienter of "senior controlling officers" may be attributed to the corporation. *Adams*, 340 F.3d at 1106. That is satisfied here, as they were both senior officials—St. Ledger was Okta's President of Worldwide Field Operations and Rowland was Okta's Chief Revenue Officer. ¶80.

### 5.    Viewing Allegations Holistically, Defendants' Innocent Inference Fails

When viewed holistically, *Tellabs*, 551 U.S. at 326, the Complaint's scienter allegations plead a strong inference that Defendants were at least deliberately reckless. Defendants' competing inferences are unpersuasive. For the data security incident, Defendants' competing inference that they acted prudently in "a pursuit of truth rather than reckless indifference to the truth" is belied by the facts—particularly, their failure to disclose the breach until they were forced to do so by the hackers. These facts show that Defendants knew but "***withheld important warning signs*** from the market." *In re BioMarin Pharm., Inc. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022). For the Auth0 integration, Defendants' competing inference that Defendants were initially optimistic about the

integration and then later discovered that the integration did not go as planned is also belied by the facts—particularly, the Complaint's allegations that Defendants continued touting the integration when they had already experienced significant integration challenges. At most, these competing inferences present a close question, which, at this stage, must be resolved in Lead Plaintiff's favor. *See In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at \*8 (C.D. Cal. Aug. 4, 2014) (when courts weigh competing inferences, "***the tie goes to the Plaintiff***").

Further, Defendants also argue that "the Court must weigh the fact that no Individual Defendant is alleged to have had any motive to deceive investors." MTD at 31. Not so. The Ninth Circuit has rejected Defendants' argument that scienter is not alleged because there are no allegations that the Individual Defendants sold stock or otherwise personally benefitted from their fraud. The Ninth Circuit does not require motive to plead scienter, and "the lack of stock sales by a defendant is not dispositive as to scienter." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944-45 (9th Cir. 2003).

<strong>CONCLUSION</strong>

For all these reasons, Defendants' Motion should be denied in its entirety. If the Court grants any part of the Motion, Lead Plaintiff respectfully requests leave to amend.

DATED:  January 12, 2023                Respectfully submitted,

                                        **LABATON SUCHAROW LLP**

                                        */s/ Michael P. Canty*
                                        Michael P. Canty (*pro hac vice)*
                                        Thomas G. Hoffman, Jr. (*pro hac vice*)
                                        Nicholas Manningham (*pro hac vice*)
                                        Charles J. Stiene (*pro hac vice*)
                                        140 Broadway
                                        New York, New York 10005
                                        Telephone: (212) 907-0700
                                        Facsimile: (212) 818-0477
                                        Email: mcanty@labaton.com
                                               thoffman@labaton.com
                                               nmanningham@labaton.com
                                               cstiene@labaton.com

                                        *Attorneys for Lead Plaintiff and the Class*

                                        **WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**

James M. Wagstaffe (#95535)
Frank Busch (#258288)
100 Pine Street, Suite 2250
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 371-0500
Email: wagstaffe@wvbrlaw.com
          busch@wvbrlaw.com

*Liaison Counsel for the Class*

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AMENDED COMPLAINT
CASE NO.: 3:22-CV-02990-SI

36