BRIAN M. LUTZ, SBN 255976
  blutz@gibsondunn.com
WESLEY SZE, SBN 306715
  wsze@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:    415.393.8200

JASON J. MENDRO, SBN 220842
  jmendro@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:    202.955.8500

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OKTA, INC. SECURITIES LITIGATION | CASE NO. 3:22-cv-02990-SI<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**<br><br>**HEARING:**<br>Date:         March 17, 2023<br>Time:         10:00 a.m.<br>Judge:        Hon. Susan Illston<br>Courtroom:  1, 17th Floor |

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT.................................................................................. 1

II.   ARGUMENT .......................................................................................................... 2

A.    The Opposition Fails to Identify any Actionable Misstatement or Omission.............. 2

1.    *Statements about the Auth0 Integration Were Neither False Nor Misleading.* ................................................................................................. 2

2.    *Statements About Okta's Data Security and the Security Incident Were Neither False Nor Misleading.* ........................................................... 8

B.    The Opposition Confirms the Complaint's Failure to Plead a Strong and Compelling Inference of Scienter ................................................................... 13

1.    *The Confidential Witness Allegations Are Neither Reliable Nor Indicative of Scienter.* ................................................................................ 13

2.    *The "Core Operations" Doctrine Is Inapplicable.* ........................................... 16

3.    *Plaintiff's Reliance on the Integration Statements Is Circular and Flawed.* .......................................................................................................... 18

4.    *Plaintiff's Corporate Scienter Arguments Lack Merit.* ..................................... 19

5.    *The Non-Fraudulent Inference Is Far More Compelling.* ............................... 20

C.    The Opposition Does Not Even Mention Plaintiff's Section 20(a) Claim.................. 20

III.  CONCLUSION ..................................................................................................... 20

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:22-CV-02990-SI

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ...................................................................................................8, 11

*Bao v. SolarCity Corp.*,
  2016 WL 4192177 (N.D. Cal. Aug. 9, 2016).................................................................................15

*Barrie v. InterVoice-Brite, Inc.*,
  2002 WL 1841631 (N.D. Tex. Aug. 8, 2002).................................................................................7

*Basic Inc. v. Levinson*,
  485 U.S 224 (1988).................................................................................................................12

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982, 985 (9th Cir. 2008).................................................................................................17

*Brodsky v. Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..........................................................................................4

*Chang v. Accelerate Diagnostics, Inc.*,
  2016 WL 3640023 (D. Ariz. Jan. 28, 2016) ...................................................................................5

*City of Arcadia v. EPA*,
  265 F. Supp. 2d 1142 (N.D. Cal. 2003) ..........................................................................................8

*City of Dearborn Heights Act 345 Police & Ret. Sys. v. Align Tech., Inc.*,
  865 F.3d 605 (9th Cir. 2017)..........................................................................................................5

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..........................................................................................9

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010)................................................................................................2, 3, 4

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ..............................................................................14

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)..................................................................................3

*In re Facebook, Inc. Sec. Litig.*,
  477 F. Supp. 3d 980 (N.D. Cal. 2020) ..........................................................................................12

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016)........................................................................2, 7, 17

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)..............................................................................................7

*In re First Am. Fin. Corp.*,
  2021 WL 4807648 (C.D. Cal. Sept. 22, 2021)..................................................................................1

iii

Gibson, Dunn &
Crutcher LLP

*Hatamian v. Advanced Micro Devices, Inc.*,
   87 F. Supp. 3d 1149 (N.D. Cal. 2015) ...................................................................................................4

*Ikeda v. Baidu, Inc.*,
   2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) ........................................................................................5

*In re Intel Corp. Sec. Litig.*,
   2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)........................................................................................5

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011).................................................................................................................................9

*Kang v. PayPal Holdings, Inc.*,
   --- F. Supp. 3d ----, 2022 WL 3155241 (N.D. Cal. Aug. 8, 2022).............................................10, 14

*Kelly v. Elec. Arts, Inc.*,
   71 F. Supp. 3d 1061 (N.D. Cal. 2014) ...................................................................................................3

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018)................................................................................................................10

*In re Leapfrog Enter., Inc. Sec. Litig.*,
   200 F. Supp. 3d 987 (N.D. Cal. 2016) .................................................................................................19

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
   543 F. Supp. 3d 96 (D. Md. 2021) ...................................................................................................1, 16

*In re Maxwell Techs., Inc. Sec. Litig.*,
   18 F. Supp. 3d 1032–33 (S.D. Cal. 2014) ...........................................................................................19

*McGovney v. Aerohive Networks, Inc.*,
   2019 WL 8137143 (N.D. Cal. Aug. 7, 2019)........................................................................................10

*McGovney v. Aerohive Networks, Inc.*,
   367 F. Supp. 3d 1038 (N.D. Cal. 2019) ...............................................................................................10

*In re Nash Finch Co.*,
   502 F. Supp. 2d 861 (D. Minn. 2007) ....................................................................................................4

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014)...............................................................................................................20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014)..........................................................................................................3, 16

*In re Qualcomm Inc. Sec. Litig.*,
   2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .....................................................................................19

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017).............................................................................................................3, 4

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014).................................................................................................................18

*Reidinger v. Zendesk, Inc.*,
   2021 WL 796261 (N.D. Cal. Mar. 2, 2021)......................................................................................1, 18

iv

Gibson, Dunn &
Crutcher LLP

*Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) .................................................................................15, 16

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ..................................................................................4

*Rodriguez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018) ........................................................................................12

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)...........................................................................................................4

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009)..........................................................................................................8

*South Ferry LP No. 2 v. Killinger*,
    399 F. Supp. 2d 1121 (W.D. Wash. 2005)..............................................................5, 16, 17, 18, 19

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996)..............................................................................................................5

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
    2017 WL 3097184 (N.D. Cal. June 22, 2017) .............................................................................3, 4

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012)..........................................................................................................18

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996)..............................................................................................................3

*Welgus v. TriNet Grp., Inc.*,
    2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) .................................................................................4

*Weston Family P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ................................................................................................3, 4, 5, 8

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)...........................................................................................10, 17, 18

**Regulations**

17 C.F.R. § 229.105 ...........................................................................................................................7

## I.     PRELIMINARY STATEMENT

Plaintiff's Opposition to the Motion to Dismiss ("Opposition" or "Opp.") advances theories of securities fraud that have no support in the law or in common sense.  Plaintiff's arguments boil down to two misguided contentions.  First, according to Plaintiff, public companies must disclose every data security vulnerability they encounter, thereby inviting cyberattacks—even if they have not detected any actual breach.  Second, Plaintiff contends that public companies subject themselves to a sweeping obligation to disclose all employee departures and other supposed business setbacks simply by expressing general optimism about significant initiatives, such as integration efforts.  These radical propositions have no basis in the law.

Defendants showed that a tide of cases rejected claims just like Plaintiff's.  Mot. to Dismiss ("Mot.") at 8 n.3 (data security) & 4 (integration).  Yet the Opposition does not even grapple with these cases, let alone show that this one is less defective.  It is no distinction to say that data security is important to Okta; it is important to every company, just as other plaintiffs futilely argued.  *See, e.g.*, *In re First Am. Fin. Corp.*, 2021 WL 4807648, at *2, *12 (C.D. Cal. Sept. 22, 2021) (granting dismissal despite the allegation that "protecting consumer data was crucial to [the defendant's] business operations"); *Reidinger v. Zendesk, Inc.*, 2021 WL 796261, at *10 (N.D. Cal. Mar. 2, 2021) (granting dismissal despite the allegation that the defendant's "entire business revolve[d] around collecting, storing, and processing users' sensitive information"), *aff'd*, 2022 WL 614235 (9th Cir. Mar. 2, 2022).  And Plaintiff is flat wrong to say (at Opp. 2, 18 n.7) that its attacks on Okta's integration statements is a unique feature that sets this case apart from the rest.  *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 114 (D. Md. 2021) ("Plaintiff's claims regarding the due diligence and integration statements fail for several reasons."), *aff'd*, 31 F.4th 898 (4th Cir. 2022).

The Opposition fails to identify any false or misleading statement of material fact.  Plaintiff presents no serious argument that the general statements about data security, including one Plaintiff now concedes was not Okta's statement, was misleading.  Nor does Plaintiff cite any factual allegation that is contrary to Okta's risk factors warning that security breaches might occur.  Instead, the Opposition resorts to confusing what Defendants learned in January 2020 (i.e., there was an unsuccessful attempt to access an account that Okta promptly shut down) with what they learned in

1

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:22-CV-02990-SI

March (i.e., a hacker actually compromised customer data). This chronology of events—which the allegations of fact confirm—dismantles Plaintiff's claim that any "breach" was concealed until March. Plaintiff also fails to show that general statements about Okta's integration process—such as, "we're off to a fantastic start," "the integration has gone very well," and "we've made great progress"—amount to more than inactionable puffery. No facts support this theory, and courts have rejected similar claims time and again.

Moreover, the Opposition points to no facts to satisfy Plaintiff's heavy burden of pleading scienter. There are no indications of fraudulent intent or reckless deceit here. There were no suspicious stock sales. The Company was a victim of a cyber-attack, and the alleged facts show that Okta disclosed the attack as soon as it discovered customer data had been impacted. Okta robustly warned its investors about the risks of its integration with Auth0 and also disclosed its challenges. Plaintiff points to no facts showing that Okta knew about the data breach and hid it from investors, or that Okta knew that employee departures following the acquisition made Okta's general optimism about the integration untrue.

The Complaint should be dismissed in its entirety.

## II.    ARGUMENT

### A.    The Opposition Fails to Identify any Actionable Misstatement or Omission

#### 1.    *Statements about the Auth0 Integration Were Neither False Nor Misleading.*

##### a.    Optimistic Statements About the Auth0 Integration.

The Opposition advances no serious argument that Defendants' generalized optimistic statements about the Auth0 integration process are actionable under the federal securities laws.

*First*, the challenged statements are classic examples of inactionable corporate puffery. The statements—such as Okta is "making great progress" on the integration (¶ 150) or the integration has "gone very well" (¶ 140)—are precisely the type of "optimistic, subjective assessment[s]" that "hardly amount[] to a securities violation." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). The Opposition does not address—let alone dispute—that "CEOs and executives of companies that merge with or acquire other companies often describe ongoing mergers as smooth, rapid, and successful— which courts regularly deem corporate puffery." *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *7

(N.D. Cal. Nov. 14, 2016) (citing cases holding that statements that an integration is "moving rapidly," "progressing well," "continuing smoothly," and "already a success" are "routinely dismiss[ed]" as corporate puffery).[1]

Plaintiff argues that these "statements are not puffery because they were concrete assurances about the then-existing state of the Auth0 integration that were highly material to investors." Opp. 14. But even a cursory review of the challenged statements shows Plaintiff is wrong. Defendants never tied any of their challenged statements with a specific metric or concrete benchmark. And absent any reference to a "specific aspect[] of a company's operation," courts have recognized time and again that generalized upbeat statements are not actionable. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (citing *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)); *see also Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620–21 (9th Cir. 2022) (absent "specific or unqualified guidance" like a "specific deadline or revenue impact," "vaguely optimistic assessment[s]" are "so imprecise and noncommittal that they are incapable of objective verification").

Plaintiff's reliance on *In re Extreme Networks, Inc. Securities Litigation*, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) (*see* Opp. 12), only underscores why there is no actionable statement in this case. In *Extreme Networks*, the court held that the plaintiffs had "not adequately" pleaded it was false for the defendants to state that "overall, our integration efforts are on track." *Id.* at *15. As the court noted, because "Defendants never promised a seamless integration plan, they similarly were not misrepresenting the actual situation when they assured the market that the plan was 'on track[.]'" *Id.* The same is true here. Defendants never "promised a seamless integration plan"—and in fact, were candid about the challenges of executing an acquisition of this size. *See, e.g.*, ¶¶ 74, 85, 93, 120, 136, 151, 155, 156, 162.

Similarly, in *Union Asset Management Holding AG v. SanDisk LLC*, (*see* Opp. 14), the court reasoned that statements that an integration was "going quite well" are, "[i]n the abstract … like the kind of corporate puffery that does not give rise to a claim for securities fraud." 2017 WL 3097184, at

---

[1] Plaintiff claims that puffery determinations "should be left to the trier of fact." Opp. 15 n.3. But courts routinely dismiss statements puffery as inactionable as a matter of law. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014); *In re Cutera*, 610 F.3d at 1111; *Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061, 1070 (N.D. Cal. 2014) (Illston, J.).

Gibson, Dunn & Crutcher LLP

*1 (N.D. Cal. June 22, 2017). The court narrowly held the statements were actionable in that particular case because they were made to "reassure the investing public that SanDisk would bounce back from specific negative events" relating to SanDisk's poor revenue numbers and loss of a major customer. *Id.* Nothing like that is alleged here, as Plaintiff does not claim any "specific negative events" that the Defendants were trying to rehabilitate. Plaintiff's other cases involve statements about specific, quantifiable milestones in the progress of an integration—which, again, does not exist here. *See In re Quality Sys.*, 865 F.3d at 1143–44 (challenged statements "provided a concrete description of the past and present state of the pipeline," including specific metrics about size of market); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *9–10 (N.D. Cal. Apr. 28, 2020) (challenged statements were "link[ed]" with defendant's statements about its growth strategy, including how the defendant's platform would help "increase[e] transaction volume" and "acquir[e] new customers").[2]

Plaintiff argues that the challenged statements are not puffery because "analysts' repeated questions on the topic" showed the "materiality of the Auth0 integration statements." Opp. 15. But whether a statement is puffery depends on whether it is sufficiently concrete and "capable of objective verification"—not whether the general subject matter is of interest to analysts. *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *11 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x. 239 (9th Cir. 2019); *see also In re Cutera*, 610 F.3d at 1111. It is of course possible that a topic—such as a $6.5 billion transaction—may be important, while general statements about that topic—such as we are "making progress" on integrating—are puffery.

Nor does the fact of inevitable setbacks transform general optimism into fraud. "[P]roblems and difficulties are the daily work of business people," and "[t]hat they exist does not make a lie out of any alleged false statement" that "project[s] optimism" about the business. *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001)); *see also Twitter*, 29 F.4th at 621 (company's statements that product development was "on

---

[2] *See also Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159 (N.D. Cal. 2015) (finding actionable statements that a specific measure of manufacturing productivity was "in line with our expectations" and "on target") (cited in Opp. 12); *In re Nash Finch Co.*, 502 F. Supp. 2d 861, 881 (D. Minn. 2007) (finding actionable statement that the "operational, logistical, and technical integration have gone … ahead of schedule," given that plaintiffs averred a specific percentage decrease in one key productivity metric).

track" were "so imprecise and noncommittal that they are incapable of objective verification").[3]

*Second*, Plaintiff ignores the context of the challenged statements. When read in context, Defendants' general optimistic statements about the integration were couched by statements emphasizing that the integration was large, complex, and challenging—that Okta "didn't have all the answers" and that there was "a lot of work" to be done. *See* Mot. 17. No reasonable investor could interpret Defendants' statements about the acquisition to mean that it was going perfectly, and the full context shows that Defendants' positive statements were "much more qualified and less definitive" than Plaintiff suggests. *Twitter*, 29 F.4th at 620.[4]

This is not, as Plaintiff contends, a "truth-on-the-market defense." Opp. 17. Rather, Defendants correctly maintain that the challenged statements must be examined in "the context in which they were made, specifically in regard to contemporaneous qualifying or clarifying language." *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *10 (N.D. Cal. Mar. 29, 2019) (citing *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996)). "This is not a truth-on-the-market defense." *Chang v. Accelerate Diagnostics, Inc.*, 2016 WL 3640023, at *5 (D. Ariz. Jan. 28, 2016); *see also In re Intel*, 2019 WL 1427660, at *13 n.18 (reasoning that requiring statements to be read in context is not a truth-on-the-market defense).

Moreover, Plaintiff's argument that Defendants' general optimistic statements somehow

---

[3] Plaintiff also disputes Defendants' characterization of the challenged statements as inactionable opinion statements. *See* Mot. 17 n.9 (citing, as illustrative examples, ¶¶ 140, 162, 163); Opp. 14–16. Plaintiff contends that these are not opinion statements because not every sentence was couched with "prefatory opinion language, such as 'I think.'" Opp. 15. But there is no rule that a statement—let alone *every* statement—contain such prefatory language to constitute an opinion. Additionally, Plaintiff claims that Defendants' opinion statements were "unqualified statements of present fact" (Opp. 16), but Defendants' use of terms like "gone well," "a lot of progress," and "great milestone" are hardly verifiable statements of fact. And finally, although Plaintiff correctly observes that an opinion statement can sometimes be actionable "if it 'omits material facts' that 'conflict with what a reasonable investor would take from the statement itself'" (*id.* (citation omitted)), to establish falsity under that theory Plaintiff must "allege facts showing that [Defendants] knew undisclosed information that seriously undermined the basis for [their] opinion." *Ikeda v. Baidu, Inc.*, 2021 WL 1299046, at *9 (N.D. Cal. Apr. 7, 2021) (citing *City of Dearborn Heights Act 345 Police & Ret. Sys. v. Align Tech., Inc.*, 865 F.3d 605, 615 (9th Cir. 2017)). Plaintiff has not adequately alleged any such facts here.

[4] Plaintiff's reliance on *South Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121 (W.D. Wash. 2005)*, vacated in part*, 542 F.3d 776 (9th Cir. 2008), is misplaced. *See* Opp. 18. In *South Ferry*, the defendant told investors there were operational challenges in integrating technology platforms, but also specifically "reassured investors that [the company] 'took immediate steps to address any of the operating challenges'"—even though the company had not actually taken those steps. 399 F. Supp. 2d at 1138. Plaintiff pleads no such facts in this case.

Gibson, Dunn &
Crutcher LLP

obscured the Company's allegedly struggling sales unravels in light of Okta's disclosures, *throughout the class period*, detailing its revenue from its sales of subscriptions and services. *See, e.g.*, Lutz Decl. Ex. 2 at 6 (Okta Form 10-Q, noting that the report "includes the results of operations for Auth0 for the period from May 3, 2021 through July 31, 2021"); Lutz Suppl. Decl., Ex. 2A at 12–14, 36–37, 39 (Okta Form 10-Q, reporting Auth0-related revenues and earnings for that quarter); Lutz Suppl. Decl., Ex. 4A at 60, 95 (Okta Form 10-K, reporting Auth0-related revenues and earnings for fiscal year); Lutz Decl., Ex. 8 at 5, 10 (analyst call discussing sales performance following Auth0 integration).  Given the Company's regular reporting on sales performance, general statements about progress in the integration could not have misled investors about sales.

*Third*, Plaintiff cites no particularized factual allegations about the supposed employee attrition and retention challenges that they contend rendered the statements false when made. *See* Mot. 18–19. Take, for example, Plaintiff's general claim about a "mass exodus of employees from the Company after the acquisition." Opp. 13.  The complaint is devoid of particularized facts to support this assertion. The only allegation about specific employee departures is that Okta "los[t] several senior Auth0 employees" (namely, Auth0's Chief Legal Officer, Chief Human Resources Officer, and Chief Financial Officer) in August 2021.  Opp. 13 (citing ¶ 65).  Plaintiff has not alleged how the departure of these Auth0 officers in August 2021—*before* the class period began, and hardly a surprise in any combination of two large companies—had any bearing on the integration issues Plaintiff claims occurred the following year.

Plaintiff also points to allegations that many employees allegedly left the Company. *See* Opp. 13 (citing ¶¶ 65, 89, 91–92); *see also* Opp. 14 (citing ¶¶ 66–67).  But here again, Plaintiff fails to plead any specifics—including, most importantly, how any departures impacted the success of the sales integration. *See* Mot. 18–19.  In fact, Plaintiff concedes that "the integration process began as promising" (¶ 78), and CW3 conceded that in the months following the unification, the impact of the integration on sales performance remained unclear (*see* ¶ 40).  Even though CW3 missed her sales quota, she alleges other "team members did better," and CW3 "started to get more sales opportunities" in the following months. *Id.*  Simply saying there was a "mass exodus" of employees does not render a statement about the general progress of the integration misleading if the Plaintiff "do[es] not

6

specifically link" this allegation with any alleged misstatement. *Barrie v. InterVoice-Brite, Inc.*, 2002 WL 1841631, at *9 (N.D. Tex. Aug. 8, 2002); *see also FireEye*, 2016 WL 6679806, at *10 ("conclusory statement [of] a 'mass-layoff'" is not actionable in the absence of "details regarding the extent and severity of layoffs"). In fact, "reductions in personnel after a merger are frequently consistent with 'synergy savings goals' and are often a principal reason why two companies deem it in their best interest to merge." *InterVoice-Brite*, 2002 WL 1841631, at *9. Indeed, Plaintiff expressly pleads that some of these employees were "pushed out" (¶ 67), suggesting their departure was consistent with the integration plan.[5]

b.    Risk-Factor Disclosures Regarding the Auth0 Acquisition.

Plaintiff implies that companies are subject to sweeping obligations to disclose past risks and employee departures. *See, e.g.*, Opp. 16–17, 20–23. They are not. Rather, the SEC instructs every public company to include in its periodic reports prospective "discussion[s] of the material factors that make an investment in the [specific company] risky." 17 C.F.R. § 229.105 (Reg. S-K, Item 105). "Though ubiquitous in securities filings," "cautionary statements of potential risk have only rarely been found to be actionable by themselves." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360–61 (S.D.N.Y. 2008) (citations omitted).

Here, Plaintiff's attempt to cast Okta's risk-factor disclosures regarding the Auth0 acquisition as misstatements fails. *See* ¶¶ 138, 153, 159, 165. Plaintiff contends a single risk-factor disclosure was misleading: that "there could be a loss of our and/or Auth0's key employees and customers," which could prevent the Company from "realiz[ing] the potential benefits from the Acquisition." Opp. 16 (citing ¶¶ 138, 153, 159, 165). Plaintiff argues that this disclosure was misleading because it "warned of potential risks" that, according to Plaintiff, "had already come to fruition" when the disclosure was made in September 2021, December 2021, March 2022, and June 2022. Opp. 16 (emphasis omitted).

But again, Plaintiff points only to general allegations that employees left at unspecified times,

---

[5] The Opposition also mentions that "in December 2021, Defendants scrapped Okta's initial integration plan … for a new plan." Opp. 12. It is unclear how an allegation that Okta adapted its integration plan renders any of the challenged statements false, as Defendants never said that the integration plan would not change.

7

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:22-CV-02990-SI

including "shortly after the acquisition" and during the "fall of 2021." *Id.* These general allegations are not enough. For example, Plaintiff fails to identify which "key" employees left, or whether their departures were unexpected. The Complaint even suggests that the departure of many employees was a *planned* part of the integration process—and not an unexpected development during the integration. *See* ¶ 67 (alleging Okta employees were "pushed out" as part of the integration process). Absent specific allegations about who left and why they were "key," the mere fact that the integration involved the departure of some unspecified employees does not render a general disclosure about the risk that "key" employees might leave the Company misleading. That the Company later determined in August 2022 that "heightened attrition" "impacted [its] business momentum" (¶ 194) says nothing about whether, *at the time it was made more than a year earlier*, the risk had already materialized. *See Twitter*, 29 F.4th at 621 ("[I]t is simply not enough to assume or implausibly infer that the defendants must have known about these issues [earlier] … based on later facts or developments.").[6]

### 2. Statements About Okta's Data Security and the Security Incident Were Neither False Nor Misleading.

#### a. General Statements About Data Security.

Defendants showed that Plaintiff failed to plead any false or misleading statement relating to Okta's data security or the security incident. *See* Mot. 9–16. Among other reasons, general statements about Okta's commitment to data security (*e.g.*, the statement quoted in ¶ 159) are "transparently aspirational" and "not actionable as a matter of law." Mot. 9 (quoting *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021)) (internal quotation marks omitted). The Opposition fails to respond to this point and, therefore, concedes it. *See, e.g.*, *City of Arcadia v. EPA*, 265 F. Supp. 2d 1142, 1154 n.16 (N.D. Cal. 2003) (holding that "the implication of [a] lack of response is that any opposition to this argument is waived").

The Opposition attempts to salvage Plaintiff's challenges to just two general statements about data security—one made by an Okta *customer* about how security is "*of the utmost importance*" to *that*

---

[6] Because Plaintiff has not pleaded any allegations suggesting that the impact of employee retention issues on sales performance had "come to fruition" when the challenged risk disclosure was made, Plaintiff's cases are inapposite. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (disclosure warning about risk of product liability actions "in the abstract" was misleading because "a lawsuit already had been filed").

*customer*, and another from McKinnon regarding maintaining a "ZeroTrust" environment.  Opp. 18–19.  Plaintiff's arguments lack merit.

Plaintiff concedes that the Complaint mischaracterizes the first statement by attributing it to Okta instead of its customer.  *Id.* 19 n.8.  Surprisingly, Plaintiff claims Okta is responsible for its *customer's* statement because Okta included the statement in a press release.  Not so.  First off, it makes no sense to construe a customer's views on that customer's security as an assurance by Okta about the adequacy of *Okta's* "security practices."  Opp. 19.  Absent such an assurance, Plaintiff has no statement to challenge, and its swipes at Okta's security practices become irrelevant.  Furthermore, "[o]ne who … publishes a statement on behalf of another is not its maker" and "attribution within a statement … is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011).  Here, the challenged statement is clearly attributed to Okta's customer, and the Complaint alleges no facts indicating Defendants had "ultimate authority" over both the content and delivery of the customer's statement.  *Id.* at 142.  Therefore, Okta could not be liable for it.  *See, e.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1071 (N.D. Cal. 2012) (dismissing certain allegations because plaintiffs failed to allege the defendant had "'ultimate authority' over the statements made by [and attributed to others]").

Nor could any reasonable investor construe the second statement Plaintiff attacks as an assurance regarding the adequacy of Okta's "security practices." *See* Opp. 19.  The statement is drawn from McKinnon's comments at a technology conference, where he spoke about the steps and challenges to establishing "Zero Trust capability."  ¶ 143.[7]  In their Motion, Defendants pointed out that McKinnon's statements did not concern Okta's sub-processors at all (Mot. 11), and the Opposition does not argue otherwise.  Instead, it merely repeats the Complaint's assertion that the statement was wrong because Okta supposedly lacked adequate security for its administrative tools and sub-processors. Opp. 19.  But Plaintiff does not, and cannot, explain how its unsupported knocks on Okta's security could make a general discussion of the "Zero Trust" framework untrue or misleading.

[7] "Zero Trust" is a type of security framework that imposes security requirements on "various users … regardless of their location, device or network."  ¶ 103.

9

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:22-CV-02990-SI

Gibson, Dunn & Crutcher LLP

In any event, Plaintiff fails to cite factual allegations supporting its conclusory assertion that Okta did not adequately secure its administrative tools, which Plaintiff argues "led to the January 2022 Breach." *Id.* CW6 and CW7—who are alleged to be "Senior Solutions Engineers" (¶¶ 43–44)—are not described with the "particularity [required] to establish their reliability and personal knowledge." *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1052 (N.D. Cal. 2019). And there are no facts alleged showing that CW6 had personal knowledge about how Okta secured its administrative tools or that CW7, who stopped working for Okta six months before the putative class period, would have knowledge that a general statement about the "Zero Trust environment" was untrue. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (rejecting CW allegations because "[t]wo of the witnesses … were not employed by Digimarc during the time period in question"). Furthermore, the Opposition makes no attempt to connect CW6's or CW7's allegations about Okta's SuperUser tool to the security incident. Neither CW6 nor CW7 offers any allegations about Okta's security requirements for sub-processors, much less allegations that any Defendant knew about inadequacies with respect to Okta's security requirements for sub-processors. *See* ¶¶ 98–102.

b.      The Data Security Risk Factor.

Plaintiff contends that Okta's data security risk factor was misleading because it presented as hypothetical the risk that Okta's "data security … may allow unauthorized access to [Okta's] systems or data or [Okta's] customers' data," when Defendants supposedly knew a "breach" had already occurred. Opp. 20 (quoting ¶ 159). But Defendants explained they did *not* know that any breach had occurred when they issued the challenged risk disclosure on March 7, 2022—and the Complaint does not allege otherwise. Mot. 12.[8] In response, Plaintiff cites six paragraphs of the Complaint to argue

---

[8] Despite taking "no position" on Defendants' Request for Judicial Notice (ECF No. 57), Plaintiff refers to Exhibit 6 to Defendants' Request for Judicial Notice as an "extraneous exhibit[]." Opp. 22 & n.10. Exhibit 6 is cited in the Complaint, and therefore properly subject to the doctrine of incorporation by reference. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018). That doctrine not only prevents Plaintiff from "selecting only portions of documents that support [its] claims, while omitting portions of those very documents that weaken—or doom—[its] claims," but it also "permits courts to accept the truth of matters asserted in incorporated documents." *Kang v. PayPal Holdings, Inc.*, --- F. Supp. 3d ----, 2022 WL 3155241, at *7 (N.D. Cal. Aug. 8, 2022) (quoting *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *7 (N.D. Cal. Aug. 7, 2019), and *Khoja*, 899 F.3d at 1014). That said, the Court need not accept the language in Exhibit 6 for the "truth" that Defendants did not know the extent of the security incident until late March 2022, as Plaintiff's own allegations state the same thing. *See* ¶ 106. And the Complaint is obviously devoid of any specific factual allegation that Defendants knew before then.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:22-CV-02990-SI

Gibson, Dunn & Crutcher LLP

that "Defendants confirmed they knew about the breach in January 2022" (Opp. 22; ¶¶ 12, 105, 106, 107, 108, 159).

None of those allegations supports Plaintiff's argument. Paragraph 12 summarizes, without supporting detail, Plaintiff's contention that Okta learned about a security incident in January. Although Plaintiff asserts that hackers compromised customer information, it does not plead any facts to suggest that Defendants knew about that compromise in January. ¶ 12. Paragraphs 105 and 107 say the hackers posted screenshots evidencing a breach in March and that Okta's stock price declined. Paragraph 106 quotes McKinnon as stating: "In late January 2022, Okta detected an *attempt* to compromise the account of a third party customer support engineer working for one of our subprocessors. The matter was investigated and contained by the subprocessor." ¶ 106 (emphasis added). Paragraph 108 discusses a post about the incident from David Bradbury, Okta's Chief Security Officer. ¶ 108. In the full version of his post, Bradbury similarly recounts: "In January 2022, Okta detected an unsuccessful *attempt* to compromise the account of a customer support engineer working for a third-party provider." Ex. 5 (emphasis added). Okta responded, Bradbury added, by "terminating the user's active Okta sessions and suspending the individual's account." *Id*. Paragraph 159 quotes Okta's Annual Report for 2022, which nowhere suggests that Defendants knew in January that hackers had *accessed* customer data.

These allegations—the best Plaintiff could muster—do not support Plaintiff's contention that Defendants knew of any "breach" or actual compromise of data in January 2022 or any time before Okta issued its risk disclosure on March 7. Rather, these allegations confirm that Defendants had only learned of an unsuccessful *attempt* to access an account, which Okta promptly shut down. There is no reason why Okta should have been expected to identify as a *prospective* risk factor the fact that someone had unsuccessfully attempted to access an account that Okta shut down.

This sequence of events stands in stark contrast to the facts of the *Alphabet* case. Alphabet's senior officers allegedly received a detailed memo highlighting an *ongoing* security vulnerability and, thereafter, caused the company to mislead investors by concealing this information, reporting in Alphabet's public filing that there were "no material changes" to its risk factors. 1 F.4th at 696, 702–04.

Plaintiff further argues that the security incident must have been material to investors and unlawfully *omitted* because of the nature of Okta's business.  Opp. 21–23.  Not so.  "Silence, absent a duty to disclose, 'is not misleading under Rule 10b-5.'"  *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1012 (N.D. Cal. 2020) (quoting *Basic Inc. v. Levinson*, 485 U.S 224, 239 n.17 (1988)).  Plaintiff pleads no facts demonstrating that Okta had any duty to disclose what it knew in January 2022—that Okta detected an attempt to compromise an account, and that the matter had been investigated and contained.

> c.    McKinnon's Statements Regarding the January 2022 Security Incident.

Plaintiff grossly overstates its allegations when it argues that Defendants "continued misleading investors by telling them they had maintained customer trust following the January 2022 Breach." Opp. 23.   Plaintiff characterizes McKinnon's statements as "concrete assurances about existing customer trust."  *Id.* at 24.  But that is simply not the case.  McKinnon's statement was made in June 2022 during an interview, in which he said Okta had received feedback from its customers on how it could improve after the security incident—create a secure "support environment," "communicate better," and "instill this trust."  ¶ 167.  McKinnon opined, "I think we've been able to do that."  *Id*. This was simply a statement of McKinnon's opinion—not about "existing customer trust," but about McKinnon's view that Okta had acted on the feedback it received.  Plaintiff does not dispute that his opinion was genuine, and his "[g]eneralized statements of corporate optimism" are inactionable puffery.  *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1054 (N.D. Cal. 2018).

Irrelevant allegations from confidential witnesses that do not even mention McKinnon or show that Okta was losing customers over the security incident do not turn this general statement about how Okta was responding to customer feedback into actionable misstatements of fact.  Plaintiff cites an allegation from CW3, for example, that alleges "*the Company* was saying they were losing sales because of the breach" and that the "breach [came] up with every customer."  ¶ 113 (emphasis added). But CW3 does not refer to a single sale lost on account of the breach and was commenting on a meeting that allegedly occurred in March 2022—three months before the June interview during which McKinnon opined that the company was responding to its customers' feedback.  *Id*.  Plaintiff also claims CW4 "recalled that prospective customers were deciding against doing deals with Okta after

the breach" (¶ 114), but again, CW4 identifies not one deal that fell through because of the security incident, much less when. And CW8 admits she could not "quantify the amount of lost business" due to the security incident—acknowledging her inability to refute McKinnon's puffery and opinions. ¶ 115.

The Opposition overreaches again in accusing McKinnon of falsely "explain[ing] that the Company was still on track to achieve its growth targets, quelling any investor concerns that the breach negatively impacted sales." Opp. 23. McKinnon's statement did not address sales or how the security incident affected its current growth trajectory. *See* ¶ 168. Instead, it expressed his commitment to grow the company over the next *several years*. *Id*. ("We're committed to making this a $4 billion a year company by fiscal year, fiscal year 26."). This forward-looking commitment was also inactionable puffery and opinion. It contained no assertion about whether the security incident impacted sales, and the Complaint pleads no facts to contradict it in the least.

**B.    The Opposition Confirms the Complaint's Failure to Plead a Strong and Compelling Inference of Scienter**

Plaintiff has no credible response to Defendants' arguments showing that Plaintiff failed to plead the particularized facts necessary to support a strong inference that any of the Individual Defendants intentionally lied or were deliberately reckless when making any challenged public statement relating to the security incident or the Auth0 integration.

**1.    *The Confidential Witness Allegations Are Neither Reliable Nor Indicative of Scienter.***

a.    The Auth0 Integration.

Plaintiff also tries—and fails—to twist the CW allegations about the Auth0 integration into facts showing fraudulent intent. But these allegations also offer no help to Plaintiff. None of the confidential witnesses provides any facts demonstrating that any Individual Defendant knew of information demonstrating that the general, qualified statements about the progress of the Auth0 sales integration were false. Plaintiff's complaint that it is not required to "plead 'admissible evidence'" (Opp. 27) misses the point: Plaintiff must plead particularized facts supporting an inference of scienter, and those facts simply have not been pleaded (because they do not exist).

Plaintiff argues that CW2 participated in weekly status updates about the integration with

McKinnon, Rowland, and St. Ledger. *Id.* But the Complaint does not allege that McKinnon participated in these meetings—only that "St. Ledger and … Rowland were involved in the weekly status updates." ¶¶ 80, 217. Regardless, the Complaint contains no facts that anyone—including McKinnon—learned any information at these meetings, or otherwise, that contradicted Defendants' public statements about the integration.

Plaintiff points to allegations drawn from CW3, that at "three or four All-Hands Meetings that occurred in January/February 2022, McKinnon and a guest discussed the Auth0 acquisition." ¶ 218. That is a far cry from particularized facts showing that at the meeting, McKinnon learned facts that contradicted his public statements. *See also Kang*, 2022 WL 3155241, at *11 (rejecting CW allegation about "undated 'weekly or biweekly meetings' where 'updates were provided'" without "attest[ing] to any Individual Defendant ever attending a meeting or receiving a report about" the allegedly concealed information). Plaintiff's reliance on CW5, who says that "integration issues were discussed" at meetings, including "problems making sales for Auth0" (¶ 219), fails for the same reason: CW5 does not say when these meetings supposedly happened, whether CW5 attended, what specific information was discussed, or whether McKinnon learned information that contradicted his public statements. Nor does Plaintiff explain how a discussion of "problems making sales" or "integration issues" renders statements about the Auth0 integration false when, throughout the period in question, Defendants acknowledged that the sales integration would take time and "there's no real finish line when it comes to integrations." ¶ 120.

Plaintiff argues that allegations attributed to CW2 about a change in business strategy that "directly followed alongside the integration challenges" also supports an inference of scienter. Opp. 27–28. But, as explained, the Complaint does not allege any facts that support an inference that the Defendants' statements about the Auth0 integration were false or misleading when made. As in *In re Diebold Nixdorf, Inc. Securities Litigation*, 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021), "Plaintiff points to no *data*—such as documents, reports, analyses, etc.—suggesting that Defendants' statements regarding [the] integration efforts were false or misleading *when made*, let alone that Defendants knew of such data but made their representations anyway." *Id.* at *11. CW1's allegations about the departures of the Chief Legal Officer, Chief Human Resources Officer, and Chief Financial Officer

and the departures of "75–85% of [Okta's] VPs and SVPs" also offer little in the way of establishing scienter. ¶ 67. Both allegations suffer from the same fatal flaw: the Complaint is silent as to how these departures impacted the integration of the sales function or rendered any challenged statement false or misleading. Plaintiff also concedes that CW1's allegations about the Board of Directors is hearsay (Opp. 27 & n.16), so there is no basis to "credit" the unsupported allegation about what the Board supposedly was told or knew from meetings CW1 did not attend.

### b.    The Data Security Incident.

Plaintiff argues that the CW allegations "demonstrate that Defendants knew of the January 2022 breach in January—two months before admitting such a breach occurred" and that "Defendants knew about Okta's data security vulnerabilities before January 2022." Opp. 28, 29. But "Plaintiff['s] summary in [its] briefing offers more than [its] allegations deliver." *Bao v. SolarCity Corp.*, 2016 WL 4192177, at *6 (N.D. Cal. Aug. 9, 2016), *aff'd*, 884 F.3d 844 (9th Cir. 2018).

For example, Plaintiff points to the allegation drawn from CW3 that, "during an All-Hands Meeting following the January 2022 Breach, Defendants informed Okta employees that Okta 'quickly' knew the breach occurred and shut the compromised account down." Opp. 28. But Plaintiff pleads no facts from which it can be inferred that the Defendants knew before March 21, 2022, that there was a "breach" as a result of a third party gaining access to Okta's sub-processor employee's computer. Indeed, it is clear from the Complaint's own allegations that, in January 2022, Okta thought the security incident was limited to an attempted intrusion that was investigated and contained. *See supra* Section II.A.2.b. In any event, CW3's account of what supposedly happened at this meeting is consistent with Okta's public statements about what it knew about the breach and when. *Compare* ¶ 113, *with* ¶ 106; *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1136 (E.D. Wash. 2013) (rejecting CW allegations that "largely consist of information publicly and contemporaneously disclosed").

Plaintiff argues that CW6 and CW7 offer "corroborative accounts" of how Okta failed to properly secure its administrative tools "which led to the January 2022 Breach." Opp. 29. That is not accurate. Neither CW6 nor CW7 can offer reliable personal knowledge of the security practices in place when the security incident occurred, or what caused the incident, because neither CW6 nor CW7

Gibson, Dunn & Crutcher LLP

15

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:22-CV-02990-SI

worked at Okta in January 2022 (¶¶ 43–44). *See cf. Sterling Fin. Corp.*, 963 F. Supp. 2d at 1135 ("Any inference that pre-Class Period practices continued during the Class Period amounts to unsubstantiated speculation."). Nor do the allegations drawn from these witnesses say anything about scienter; CW6 and CW7 are not even alleged to say what any Individual Defendant supposedly knew about the security incident or Okta's security measures. *In re Marriott*, 543 F. Supp. 3d at 144–45 (CW statements that only "criticized [the company's] IT decisions" and did not "regard[] Defendants deceiving investors" failed to support scienter).

Plaintiff fares no better with CW9's allegation of a human-error incident in October 2021 that is not alleged to have had anything to do with the security incident. Citing nothing, Plaintiff claims that "any data breach puts the Company on notice of the inadequacy of its data protection systems" just because Okta is "a company that specializes in providing software for companies to deliver secure networks." Opp. 29 & n.17. But CW9's opinion about an unrelated incident, and Plaintiff's claim that the Individual Defendants could have learned about it "without extraordinary effort," (Opp. 29–30), fails to demonstrate the fraudulent intent of any Individual Defendant with respect to the completely different security incident that occurred months later.

### 2.     The "Core Operations" Doctrine Is Inapplicable.

The core operations theory of scienter requires the plaintiff to plead "detailed and specific allegations about [Defendants'] exposure to factual information within the company" or demonstrate "the nature of the relevant fact[s are] of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP*, 542 F.3d at 785–86. "Proof under this theory is not easy." *Intuitive Surgical*, 759 F.3d at 1062. Plaintiff has no serious argument that it has made this difficult showing.

Plaintiff's core operations theory as to the Auth0 integration statements is deficient. Opp. 30–32. Plaintiff argues that "Defendants knew about specific integration challenges, such as the loss of senior Auth0 employees," not just that they knew about the integration generally. *Id.* at 31. Plaintiff cites vague CW allegations such as "attrition was a 'common concern'" for some unidentified persons (¶ 66), that CW5 "indicated McKinnon held weekly all-hands meetings during which integration issues were discussed" (¶ 219), and that "everyone, including Okta's senior executives" could "figure out

Gibson, Dunn &
Crutcher LLP

revenue from deals" (¶ 223).[9]  But even assuming these unsupported contentions were true, the Complaint does not adequately allege that any Defendant made any knowing or reckless statements about the general progress of the integration.  These allegations are a far cry from "detailed and specific allegations about management's exposure to factual information within the company" that contradicted Defendants' public statements.  *Zucco*, 552 F.3d at 1000 (allegations that management "closely reviewed accounting numbers" in a database and that "top executives" discussed these figures at "several meetings" were insufficient to impute knowledge of accounting manipulation); *FireEye*, 2016 WL 6679806, at *16 (plaintiffs failed to "provide[] information about precisely what was said by the parties in these meetings, which facts the Defendants were exposed to, and why this exposure supports an inference of scienter").

Plaintiff also argues that the Auth0 acquisition was a "massive deal for Okta," and "critical to maintaining [its] high growth rate," so it would be absurd to suggest that Defendants were unaware of attrition rates or difficulties making sales.  Opp. 30–31.  But again, Plaintiff cites no factual allegations demonstrating that the sales integration was so prominent and flawed that Defendants must have known their qualified statements about the integration process, in which Defendants repeatedly said the sales integration would take time, were false.  In *Berson v. Applied Signal Tech., Inc.*, the Ninth Circuit concluded that the plaintiffs could rely on the core operations doctrine to infer that the defendants, who were alleged to have been "directly responsible for [the Company's] day-to-day operations," must have known about four stop-work orders issued by the company's two largest customers (who together comprised 80% of its business).  527 F.3d 982, 985, 987–88 (9th Cir. 2008).  Nothing like that is alleged here to support a strong inference of scienter under the core operations doctrine.

Plaintiff also claims that scienter can be inferred under the core operations doctrine because Defendants allegedly "admitted" to knowing about the "breach" before it became public.  Opp. 32.  But the Complaint is devoid of any "detailed and specific allegations about [Defendants'] exposure [in January 2022] to factual information," *S. Ferry LP*, 542 F.3d at 785, explaining that the Incident was

---

[9] Plaintiff claims that "CW accounts confirm that Defendants had *actual* access to CRM tools that closely monitored sales to new customers and thus would have shown declining sales."  Opp. 32.  What is missing, however, is any particularized factual allegation explaining what these reports supposedly showed or how their contents contradicted any challenged statement.

17

Gibson, Dunn &
Crutcher LLP

anything more than "an attempt to compromise the account of a third party customer support engineer" that was contained, ¶ 106. *See supra* Section II.A.2.b.

Nor does Plaintiff establish that this is the "exceedingly rare" and "unusual" case where the core operations doctrine applies without particularized allegations suggesting that the Individual Defendants had access to information demonstrating the falsity of their statements relating to the security incident. *S. Ferry LP*, 759 F.3d at 785 & n.3. Plaintiff does not plead facts that remotely support the contention that it was "patently obvious" to Defendants that their general statements about the importance of data security were false. *Zucco*, 552 F.3d at 1001. There certainly was nothing "obvious" about the secret cyberattack that criminals concealed until March 21, 2022. Nor does Plaintiff's view that data security and customer trust is important to Okta—a truism for all companies— show that it is "absurd to suggest that" Defendants did not know about the actual breach of data before that compromise was publicized late in March 2020. Opp. 32. The PSLRA demands far more.

### 3. *Plaintiff's Reliance on the Integration Statements Is Circular and Flawed.*

Plaintiff also claims that the Defendants' scienter can be inferred because Defendants made "specific" statements about the integration. Opp. 32. According to Plaintiff, because Plaintiff claims statements were false, the Court can also infer that they were made with fraudulent intent. Plaintiff is talking in circles. *Zendesk, Inc.*, 2021 WL 796261, at *10 ("The scienter requirement exists because falsity does not always equal fraud."). To accept that contention would be to read the requirement to plead scienter out of the PSLRA. And the cases Plaintiff relies on show why this theory offers no path to meeting their difficult burden of pleading scienter.

In *Reese v. Malone*, the Court agreed with the plaintiffs that an individual defendant's "detailed factual statement" about a pipeline's corrosion rate that "contradict[ed] important data to which she had access" supported a strong inference of scienter. 747 F.3d 557, 572 (9th Cir. 2014), *overruled on other grounds*, 747 F.3d 557 (9th Cir. 2017). Citing to this case, Plaintiff claims Defendants made similar "specific representations about Okta's integration and sales force." Opp. 32. But the statements Plaintiff identifies as examples—Okta was "making great progress on the integration," the sales force was a "key piece of the puzzle," Okta had "some pretty good goals"—are not "detailed factual statements" about *anything*. *Id.* at 32–33. And in *In re VeriFone Holdings, Inc. Securities Litigation*,

18

704 F.3d 694, 708 (9th Cir. 2012), the defendants claimed a merger was an "unprecedented success." Here, however, Defendants cautioned the market that they could not "just flip the switch" on the Auth0 integration, and they "recogniz[ed] there is still a lot of work to do," and "there's no real finish line when it comes to integrations." ¶¶ 85, 93, 120, 151, 155, 162.[10]  There's no basis to infer from these statements that any Defendant knew that general statements about the integration process and status were false.

Plaintiff also argues that Defendants' supposed post-class period "admissions" about integration issues supports an inference of scienter because the statements "contradict[ed]" earlier statements.  Opp. 33.  This "theory is basically an assertion of fraud by hindsight—judging the statements on how things actually turned out subsequently.  Such proof is not adequate to state a claim." *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1005 (N.D. Cal. 2016).  Regardless, Plaintiff identifies no statement after the class period in which any Defendant admitted that prior statements about the acquisition integration were not true.

### 4.    *Plaintiff's Corporate Scienter Arguments Lack Merit.*

Plaintiff argues that the scienter of St. Ledger and Rowland can be imputed to Okta because they were involved with the integration process, "signed off on everything," and they "pushed out Okta's founders."  Opp. 34.  But the allegations directed at these two non-defendants amount to criticism of their management style.  *See, e.g.*, ¶ 66 (CW4 alleging St. Ledger's "team did not integrate well").  These allegations provide no basis to conclude that either of these two non-defendants—who are not alleged to have made or authorized any misstatements—knew that any challenged statement was false or misleading, or that any such knowledge could be imputed to Okta or any other defendant. *See In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1032–33 (S.D. Cal. 2014) ("[C]orporate scienter is not sufficiently alleged under these circumstances where one executive had the knowledge and other, perhaps-innocent executives made the statements.").

---

[10] Plaintiff argues that McKinnon's response to an analyst's question about employee retention was "clearly intended to quell concerns about integration risks."  Opp. 33.  But all McKinnon said was that employee retention is an "important point."  ¶ 74.  McKinnon did not make "specific denials" about Okta's attrition, like the defendants did in *In re Qualcomm Inc. Securities Litigation*, 2019 WL 1239301 (S.D. Cal. Mar. 18, 2019), nor did he "repeatedly" claim that Okta had taken certain action or immediately fixed problems like in *South Ferry*, 687 F. Supp. 2d at 1259.

Gibson, Dunn & Crutcher LLP

**5.    The Non-Fraudulent Inference Is Far More Compelling.**

Plaintiff calls it a "close question" (Opp. 35) whether the competing non-fraudulent inference—that Defendants timely and accurately reported what they knew about the security incident, and that Defendants believed what they said when they described the Auth0 integration as off to a good start and making good progress, and that the sales integration would take time—outweigh the inferences that Plaintiff asks the Court to draw.  It is not a close call.  As explained in this brief and Defendants' opening brief, Plaintiff has failed to plead particularized facts, as required, supporting a reasonable inference that any Defendant intentionally lied or was deliberately reckless when making any of the challenged statements.  And, Plaintiff failed to allege that *any* Individual Defendant engaged in suspicious trading or had any other motive to deceive investors.

The Complaint comes nowhere close to satisfying the difficult scienter element of Plaintiff's securities fraud claim.  The Complaint should be dismissed on this independent basis.

**C.    The Opposition Does Not Even Mention Plaintiff's Section 20(a) Claim**

Because the Complaint fails to allege a primary violation of the federal securities laws, Plaintiff's Section 20(a) claim necessarily fails.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).

### III.    CONCLUSION

The Complaint should be dismissed.

Dated: February 17, 2023

GIBSON, DUNN & CRUTCHER LLP


By:    _____/s/ Brian M. Lutz_____
                Brian M. Lutz

*Attorneys for Defendants Okta, Inc., Todd McKinnon, Brett Tighe, and Frederic Kerrest*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:22-CV-02990-SI

Gibson, Dunn &
Crutcher LLP