Pages 1 - 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

IN RE:  OKTA, INC. SECURITIES  )
LITIGATION.                     )
                                )
                                **) CASE NO. 22-02990 SI**
                                )
                                )
_____   )

San Francisco, California
Friday, March 17, 2023

**<u>TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS</u>**

<u>**APPEARANCES**</u>:  (via videoconference)

For Nebraska Investment Council:
                    LABATON SUCHAROW LLP
                    140 Broadway
                    New York, New York  10005
            BY:  **JAMES T. CHRISTIE, ATTORNEY AT LAW**

For Defendant Okta, Inc.:
                    GIBSON, DUNN & CRUTCHER LLP
                    555 Mission Street - Suite 3000
                    San Francisco, California  94105
            BY:  **BRIAN M. LUTZ, ATTORNEY AT LAW**

                    GIBSON, DUNN & CRUTCHER LLP
                    1881 Page Mill Road
                    Palo Alto, California  94304
            BY:  **WESLEY SZE, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

<u>Friday - March 17,2023</u>                                    <u>10:09 a.m.</u>

**THE CLERK:**  Now calling civil matter 22-CV-2990, In Re: Okta, Incorporated Securities Litigation.

Counsel, please state your appearances for the record starting with Plaintiff.

**MR. CHRISTIE:**  Good morning, Your Honor, James Christie from Labaton Sucharow on behalf of lead Plaintiff, the Nebraska Investment Council.

**THE COURT:**  Good morning.

**MR. CHRISTIE:**  Good morning.

**MR. LUTZ:**  Good morning, Your Honor, Brian Lutz from Gibson Dunn on behalf of the Defendants, and also with me is my colleague -- well, he can introduce himself.  He is unmuted.

**THE COURT:**  Good morning.

**MR. SZE:**  Good morning, Your Honor, this is Wesley Sze from Gibson Dunn.

**THE COURT:**  Good morning.  And, Marla, thank you for helping us out.

This is Defendants' motion to dismiss Plaintiff's amended complaint, and I will tell you that I am inclined to grant the motion with leave to amend, although I have some questions about that, with respect to most of the allegations.

And the issue that -- that I had with the complaint and sort of the timeline of events was a failure to kind of identify the timing of events so as to understand the causation

of the events.  It just seems it's not pinned down in a way that I can understand.

So, for example, with respect to the mass exodus of employees after the acquisition, there are things that are alleged to have happened in the Fall or around the Fall or around Fall 2021, and there are also claimed false statements that were occurring within that timeframe in September and in December, which would or would not be false depending on when the things actually happened that are alleged.

So there is a lot of it like that, that I feel is unconnected in a way that allows the appropriate finding with respect to both specificity and with respect to scienter.

So, that's kind of where I'm starting and I'm wondering -- so the mass exodus thing, for example, if I grant leave to amend -- so this would be a question for Mr. Christie, I guess, or -- yeah, Mr. Christie.  Can you add detail to that if I give leave to amend?

MR. CHRISTIE:  Sure, Your Honor.  You know, I would start by just saying that I do think if you look at all of the CW allegations collectively, yes, there are some that are more descriptive than others; but I will note that there's at least some CWs that specifically say when the exodus happened and -- I will point to CW1 that says it's in August of 2021.  That's prior to the beginning of the class period.

I will also point to CW4 who said that Auth0 employees

started to leave Okta not long after May or June of 2021.

Your Honor, CW6 talks about more of a mass exodus and that's the words that CW6 uses where she says Fall of 2021. I understand Your Honor's point that that's not exactly pinpointed, but with the class period starting in September and I think Reddit in connection with what some of the other CWs are saying, I think it is a fair inference to assume that that was at the beginning of the class period.

Now, Your Honor, just to ask [sic] your specific question with respect to amending, yes, as part of our typical firm practices, when a motion is sub judice or we are waiting for an oral argument, we always continue our investigation.

As you may know, some further layoffs have happened at Okta since the complaint has been filed, so we believe there may be other former employees or confidential witnesses who may be able to provide a finer point on the timing that Your Honor seems to think is lacking at this point.

So, yes, that's definitely something that we can -- we would be able to address if we had leave to amend.

**THE COURT:** All right. Thank you.

Well, in general it's -- I guess, Mr. Lutz, it's your motion. Do you want to be heard?

**MR. LUTZ:** I'm happy to. I mean, Your Honor, I know we don't have a lot of time. I'm happy to address that particular issue or I'm happy to address -- we have two

fundamentally distinct theories of fraud.  Your question goes to the second one, which is the acquisition integration as opposed to the security incident.  I'm happy to address either.

THE COURT:  Well, with respect to the security incident, I had -- I guess I have another question that's -- that I don't know for whom this question is -- but with respect to the security, the superuser functionality is discussed at length and were the third parties' subprocessors, did they have the ability to get superuser status?

MR. LUTZ:  There is no allegation of that, Your Honor. I would say that the super -- there is no statement that is challenged about the superuser concept at all.  There is a very general description of one statement that describes generally how we manage security and what zero trust is.

It's one of those that I can't even understand what is alleged to have been false or misleading about it, but the -- to answer your question directly, there is no allegation -- factual allegation in the complaint that the security incident that occurred had anything to do with superuser status or otherwise.

As the -- as the allegations that are set forth in the complaint and as the documents that are incorporated in the complaint make clear, this is an incident that was a hack. That was some unauthorized third party -- some hacker gained access to a third-party computer and went in for a limited

period of time and sort of sat over the shoulders, as it were, of a third-party's computer and had limited access to what that computer target had access to.  Had nothing to do with superuser or otherwise.

Your Honor, if I can just go back to -- I'm happy to answer more questions about that but --

**THE COURT:**  That's fine.

**MR. LUTZ:**  I would like to also address the acquisition integration issue that you raised.  I mean, obviously I agree.  There is no specificity at all around the employee departures.  Just saying the words "mass exodus" doesn't really mean anything.  Generally -- I mean, there is no specificity about when that may have happened.

I would say more fundamentally, there is no affirmative statement -- there is no statement that is alleged to have been misleading or false even if you assume that there was some employee exits; right.

There's two categories of statements here that are basically at issue.  One is all of the puffery statements or what we firmly believe are puffery.  "We are off to a good start.  Things are going well.  We are making progress."

I think, you know, I can go over that as addressed clearly in our briefing.  Those are not affirmative statements of fact that can be proven true or false regardless of employee departures or otherwise.  Those are classic corporate puffery

that are not actionable.

THE COURT:  Well, what about --

MR. LUTZ:  We have the written --

THE COURT:  The statement in March 2022 about how things are just going great while the complaint alleges that the employees, in fact, have not been trained on selling each other's products?  There are specific allegations of that.

MR. LUTZ:  Sure.  I would say you have to look at all of the statements in context; right.  What we said -- what we said on the very earnings calls where the puffery statements or where things are moving along fine are statements that are very specific about the challenges that are being faced.

We say -- Okta said during the course of this year-long period after the deal was announced and closed and when the integration even began, it said, "We are not going to start the sales integration until February 2022," almost a year later.

During this period and up even after it what did Okta say? They said, "There is no flip-the-switch and it happens with sales integration."  They said, "You can't" -- "this is a work in progress."

They said, "There is no finish line when it comes to integration."

So my point is they were upfront about the challenges and that this was a work in progress throughout.

THE COURT:  Well, what about on March 2nd when they

said, my --

**MR. LUTZ:**  "We are off to a great start"?

**THE COURT:**  No.  Just listen to what they said.

**MR. LUTZ:**  Yes.

**THE COURT:**  (As read:) "Ensuring that we continue the seamless integration of Auth0 across all facets of the company. Now that we have the back office and go-to-market teams have been fully integrated, we will continue to refine our systems and process to ensure that the tremendous growth opportunity continues."

Well, the CWs are saying, "We were not even trained on their products as of that time."  So isn't that just a flat misstatement?

**MR. LUTZ:**  No, no it's not.  I mean, I think we were open about what was happening with the integration.  We said the integration happened a month earlier.  It is happening right now.  We were upfront about the fact that there was still work to be done.  So, no, I don't think that's a misstatement at all.

I mean, look, whether you look at the statements made throughout the class period or you look at the risk factor that is focused on in the complaint, I don't think there is an affirmative statement that is challenged or that is alleged to have been false by any factual statement that is provided by the confidential witnesses or otherwise.  To your point about

timing, right, you asked about the timing of these things.

**THE COURT:**  Yes.

**MR. LUTZ:**  As best as I can read the complaint, the only inference that you can possibly draw is that there were some employee departures early on after the deal was announced before the class period even began; right.

You have to remember the transaction that occurred here was announced, I think, six months before the class period began and closed four months before the class period even began.

So, yes, there were some departures.  The Plaintiffs, the only specificity they provide is by identifying the chief legal officer, the head of human resources, and the chief financial officer who left.  That's the only specificity they provide as to particular employee departures.

Of course, it's not particularly surprising when you have a combination of two companies that senior officers of the acquired company may not -- may leave.  That's normal.

There is no specificity at all as to the others.  And there is no indication that even if you assume that there is a mass exodus -- there is no specificity provided about that -- when that happened or that it impacted or when it may have impacted the sales function, those allegations do not exist. They certainly do not exist here.

I understand that Your Honor may give them leave to try to

fix that.  In this complaint, that does not exist.

**THE COURT:**  All right.  Thank you.  Mr. Christie.

**MR. CHRISTIE:**  So, Your Honor, I will just start with the integration because we were just speaking about that and I will touch on the -- you know, the data security point after.

You know, I think Mr. Lutz's arguments rely on us having to abandon common sense with respect to the allegations in the complaint and looking at them in their entirety.

The CW allegations do contain a lot of specificity with respect to the departures.  You had already talked about kind of the fact that this obviously happened early on in the beginning of the class period when you have the mass exodus; but, I mean, you have to take that alongside some of the other allegations that -- so, for example, CW5 says that Okta pushed out approximately 75 to 80 percent of the vice presidents and senior vice presidents and that they say right after that (as read:) "and the people who were pushed out were replaced with people who did not understand Okta's product and the market."

Likewise, CW2 says -- and as Your Honor noted -- (as read:) "that neither Okta employees nor Auth0 employees had knowledge of each other's products and did not receive training or education on the other's products."

Additionally, CW2 explained that Auth0's sales force that would have to operate separately at the time from Okta systems.

Your Honor, put yourselves in the shoes of one of these

salespeople and all of the sudden all the Auth0 people who have all the knowledge of the Auth0 product and the customizability and all of the stuff that goes along with that that is different and apart from the Okta product, and all of the sudden the Okta people are left to sell a product that they don't understand.

And, Your Honor, what happens in December of 2021 is the company completely scraps the plan that they had in place and they make everyone generalists and ask them to sell both products, which obviously did not work.  We know it impacted the company's sales.

And, Your Honor, just from a timing standpoint, certainly by now the mass exodus has happened and we are talking --

THE COURT:  Certainly by what?

MR. CHRISTIE:  Sorry.

THE COURT:  Certainly by what?

MR. CHRISTIE:  By the turn of the year.  Going from 2021, we know the company has completely scrapped the integration plan; and they announced it to employees in December and effective January.

We know that they completely scrapped the plan at that point, and they make everyone generalists and ask them to sell products that they don't understand.

And, you know, more specificity from CW5 saying that 20 percent of sales representatives -- only 20 percent hit

their quotas and that there was a mass exodus of employees.  So she links the two together.

CW3 similarly said everyone in sales was struggling and that she only managed to achieve 20 percent of her bill -- of Okta first quarter for fiscal year 2023.

Your Honor, I think it is a little rich for Mr. Lutz to say there is no specificity whatsoever.  I think when you read all of the CW allegations in context you do reach that point of demonstrating that the statements that Your Honor pointed out were false and misleading.

And, you know, to that end, Your Honor, I would just like to mention some of the other ones that -- you know, maybe there are some that have that flavor of puffery that you have seen in some other cases, but number one, in the context here, which we think is very critical -- I know Mr. Lutz mentioned context of -- you know, kind of some of the warnings that the company might have given -- but I think the counter -- the counterbalancing context that's really important in this case is the fact that this was a massive and important acquisition. I mean, this is of critical importance to investors and the company alike.

I will give you a quotation from one of the investors. And this is from May 27th, 2021.  It is paragraph 62, Your Honor.  This is an analyst from J&P.  He says, quote, "The company must show that it can integrate these businesses,

retain the Auth0 team and knowhow and most importantly, successfully execute two different go-to-market strategies with two different product platforms."

And, Your Honor, that continues throughout the class period where analysts are asking questions of the Defendants of -- specifically about the integration and how it's going.

I will give you an example of one question that's asked. It is paragraph 140, Your Honor.  This is September 14th of 2021.  The analyst says (as read:) "More so -- maybe more so on a tactical level, what should investors think about over the next year as its integrated in?  And I think you recently announced sales integration, building in some cushion relative to how you are bringing the sales force together.  So help us understand just what to look for and potential benchmarks as you move forward with the integration."

So, Your Honor, just taking that really quick, that's an analyst specifically caring about this.  Mr. Lutz said everything is puffery.  All the statements that are alleged are puffery, Your Honor, if an analyst cares about it, obviously even under the rule that Mr. Lutz sets forth in his brief about, you know, what constitutes puffery and that puffery is always something that is objectively verifiable or something that can cause inducing reliance of a reasonable investor, I mean, this is the perfect example of the fact that the answer they were going to hear was inducing reliance.  They wanted to

know how -- how the integration was going.

And, Your Honor, I will just point to Defendant Kerrest's answer to that -- which is, yes, Mr. Lutz, you know, has cherry picked some of the language to say it's all puffery -- but Mr. Kerrest says, (as read:) "Yes, absolutely.  The integration has gone very well.  We are about four months in.  We are pretty good at execution, so we have had some pretty good goals for ourselves; but I think we have been beating even those, which is great."

Now, Your Honor, if you want to just look at "things have gone very well," maybe in the past that's puffery.  He goes well beyond that, and he specifically says there's goals and they have been hitting them.

And, you know, even taking in some of the -- you know, takeaway expectation language that Mr. Lutz is referring to, we are now in the world of whether or not a reasonable investor might find that statement to be false and misleading.

And I'm taking all things together -- the importance of the integration, what's said in this statement -- I think it's reasonable to say that some investors may have found that this meant that the integration was going very well when we know from the CW allegations behind the scenes, that it wasn't going very well.

Now, Your Honor, just real quick, I would like to just point to one other statement.  I know you are sensitive to the

timing aspect of this.

I'm going to go all the way to March, where you were, to 2022.  Now, that we know all of this stuff has happened by January at the very least -- it is actually early.  It is December -- they have completely scrapped the integration plan because it wasn't working.  They are starting from zero.

And they say -- this is Defendant McKinnon on March 2, 2022.  It is paragraph 157 of the complaint -- and he says, (as read:) "What we are getting is we are getting synergy on the -- really on the sales side.  So we have all of the Okta reps now can sell all the products."

Your Honor, I'm just going to stop there.  We know that's not true.  They weren't trained on the Auth0 product.  All the Auth0 people had left the company at that time.  And from what we gleaned from the CW allegations, they didn't understand how to sell the product and sales were flagging because of that.

And then he says, (as read:) "So we increased the capacity.  We can -- we increased what they can actually sell, so there is tons of upside from that."

Your Honor, just setting aside some of the language, again, Mr. Lutz may have cherry picked from that statement, saying things like "there's tons of upside from that" is obviously something an investor can rely on.  It is obviously objectively verifiable because they are talking about upside. And so that is something honestly, Your Honor, it just can't be

considered puffery especially in the context here.

And, Your Honor, I will just point you to some of the cases we cited, the *Extreme* case, and I will also point you to the *Zendesk* case.  That's in our briefing.  We think that that clearly overcomes some of Mr. Lutz's points on that.

Unless Your Honor has any other questions, I will just mention the superuser point --

**THE COURT:**  All right.

**MR. CHRISTIE:**  -- which Mr. Lutz had brought up originally.  Your Honor, from our point of view the superuser allegations and some of the statements around there, we believe that it supports the fact that the company was aware that its data security measures were not sufficient at the time.

**THE COURT:**  But did you allege that superuser was available to third parties and actually was responsible for the breach?

**MR. CHRISTIE:**  No, Your Honor.  And, again, I don't think that those two points are directly connected.

I think the fact that there was superuser issues and at least one breach that we know from CW9 that occurred prior to the breach in January of 2022, in our minds puts the Defendants on notice that they were susceptible to data security incidents.

And then -- but, Your Honor, where the heart of this -- this -- he called it a separate theory -- and, Your Honor, I

would like to explain why they are not separate in a moment -- the heart of this theory, the data security theory, is that they knew that a data security event occurred in January of 2022.

You know, maybe they want to characterize it as an attempt; but as far as we know, Your Honor, and what the Defendants have stated was that they knew it -- something had happened in January 2022 where a hacker was able to access the internal side of Okta's systems and was able to view information from some of its customers.

Now, Your Honor, Mr. Lutz's point is that that was just an attempt. From my point of view, that's like saying that if someone breaks into your house and looks at your children sleeping and looks through your personal belongings but doesn't take anything, that that's not burglary.

Investors understood it to be a major data event. The stock price reacted significantly to it, and Defendants didn't say anything about it until March of 2022.

So they sat on it for two months. They knew it had happened, and that's clear from the allegations in the complaint; and yet Defendants said nothing about it until a hacker posted items on the internet and screenshots on the internet that demonstrated that hack had occurred, and then all of the sudden Defendants had to come out with statements about it and obviously the investors reacted to that.

So, with respect to the statement that I think is really at issue with the data security side of the case, Your Honor, that's the March 7th, 2022, 10K; and it's a risk disclosure that was included in the Defendant's 10K filing.

And it says, (as read:) "An application, data security or network incident may allow unauthorized access to our systems or our data or our customers' data."

So, Your Honor, then the *Alphabet* case we cited throughout our case specifically says that such risk disclosures which, quote, "speak entirely of as yet unrealized risks and contingencies and do not alert the reader that some of the risks may have already come to fruition can mislead reasonable investors."

And, Your Honor, that's exactly what we have here.  This is -- if you are an investor and you were wondering if Okta had ever experienced a securities breach and you read that statement in March 7 of 2022, you would certainly be under the impression that no security breach had ever happened even though Defendants had known for two months that one had.

So that's where we feel like the data security side of things, you know, is an actionable claim under 10(b)(5).  And, Your Honor, I said I would connect the two.  I would just like to do that briefly, and then I will let you go.

Think about the timing of this.  You have the integration. Investors are caring how it's going.  And then all of the

sudden you have this data security event.

And now in addition to having to sell products that your salespeople don't fully understand how to sell, you are going to announce to investors that this company, which is a data security company, Your Honor, that they work in data identity management, had a security event.  Maybe that might impact their ability to continue to sell the products.

And, in fact, Your Honor, we know that's true because we have CW allegations.  I will point you to paragraphs 113 through 115.  There's three different CWs that say that the breach was impacting their ability to sell the products once it was actually disclosed.

So it's no surprise, Your Honor, that the Defendants here didn't disclose this breach when it was obvious that it was going to impact their ability even further than the fact that their salespeople were not trained to sell the Auth0 and Okta products.

So with that, Your Honor, unless you have any other questions...

**THE COURT:**  All right.  Thank you.

**MR. LUTZ:**  Your Honor, may I respond?

**THE COURT:**  You may briefly.

**MR. LUTZ:**  Yeah.  Look, I welcome a careful analysis of the three paragraphs that my colleague mentioned as purportedly not being corporate puffery.  I think it is quite

the opposite.  And if you look at them in the context of the full statement, it's all the more clear.

And, Your Honor, just starting with paragraph 93, which is what you read from in March, I would note that the language that you read from, almost all of that is not even alleged by the Plaintiffs to have been false or misleading.

The only portion of that that is alleged to have been false or misleading is the last sentence.  (As read:) "We are off to a great start and recognize there's still a lot of work to do."

Again, it is puffery and it's qualified.  It is specifically identifying that this is not done.  We have got work to do.

Same with paragraph 140.  Paragraph 140 that my colleague mentioned -- this is in response to the analyst question -- at the very beginning of this period -- of the purported class period in September of 2021.  (As read:) "So the integration has gone very well.  We are about four months in.  We have got -- we are pretty good at execution.  We had some pretty good goals for ourselves, but I think we have been beating even those, which is great."

Very general, not specific about anything and indeed is consistent with the allegation from one of the confidential witnesses that the Plaintiffs themselves cite which says, "Yes, the integration did get off to a good start."

This is, again, puffery, not specific and consistent with even the confidential witness allegations that they provide.

At paragraph 157, which is the other one that was mentioned -- this is the synergy scenario -- this is one I just do not understand. There is no affirmative representation about anything here. All they are saying is we are now -- they are now integrated. They are now together and there are -- opportunities are there; right. That's what they say.

We are getting synergies on the sales side. All of the Okta reps now can sell all of the products.

It is not a misrepresentation. It's just saying -- they are saying they now have the ability --

**THE COURT:** You are saying that they may. You are not saying they know how to or know anything about the products you are just saying --

**MR. LUTZ:** Yeah, this is what it's saying. And what does he go on to say? (As read:) "We increased the capacity. We can -- we increased what they can actually sell so there is tons of upside from that."

I mean, come on. That is not an affirmative representation about anything. It is saying we have now united them. We have got opportunity into the future. That's all that they are saying there.

On the security incident, I just have to fundamentally disagree with the characterization of the allegations.

And if you look at the allegations in the documents that are relied upon, there is no factual basis for the notion that Okta knew about a, quote-unquote, breach that was disclosed two months later.

Okta learned, as the Plaintiffs themselves allege included in paragraph 106 of their complaint, they alleged that what we learned in January of 2022 was that there was someone who came in and tried to get unauthorized access to the computer of one support engineer at a subprocessor; that the issue was -- that the account was shut down.  The issue was investigated and Okta was told it was contained.

Not until two months later -- not until two months later when the hacker posted screenshots online did we learn and did the Plaintiffs acknowledge that we learned what everybody else knew, that was -- that there was unauthorized access and there was limited customer access to limited customer data.

That's what we reported.  We took -- we took responsibility for it.  We said, look, these are the number of customers who may have been impacted but because of the nature of the incident no sensitive data was accessed, no Okta system was breached.

It turned out to be much, much more restrictive than even that.  Only a handful -- I think two customers where even non-sensitive data was accessed, and it had no discernable impact on Okta's financial performance.

The notion that Okta knew about a, quote-unquote, breach and didn't disclose it in January is both untrue and it is unsupported by any factual allegation in the complaint and is contradicted by the very documents that the Plaintiffs rely on and incorporate by reference into their complaint.

Now, the notion that *Alphabet* -- the general risk disclosure that was put out in March, they say it was misleading because the risk had already materialized.  It is untrue.

The risk was unknown to anybody as the sequence and timeline of events make clear; but if you want to take *Alphabet* -- I mean, *Alphabet* is the opposite case; right, where in that case, as you probably know, there is a -- the allegation was that the security incident was identified internally at Alphabet, was written up in a memo, was identified as a serious issue, provided to the CEO and the senior most members of management.

And the allegation there is that management decided not to disclose it and did not update their risk factors to reflect the fact that this new issue had occurred.  That is a completely different scenario than what we have here.

And then just, I guess, the other thing is, I was hardened to hear my colleague now acknowledged that the superuser thing had nothing to do with the security incident.

That's not what they said, granted with zero supporting

facts in their complaint and brief.  I think it was an appropriate acknowledgment today that it had nothing to do with the security incident.

Look, I will stop there, Your Honor, unless you have questions.

THE COURT:  I do not.  Thank you, both.  It has helped me to hear your thoughts.

I wish somebody would give people English lessons or something so that we wouldn't continue having fights over whether statements that were released to the public intending to influence the markets actually don't mean anything.  There is nothing to them.  There is no facts.  So don't get worried about them.  They don't mean anything.  They are just puffery.  We could do with a lot less puffery if that's true; but, anyway, we will go ahead and sort through what we have got here.

So I will get back to you shortly, and I appreciate the argument.  Do we have a next date at this time?

THE CLERK:  We have the initial CMC on April 28th.

THE COURT:  Okay.  I will leave it there for now.  I will get you an order.  I'm -- I'm fairly sure it will give leave to amend in some particulars.

So whether you want to keep the CMC where it is or feel it would be more useful if we pushed it out, you folks can talk to each other and let me know your thoughts on that; but I will

leave it where it is for now.  All right.  Thank you-all very much.

        **MR. CHRISTIE:**  Thank you, Your Honor.

        **MR. LUTZ:**  Thank you, Your Honor.

            (Proceedings adjourned at 10:42 a.m.)

                    ---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, April 14, 2023

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter