**LABATON KELLER SUCHAROW LLP**
MICHAEL P. CANTY (*pro hac vice*)
  mcanty@labaton.com
JAMES T. CHRISTIE (*pro hac vice*)
  jchristie@labaton.com
NICHOLAS MANNINGHAM (*pro hac vice*)
  nmanningham@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

**ADAMSKI MOROSKI MADDEN**
**CUMBERLAND & GREEN LLP**
JAMES M. WAGSTAFFE, SBN 95535
  wagstaffe@wvbrlaw.com
Mailing Address:  Post Office Box 3835
San Luis Obispo, CA 93403-3835
Physical Address:  6633 Bay Laurel Place
Avila Beach, CA 93424
Telephone: (805) 543-0990

*Counsel for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OKTA, INC. SECURITIES LITIGATION | CASE NO. 3:22-cv-02990-SI<br><br>**DECLARATION OF MICHAEL P. CANTY IN SUPPORT OF (I) CLASS REPRESENTATIVES' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES**<br><br>**Date**:  Nov. 8, 2024<br>**Time**:  10:00 a.m.<br>**Judge**: Hon. Susan Illston<br>**Courtroom**: 1, 17th Floor |

I, MICHAEL P. CANTY, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm of Labaton Keller Sucharow LLP ("Labaton"), which serves as court-appointed Class Counsel for Nebraska Investment Council ("NIC" or "Lead Plaintiff") and North Carolina Retirement Systems ("NCRS" and together with NIC, "Plaintiffs" or "Class Representatives") and the certified Class in the above-captioned litigation (the "Action").[1]  I am admitted to practice before this Court *pro hac vice* and have been actively involved throughout the prosecution and resolution of the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision and participation in all material aspects of the Action.

2.      I respectfully submit this Declaration in support of Class Representatives' motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Federal Rules" or "Rules") for final approval of the proposed settlement with all defendants: Okta, Inc. ("Okta" or the "Company"), and Todd McKinnon, Brett Tighe, and Frederic Kerrest (collectively, the "Individual Defendants" and, with Okta, the "Defendants") for $60,000,000 in cash.  If approved, the Settlement will resolve all claims in the Action against Defendants, and related claims, on behalf of the Court-certified Class, consisting of all persons and entities who or which, during the period from March 3, 2022 through August 31, 2022, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded Class A common stock of Okta, Inc. and were damaged thereby.[2]  The Court preliminarily approved the Settlement and directed notice to the Class by Order dated July 19, 2024 ("Preliminary Approval Order").  ECF No. 124.

3.      I also respectfully submit this Declaration in support of: (i) approval of the proposed plan for allocating the net proceeds of the Settlement to eligible Class Members ("Plan

---

[1]      All capitalized terms used herein that are not otherwise defined have the meanings provided in the Stipulation and Agreement of Settlement, dated May 28, 2024 ("Stipulation"). ECF No. 119-2.

[2]      Excluded from the Class are: (i) Defendants; (ii) members of the Immediate Families of each Defendant that is an individual; (iii) the officers, directors, and control persons of Okta; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and (v) the legal representatives, heirs, affiliates, successors or assigns of any such excluded party.  Also excluded from the Class are any persons or entities who or which exclude themselves from the Class by submitting a timely and valid request for exclusion that is accepted by the Court.

of Allocation"); and (ii) Class Counsel's motion, on behalf of all Plaintiffs' Counsel,[3] for an award of attorneys' fees of 22% of the Settlement Fund, which includes accrued interest; payment of Litigation Expenses incurred by Class Counsel in the total amount of $280,272.17, plus accrued interest; and, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), payment of $17,000, in the aggregate, to Class Representatives for costs incurred in connection with their representation of the Class ("Fee and Expense Application").

4.        For the reasons discussed below and in the accompanying memoranda,[4] I respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved by the Court; and (iii) the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be granted in all respects.  Moreover, the Settlement, Plan of Allocation, and Fee and Expense Application have the full support of Class Representatives—sophisticated, institutional investors that have actively supervised the Action since its inception.  *See* Declaration of Christopher R. Heinrich on behalf of Nebraska Investment Council, attached hereto as Exhibit 1; and Declaration of Benjamin Garner on behalf of North Carolina Retirement Systems, attached hereto as Exhibit 2.[5]

## I.    PRELIMINARY STATEMENT

5.        The proposed Settlement now before the Court provides for the full resolution of the Action, and related claims, in exchange for a cash payment of $60 million.  As detailed herein, Class Representatives and Class Counsel respectfully submit that the Settlement represents an

---

[3]        "Plaintiffs' Counsel" refers collectively to Labaton Keller Sucharow LLP, Adamski Moroski Madden Cumberland & Green LLP, and O'Neill, Heinrich, Damkroger, Bergmeyer & Shultz, P.C., L.L.O.

[4]        In conjunction with this Declaration, Class Representatives and Class Counsel are submitting Class Representatives' Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation and Memorandum of Points and Authorities in Support Thereof ("Settlement Memorandum") and Class Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses and Memorandum of Points and Authorities in Support Thereof ("Fee and Expense Memorandum").

[5]        All exhibits to the Motions are annexed hereto.  For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached hereto and the second reference is to the exhibit designation within the exhibit itself.

excellent result for the Class, particularly in light of the significant risks of continuing to litigate the Action.

6.      In choosing to settle, Class Representatives and Class Counsel took into consideration the substantial challenges associated with advancing the claims through trial, as well as the duration and complexity of the legal proceedings that remained ahead.  As discussed in detail below, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all.  The decision to settle was informed by a comprehensive investigation into the claims and defenses in the Action, intensive motion practice and discovery, certification of the Class, and extensive arm's-length negotiations overseen by a highly respected mediator.

7.      The case—which was litigated efficiently and aggressively from the initial complaint to the agreement to settle—was settled only after Class Representatives, among other things: (i) conducted a rigorous investigation of the claims at issue, including interviews with approximately 19 former Okta employees (nine of whom provided information for use in the Complaint); (ii) prepared and filed a detailed Complaint, which expanded the scope of the initial complaint by adding particularized allegations supporting claims that Defendants misled investors about the Auth0 integration; (iii) opposed Defendants' wide ranging motion to dismiss the Complaint through briefing and oral argument; (iv) moved for and obtained class certification; (v) researched, drafted, and propounded discovery requests on Defendants; (vi) reviewed nearly 4,000 documents in connection with the mediation process; (vii) prepared for and participated in a formal mediation process, including drafting and analyzing extensive mediation statements; and (vii) consulted with experts in the fields of damages and loss causation.

8.      The Settlement is well above industry trends.  The $60 million Settlement Amount is four times the median recovery of $15 million in securities class action cases in 2023. *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2023 Review and Analysis* (Cornerstone Research 2024), Ex. 3, attached hereto, at 1.  For the period from 2018 through 2022, the median settlement value was $11.7 million, and in 2022 it was $13.5 million. *Id*.  It is also well above the $9 million median recovery for securities class actions prosecuted

1  and settled within the Ninth Circuit from 2014 through 2023, above the average securities

2  settlement nationwide in 2023 of $47.3 million, and above the $46.5 million average from 2018

3  to 2022. *Id*. at 1, 18.

4        9.    Moreover, according to analyses prepared by Class Representatives' damages

5  expert, the aggregate damages the Class could have obtained at trial ranged from $600 million to

6  approximately $1.036 billion based on different scenarios, as discussed herein.  Accordingly, the

7  $60 million Settlement Amount represents approximately 5.8% to 10% of Class Representatives'

8  expert's estimation of likely recoverable damages, depending on the types of alleged

9  misstatements and omissions and allegedly truthful revelations that were ultimately presented to

10  the jury, which is well above industry norms.  *See* §VI.C.

11        10.   In addition to seeking approval of the Settlement, Class Representatives seek

12  approval of the proposed Plan of Allocation governing the calculation of claims and the

13  distribution of the Settlement proceeds.  As discussed below, the proposed Plan of Allocation was

14  developed with the assistance of Class Representatives' damages expert, and provides for the

15  distribution of the Net Settlement Fund to Class Members who submit Claim Forms that are

16  approved for payment on a *pro rata* basis based on their losses attributable to the alleged fraud.

17        11.   With respect to Class Counsel's request, on behalf of all Plaintiffs' Counsel, for

18  an award of attorneys' fees and payment of expenses, the requested fee of 22% would be fair both

19  to the Class and counsel, and warrants the Court's approval.  This fee request is below the Ninth

20  Circuit "benchmark" and other fee percentages frequently awarded in connection with similar

21  settlements and, under the facts of this case, is justified considering the benefits that Class Counsel

22  conferred on the Class, the risks it undertook, the quality of the representation, the nature and

23  extent of the legal services, and the fact that Class Counsel pursued the case at its own financial

24  risk.  Class Counsel also seeks expenses in the amount of $280,272.17, plus reimbursement to

25  Class Representatives, pursuant to the PSLRA, for their efforts on behalf of the Class in the

26  aggregate amount of $17,000.  The expense amounts are less than the maximum amount of

27  expenses of $410,000 provided for in the Notice.

28

12.     Class Counsel has worked with the Court-authorized Claims Administrator, Epiq Class Action and Claims Solutions ("Epiq"), to disseminate notice of the Settlement to Class Members as directed in the Preliminary Approval Order.  In this regard, Epiq has provided 61,665 copies of the Notice and Claim Form (together, "Notice Packet") to Class Members and their nominees.[6]  Additionally, Epiq has posted the Notice and Claim Form, along with other relevant documents, on the website www.OktaSecuritiesLitigation.com, and has caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire*.  *See* Mailing Decl., ¶14.  As ordered by the Court and stated in the notices, objections, and requests for exclusion from the Class are due no later than October 18, 2024.  To date, there have been no objections to any aspect of the Settlement and no requests for exclusion.[7]

## II.    SUMMARY OF CLASS REPRESENTATIVES' CLAIMS

13.     Class Representative's claims in this Action are set forth in the operative Amended Class Action Complaint for Violations of the Federal Securities Laws, filed on October 13, 2022 (ECF No. 48) (the "Complaint"), which asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, against Defendants.

14.     In the Complaint, Class Representatives allege, among other things, that Defendants made materially false and misleading statements and omissions about Okta's integration of Auth0, a highly touted acquisition that Defendants claimed would accelerate Okta's growth in the customer identity and access management market and sustain the Company's high growth rate.  ¶¶4-25.  Class Representatives allege that soon after the close of the acquisition, the Company began to experience severe problems with the integration of Auth0.  ¶8.  However, Defendants allegedly concealed these problems while touting that the Company was already seeing progress with the integration.  ¶9.  The Complaint also alleged that Defendants failed to

---

[6]     *See* Declaration of Morgan Kimball Regarding Notice Mailing, dated October 2, 2024, attached hereto as Exhibit 4 ("Mailing Decl."), ¶¶5-12.

[7]     Class Representatives and Class Counsel will address any objections that may be received after this submission in their reply submission to be filed with the Court on or before November 1, 2024.

disclose a data security incident in January 2022 and made false and misleading statements relating to it. ¶¶4-25. The Complaint alleges that the price of Okta's publicly traded Class A common stock was artificially inflated as a result of the allegedly false and misleading statements and omissions and that the Company's stock price declined when the alleged truth about Okta's business was revealed to the market, causing damages to the Class. ¶¶172, 179.

## III.   RELEVANT PROCEDURAL HISTORY OF THE ACTION AND CLASS COUNSEL'S LITIGATION EFFORTS

### A.   Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

15.   On May 20, 2022, an initial class action complaint, captioned *City of Miami Fire Fighters' and Police Officers' Retirement Trust v. Okta, Inc., et al.*, Case No. 3:22-cv-02990, was filed in U.S. District Court, Northern District of California (the "Court") alleging violations of the federal securities laws against Defendants. ECF No. 1.

16.   On July 19, 2022, motions to appoint a lead plaintiff and to approve lead plaintiff's selection of counsel were filed by three movants pursuant to the procedure set forth by the PSLRA. ECF Nos. 14, 22, 28.

17.   On August 26, 2022, the Court entered an Order appointing NIC as Lead Plaintiff and Labaton Sucharow LLP (n/k/a Labaton Keller Sucharow LLP) as Lead Counsel for the class pursuant to the PSLRA. ECF No. 39.

18.   On October 13, 2022, Lead Plaintiff filed the Complaint, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. ECF No. 48.

### B.   Lead Plaintiff's Investigation and Filing of the Complaint

19.   Prior to filing the Complaint on October 13, 2022, Lead Counsel conducted an extensive investigation into the facts underlying potential claims. Lead Counsel's investigation included reviewing: (i) the Company's SEC filings; (ii) conference call transcripts and press releases; (iii) media and analyst reports about the Company; and (iv) other public information regarding the Company and the data security industry. Further, Lead Counsel consulted with a financial expert in connection with evaluating loss causation and damages issues.

20.     In addition to marshalling facts from these sources, Lead Counsel's investigators developed leads for potential witnesses to interview for additional factual information, and also had telephonic communications with numerous former Okta employees and other individuals with potentially relevant knowledge.  Lead Counsel identified and contacted approximately 173 Okta former employees and other persons with relevant knowledge, and interviewed approximately 19 of them.  Ultimately, Lead Counsel included information obtained from nine former Okta employees in the Complaint.

21.     Lead Counsel also conducted extensive legal research before filing the Complaint to determine which theories of liability to allege and how to allege those theories given the current state of the law.

22.     After Lead Counsel's thorough investigation, on October 13, 2022, Lead Plaintiff filed the 84-page Complaint, detailing Defendants' alleged violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.  ECF No. 48.

### C.     Defendants' Motion to Dismiss the Complaint and the Court's Ruling Thereon

23.     On December 1, 2022, Defendants filed a motion to dismiss ("Motion to Dismiss") pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 56.  In their Motion to Dismiss, Defendants argued that the Complaint should be dismissed in its entirety primarily because it failed to plead: (i) any materially false or misleading statement and (ii) any facts giving rise to a strong and compelling inference of scienter for any Defendant.  *Id.*

24.     Lead Counsel reviewed and analyzed Defendants' Motion to Dismiss brief and the legal authority cited therein.  Lead Counsel also conducted extensive legal research into Defendants' arguments and potential responses thereto.  On January 12, 2023, Lead Plaintiff opposed the motion to dismiss.  ECF No. 61.  Lead Plaintiff rebutted the arguments and authorities in Defendants' Motion to Dismiss and argued that the Complaint adequately alleged all elements of its Exchange Act Claims, including falsity and scienter. *Id.*

25.     On February 17, 2023, Defendants filed their reply in support of their motion to dismiss.  ECF No. 68.

26.     The Court held a hearing on Defendants' Motion to Dismiss on March 17, 2023. ECF No. 70.  On March 31, 2023, the Court entered its Opinion and Order granting in part and denying in part Defendants' motion ("MTD Order").  ECF No. 72.  In its MTD Order, the Court sustained claims based on alleged omissions made on March 2 and June 2, 2022, and dismissed, among other things, claims based on alleged misstatements from September 1, 2021 through March 1, 2022, as well as all of the alleged misstatements regarding the January 2022 data security incident.  *Id.*

27.     The case proceeded to discovery with a class period of March 3, 2022 through August 31, 2022.  *Id*.  Defendants filed their answer and defenses to the Complaint on May 5, 2023.  ECF No. 83.

**D.     Commencement of Formal Discovery and Lead Plaintiff's Motion for Class Certification and Defendants' Appeal**

28.     On May 30, 2023, Lead Plaintiff initiated formal discovery by serving its first set of requests for the production of documents ("RFPs").

29.     On May 31, 2023, Defendants served their first set of RFPs and Interrogatories.

30.     Defendants responded to Lead Plaintiff's RFPs on June 29, 2023, and Lead Plaintiff responded to Defendants RFPs and Interrogatories on June 30, 2023.

31.     Thereafter, the Parties engaged in several meet and confers regarding various discovery disputes.

32.     On August 18, 2023, Lead Plaintiff filed its Motion for Class Certification and Appointment of Class Representative and Class Counsel.  ECF No. 91.

33.     Throughout September and October 2023, the Parties engaged in discovery related to Lead Plaintiff's motion for class certification.

34.     On October 25, 2023, before Defendants filed an opposition to the class certification motion, the Parties filed a joint stipulation withdrawing Lead Plaintiff's motion for class certification without prejudice and proposing new deadlines for the briefing of a renewed motion for class certification.  ECF No. 94.

35.     On November 1, 2023, Lead Plaintiff filed a renewed motion for class certification, which added NCRS as an additional named plaintiff and proposed class representative.  ECF No. 97.

36.     On January 17, 2024, Defendants filed a notice of non-opposition to Plaintiffs' renewed motion for class certification.  ECF No. 102.

37.     On February 5, 2024, the Court granted Plaintiffs' renewed motion and appointed Plaintiffs as Class Representatives, certified a class of investors who purchased or otherwise acquired the publicly traded Class A common stock of Okta during the period from March 3, 2022 through August 31, 2022, inclusive, and appointed Labaton as Class Counsel.  ECF No. 105.[8]

## IV.    CLASS REPRESENTATIVES' EXTENSIVE DISCOVERY EFFORTS

38.     In May 2023, Lead Plaintiff began formal discovery efforts on behalf of the Class. Until that point, discovery had been stayed pursuant to the PSLRA.  *See* 15 U.S.C. § 78u-4(b)(3)(B).  Class Representatives' efforts thereafter included propounding formal discovery requests on Defendants and responding to discovery requests served by Defendants.  The Parties' discovery also included the review of nearly 4,000 documents produced in connection with mediation.  The discovery efforts set forth herein provided Class Representatives with a thorough understanding of the strengths and weaknesses of Class Representatives' claims and assisted Class Counsel in considering and evaluating the fairness and adequacy of the Settlement.

### A.    Pre-Trial Conference, Initial Disclosures, and Protective Order

39.     Following the MTD Order, the Parties completed the Rule 26(f) Conference and subsequently filed a joint status report with the Court on April 21, 2023.  ECF No. 76.  On April 28, 2023, following a status conference, the Court adopted the Parties' proposed schedule as set

---

[8]     The class that was certified by the Court (*see* ECF Nos. 97, 105) is the same as the "Class" as it is defined in the Stipulation, except that the Class as defined in the Stipulation contains additional individuals or entities that are excluded from the Class, including control persons of Okta and any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest. *See N.D. Cal. Procedural Guidance for Class Action Settlements* ("Guidance") ¶1(a) (requiring disclosure of any differences between settlement class and the certified class).

forth in their joint status report, including, among other deadlines, an August 18, 2023 deadline for Lead Plaintiff to file a motion for class certification.  ECF No. 80.

40.     On May 19, 2023, the Parties exchanged initial disclosures pursuant to Federal Rule 26(a).

41.     The Parties also engaged in a series of conferences to negotiate a protective order ("Protective Order") to govern the confidentiality of material produced in discovery.  On July 19, 2023, Defendants filed a proposed stipulated Protective Order.  ECF No. 89.  The Court approved and so-ordered the proposed Protective Order on July 20, 2023.  ECF No. 90.

**B.    Discovery Propounded on Defendants and Third Parties**

42.     Lead Plaintiff served two sets of requests for productions ("RFPs") on Defendants, on May 30, 2023 and March 29, 2024.  Lead Plaintiff also served a notice of subpoena on Third Party David Wilner, a former executive at Okta, on September 22, 2023.

43.     The Parties engaged in numerous meet-and-confer conferences (typically, via video conference) and exchanged multiple meet-and-confer letters and emails, as to the scope and manner of the requested document productions and interrogatories, including issues pertaining to search terms, relevant time periods, document custodians, and other disputes related to the requests.  Through this comprehensive effort, the Parties were able to reach an understanding as to the scope of Defendants' discovery, and reached many compromises without having to seek the Court's assistance.

44.     In advance of the March 25, 2024 mediation, Defendants produced approximately 4,000 documents to Class Representatives.  The review of Defendants' documents began on January 26, 2024 when Defendants produced their first batch of documents.  Then, on February 7, 2024, Defendants produced their second batch of documents.

45.     Class Counsel conducted an efficient review of those documents.  A team of experienced attorneys reviewed and analyzed the productions.  These attorneys have all worked on multiple securities cases and specialize in securities litigation, and are experienced in utilizing the latest technology with respect to document review.  These attorneys were integral to the litigation team and focused on reviewing Defendants' document productions for the purpose of

preparing for mediation as well as continued litigation, such as fact depositions, expert reports, depositions, and trial preparation.

46.    To efficiently focus on the most relevant documents, these attorneys used the Relativity eDiscovery platform's search and data analytic software tools to analyze the data and target the most significant communications, workpapers, and reports.  The review was conducted with a combination of linear review, targeted search terms, and custodial document review using the Relativity eDiscovery platform.

47.    The attorneys conducted targeted searching through text, file names, document type, dates, bates numbers, etc. to identify relevant, irrelevant, and "hot" documents for additional review, and to create collections of documents sorted by issue.  Through experience and their increasing familiarity with the documents, the review team identified additional swaths of important documents, which were also run through the analytics and search functions to derive the most significant documents for use in connection Class Representatives' mediation statements.  The review team analyzed and coded documents, and prepared for periodic "hot" document meetings.

48.    Throughout the case, the attorneys reviewing the documents prepared meaningful work product, including chronologies, compendiums of key players, and analyses of hot documents, which they continually updated and refined as the team's knowledge of the issues in the case expanded.  In connection with the mediation statement, members of the review team helped prepare the exhibits.

C.    Discovery Propounded on Class Representatives

49.    Defendants also aggressively sought discovery from Class Representatives.  On May 31, 2023, Defendants served their first set of RFPs and Interrogatories on NIC.

50.    On September 11, 2023, Defendants served their first set of requests for admissions ("RFAs") and second set of Interrogatories on NIC. In September 2023, Defendants also sent document and testimony subpoenas to NIC's investment managers, Hamilton Lane Advisors and Trinity Ventures XII, L.P., seeking evidence relevant to Defendants' assessment of Lead Plaintiff's Class Certification Motion.

51.     On November 13, 2023, Defendants served their Rule 30(b)(6) deposition notices on Plaintiffs, as well as their first set of RFPs on NCRS.

52.     Class Representatives objected to many of Defendants' requests on the basis that they were exceedingly broad, were not limited to a reasonable scope or time period, and sought information that was protected by various privileges and other protections.  As a result of the breadth of Defendants' requests, the Parties engaged in extended meet-and-confer conferences (typically, via video conference) and exchanged multiple meet-and-confer letters and emails to negotiate the scope of discovery on Class Representatives.  The Parties were able to reach a compromise on Class Representatives' productions without seeking the Court's assistance.

### D.     Discovery Disputes

53.     As described above, discovery in this matter was intense and thorough.  The Parties held numerous meet-and-confer sessions throughout the course of discovery.  The Parties also engaged in several letter writing campaigns and contentious email correspondence, concerning, among other things NIC's acquisition of Okta securities and Defendants' production in advance of the mediation.  Through several productive meet and confers, the Parties were able to reach compromises on all the issues without the need for judicial intervention.

## V.     THE SETTLEMENT

### A.     The Parties' Settlement Negotiations and Mediation

54.     After Class Representatives filed their renewed motion for class certification, the Parties, through their counsel, conferred on the possibility of reaching a negotiated resolution of the Action and agreed to participate in a mediation under the auspices of David M. Murphy of Phillips ADR (the "Mediator").

55.     On March 25, 2024, the Parties participated in a full-day mediation session before the Mediator.  In advance of the mediation, as discussed above, Defendants produced nearly 4,000 documents to Class Representatives.  The Parties also submitted detailed mediation statements and exhibits to the Mediator, which addressed issues of both liability and damages.

56.     The Parties did not reach a settlement by the conclusion of the full-day mediation session.  However, the Parties continued negotiations with the assistance of the Mediator.

57. On April 10, 2024, the Mediator issued a mediator's recommendation, which the Parties accepted on April 16, 2024, subject to the negotiation of a mutually acceptable long form stipulation of settlement. A Term Sheet was executed by the Parties on April 29, 2024, and the Stipulation was executed on May 28, 2024.

**B.    Preparation of Settlement Documentation and Preliminary Approval Motion**

58. Thereafter, the Parties worked diligently to negotiate the full settlement terms set forth in the Stipulation and its exhibits as well as a confidential supplemental agreement regarding requests for exclusion ("Supplemental Agreement"). On May 28, 2024, the Parties executed the Stipulation setting forth the full terms and conditions of the Settlement.

59. The Settlement provides that Defendants will pay, or cause to be paid, $60 million in cash into an interest-bearing escrow account. *See* Stipulation, ¶ 5. The Settlement Amount, plus accrued interest, after the deduction of Court-awarded attorneys' fees and Litigation Expenses, Notice and Administration Expenses, Taxes, and any other costs or fees approved by the Court (the "Net Settlement Fund"), will be distributed to Class Members who submit timely and valid Claims, in accordance with a plan of allocation approved by the Court. The Settlement is not a claims-made settlement and there is no reversion to Defendants or the funders if the Settlement is approved. Stipulation, ¶ 11.

60. In exchange for the payment of the Settlement Amount, upon the Effective Date of the Settlement, Class Representatives and each Class Member will release and dismiss the "Released Plaintiffs' Claims" against the "Released Defendant Parties." Stipulation, ¶ 3. The definition of Released Plaintiffs' Claims was tailored to provide Defendants and the other Released Defendant Parties with "complete peace" but to release only claims that Class Representatives and any other members of the Class: (i) asserted in the Action or could have asserted in the Action, or any forum, that arise out of or are based upon both: (1) the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the complaints filed in the Action and (2) the purchase or acquisition of Okta Class

A common stock during the Class Period. Stipulation, ¶ 1(ii); *see also* Guidance ¶ 1(b) (requiring disclosure of differences between released claims and claims of the operative complaint).

61.    In addition, the Settlement does not release claims asserted in related shareholder derivative actions brought purportedly on behalf of Okta against certain Okta officers and directors, *In re Okta, Inc. Stockholder Derivative Litigation*, Case No. 3:22-cv-07480-SI (N.D. Cal.) (consolidated with Case No. 3:22-cv-08627-SI) (filed November 28, 2022); *Austin Buono v. McKinnon, et al.*, Case No. 23-cv-00413-CFC (D. Del.) (filed April 14, 2024); and Tony F. Nasr v. McKinnon, et al., Case No. 24-cv-00106-CFC (D. Del.) (filed January 25, 2024).

62.    On June 11, 2024, Class Representatives submitted their unopposed motion for an order preliminarily approving the Settlement, approving the manner and form of notice to be sent to Class Members, and scheduling a hearing for final approval of the Settlement ("Preliminary Approval Motion"). ECF No. 119.

63.    On July 19, 2024, the Court held a hearing on the motion. By entry of the Preliminary Approval Order, the Court granted Class Representatives' Preliminary Approval Motion on July 19, 2024, and scheduled the final settlement hearing for November 8, 2024. ECF No. 124.

## VI.    RISKS OF CONTINUED LITIGATION

64.    As explained above, the Settlement is the result of extensive arm's-length negotiations by fully informed Class Representatives and Class Counsel, resolves this hard-fought litigation, and represents a very favorable result for the Class when considered on its own and when evaluated in light of the risks and challenges of continued litigation. Class Representatives and Class Counsel understood that while Class Representatives' claims were strong and Class Representatives believe they had adduced substantial evidence to support the Class's claims at summary judgment and trial, there were a number of factors that made the outcome of continued litigation uncertain, weighing in favor of a settlement.

65.    Principally, and as discussed below, the Court had granted Defendants' Motion to Dismiss in part, dismissing all allegations related to the security incident in January 2022 and a majority of the alleged misstatements related to the Auth0 integration. As the Court stated

during the April 28, 2023 initial case management hearing, the Court "cut out 99 percent" of the Complaint in its MTD Order.  As a result, Class Representatives moved into discovery with a significantly shorter Class Period (March 3, 2022 through August 31, 2022) and more limited theory of fraud.  With a substantially trimmed Complaint, Class Representatives understood the risks they faced in establishing one or more of the required elements—falsity, materiality, scienter, and/or loss causation—to sustain the remaining securities fraud claims through summary judgment and trial.

66.    Overall, the considerable factual record developed through document discovery, and the Parties' settlement negotiations, allowed Class Representatives and Class Counsel to undertake a comprehensive evaluation of the strengths and weaknesses of the claims.  Based on that evaluation, Class Counsel (a firm with extensive experience in the prosecution and trial of complex securities litigation) together with Class Representatives (large and sophisticated institutional investors) determined that the Settlement was in the best interests of the Class.

### A.    Risks Related to Proving Falsity

67.    As an initial matter, Class Representatives faced several challenges with respect to proving that the two surviving misstatements were materially false or misleading.  Defendants would have likely continued to argue that Class Representative cannot prove the falsity of the alleged misstatements under the theory of fraud credited by the Court in its MTD Order.  Any failure in this regard would have significant consequences with respect to proving falsity and damages.

68.    For example, the Court's determination that the statements from the March 2, 2022 and June 2, 2022 earnings calls were actionable relied, in large part, on the Complaint's allegation that Okta scrapped its initial integration plan—which involved keeping Auth0 employees as specialists selling Auth0 products exclusively for one year—at the last minute in favor of a new plan where all salespeople would be generalists expected to sell both Okta and Auth0 products. *See* ECF No. 72 at 19-20.  Moreover, in finding falsity, the Court also relied on the Complaint's allegation that Okta did not provide training to these salespeople, which harmed the Company's sales since the salespeople did not have knowledge of how to effectively sell the

products.  However, Defendants would likely seek to proffer evidence that Okta's decision to change its integration plan happened earlier than alleged in the Complaint, and thus, was not a last-minute shift in integration plans.  Moreover, Defendants would also likely seek to introduce evidence suggesting that Okta provided training opportunities and resources prior to and after the integration of the sales teams.  Finally, Defendants would likely seek to establish that the statements themselves lacked sufficient particularity and amounted to no more than corporate optimism.

69.     While the Court' had found that the alleged statements were not inactionable puffery in the MTD Order, there was a substantial risk that the Court could have changed course at summary judgment or that a jury would have found the statements insufficiently particular to hold Defendants liable—especially given the likely evidence undercutting the particular aspects of statements regarding training and the timing of the integration plan that the Court originally credited.  Defendants would therefore likely argue that Class Representatives could not prove that Defendants concealed any material negative information in the earnings calls about Okta's integration plan or the training provided to its combined sales force, presenting a real risk to establishing the theory of fraud that the Court credited in upholding the March and June alleged misstatements.

**B.     Risks Related to Proving Scienter**

70.     Class Representatives also faced significant challenges with respect to proving Defendants' scienter.  On this point, Defendants would likely argue that Class Representatives could not establish that the alleged misstatements were made with the requisite intent.

71.     For example, Defendants would have likely argued, *inter alia*, that Class Representatives could not establish that the Individual Defendants acted with the requisite fraudulent intent at the beginning of the Class Period because, despite some challenges, the attrition and sales integration issues did not begin to impact the Company's financial performance until after the June 2022 statements and that any integration challenges faced by the Company before then were therefore routine.

72.     Defendants likely would have argued that, at best, Defendants had knowledge that Okta was going through some expected integration challenges that would come along with any major acquisition, and that such challenges did not raise to the level of severity requiring disclosure because, at that time, the integration issues had yet to have any impact on the Company's financial results or projections.

73.     Accordingly, Defendants would likely seek to establish that they did not make the decision to revise Okta's FY23 guidance until late July 2022, nearly two months after the final alleged misstatements on June 2, 2022, and thus, their general statements that the integration was going well—qualified with other statements that there was still work to do—were not made with any fraudulent intent to mislead investors at the time the statements were made.

**C.     Risks Related to Proving Loss Causation and Damages**

74.     Even if Class Representatives were successful in proving falsity and scienter with respect to the March 2 and June 2, 2022 alleged misstatements, they faced significant challenges and uncertainty with respect to proving loss causation and damages.

75.     For instance, at least one analyst downgraded the Company's stock prior to the August 31, 2022 corrective disclosure based on, among other things, "increasing concerns around increased sales turnover & Auth0/Okta sales integration issues."  Accordingly, there was a risk that Defendants could have successfully argued that the August 31, 2022 alleged disclosure (the only allegedly corrective disclosure remaining in the case) was not corrective because the market had already priced in at least some risk about employee attrition and sales integration challenges before then.  At minimum, Class Representatives' damages expert would have been required to reliably account for this information, which could have significantly reduced the total amount of recoverable damages.

76.     If liability were established with respect to the claims that survived the Motion to Dismiss, Class Representatives' damages expert has estimated class wide maximum aggregate damages recoverable at trial, based on the entire stock price decline on the alleged disclosure date to be approximately $1.036 billion, after netting out Class Member gains on pre-Class Period purchases.  However, if Defendants were successful in their arguments that at least some of the

stock price decline was not attributable to the alleged fraud, the Class's maximum damages would have been significantly reduced to approximately $600 million.

77.     Accordingly, substantial risks of establishing loss causation and damages remained in the case at the time the Settlement was reached.

## VII.    COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND REACTION OF THE CLASS TO DATE

78.     As required by the Court's Preliminary Approval Order, Epiq, working under Class Counsel's supervision, began disseminating notice of the Settlement on August 2, 2024. Ex. 4, ¶7.  Specifically, Epiq has: (i) mailed by First-Class Mail a copy of the Notice Packet to potential Class Members using information gathered to date; (ii) mailed a copy of the Notice Packet to brokers and nominees that may have purchased Okta stock on behalf of Class Members ("Nominees"), contained in Epiq's Nominee database; (iii) published the Summary Notice in *The Wall Street Journal* and transmitted it over *PR Newswire*; and (iv) created a website, www.OktaSecuritiesLitgation.com, to provide information about the Action and the Settlement. *Id*., ¶¶14-17.

79.     The Notice contains important information about the Action and the Settlement, including, among other things, the definition of the certified Class, a description of the proposed Settlement, information regarding the claims asserted in the Action, and the proposed Plan of Allocation. *See generally id*., Ex. 4-A.  The Notice also provides information for Class Members to determine whether to: (i) participate in the Settlement by completing and submitting a Claim Form; (ii) object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; or (iii) request exclusion from the Class.  *Id*.  The Notice also informs recipients of Class Counsel's intent, on behalf of all Plaintiffs' Counsel, to apply for attorneys' fees in an amount not to exceed 22% of the Settlement Fund, and for payment of Litigation Expenses incurred by Plaintiffs' Counsel in an amount not to exceed $410,000.  *Id*.

80.     In accordance with the Preliminary Approval Order, as of October 2, 2024, Epiq has provided 61,665 copies of the Notice Packet to potential Class Members and their Nominees.

*Id.*, ¶12.  In addition, Epiq caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on August 13, 2024.  *Id.*, ¶14.

81.     In connection with the notice dissemination, Epiq developed a website for the Settlement in order to provide information concerning the case and important dates and deadlines in connection with the Settlement, as well as access to an online claim portal and downloadable copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and other relevant documents.  *Id.*, ¶¶16-17.  Copies of the Notice and Claim Form are also available on Class Counsel's website, www.labaton.com.  Additionally, Epiq maintains a toll-free telephone number and email for inquiries regarding the Settlement.  *Id.*, ¶¶18-20.

82.     The deadline for Class Members to file an objection to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion is October 18, 2024.  To date, not a single objection to any aspect of the Settlement has been received.  In addition, Epiq has received no requests for exclusion.  *Id.*, ¶22.

83.     Class Counsel will file reply papers on or before November 1, 2024 that will address any objections and report on requests for exclusion and claims received.

**VIII.   THE PLAN FOR ALLOCATING THE NET SETTLEMENT FUND TO THE CLASS IS FAIR, REASONABLE, AND ADEQUATE**

84.     In accordance with the Preliminary Approval Order, and as explained in the Notice, Class Members who wish to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Expenses; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim and all required supporting documentation to the Claims Administrator by mail or online at www.Oktasecuritieslitigation.com.  As provided in the Notice, the Net Settlement Fund will be distributed to Authorized Claimants in accordance with the plan for allocating the Net Settlement Fund approved by the Court.  The plan of allocation proposed by Class Representatives (*i.e.*, the "Plan of Allocation" or "Plan") is set forth on pages 9-12 of the Notice.  *See* Ex. 4-A.

85.     The proposed Plan is designed to achieve an equitable and rational distribution of the Net Settlement Fund.  However, calculations made pursuant to the Plan do not represent a formal damages analysis and are not intended to measure the amounts that Class Members could recover after a trial.  Class Counsel developed the Plan in consultation with Class Counsel's damages expert.  The Plan creates a framework for the equitable distribution of the Net Settlement Fund among Class Members who suffered economic losses as a result of Defendants' alleged violations of the federal securities laws set forth in the Complaint, as opposed to economic losses caused by market or industry factors or unrelated Company-specific factors.  To this end, Class Representatives' damages expert calculated the estimated amount of alleged artificial inflation in the per-share price of Okta's publicly traded common stock that was allegedly caused by Defendants' materially false and misleading statements and omissions.

86.     As set forth in the Plan, a Claimant's "Recognized Claim" will depend upon several factors, including the date(s) when the Claimant purchased or acquired his, her, or its shares of Okta common stock during the Class Period, and whether such shares were sold (and if so, when and at what price) or held.  Specifically, shares of Okta common stock purchased or otherwise acquired during the Class Period (*i.e.*, from March 3, 2022 through August 31, 2022, inclusive) must have been held through at least the alleged corrective disclosure on August 31, 2022 to have a recognized loss, consistent with *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

87.     Once Epiq has processed all submitted Claim Forms and provided Claimants with an opportunity to cure any deficiencies in their claims or challenge the rejection of their claims, processed responses, and made claim determinations, distributions will be made to Authorized Claimants.  Epiq will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (*i.e.*, the sum of the Claimant's Recognized Loss Amounts for each purchase as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  Class Representatives' losses will be calculated in the same manner.  Payments of $10.00 and greater will be made in the form of checks and wire transfers.  (Payments of less

1   than $10.00 will not be made, given the costs associated with such distributions and low rates of

2   negotiation.)

3          88.    As set forth in the Plan, if there is any balance remaining in the Net Settlement

4   Fund (whether by reason of uncashed checks, or otherwise), after at least six (6) months after the

5   initial distribution, and after payment of any unpaid fees and expenses incurred in administering

6   the Settlement, and Taxes, the Claims Administrator will, if feasible and economical, reallocate

7   such balance among Authorized Claimants who have cashed their initial distribution checks in an

8   economic fashion.  Re-distributions will be repeated until it is determined that re-distribution of

9   the funds remaining in the Net Settlement Fund would no longer be feasible and economical.

10  Thereafter, any remaining balance will be donated to Consumer Federation of America, a non-

11  profit, non-sectarian 501(c)(3) organization that advocates on behalf of consumers and investors,

12  or such other organizations approved by the Court.  *See* Ex. 4-A at ¶68.

13         89.    As discussed in the Settlement Memorandum, the structure of the Plan is similar

14  to that of plans of allocation that have been used in numerous other securities class actions.  To

15  date, no objections to the Plan have been filed.  In sum, Class Counsel believes that the Plan

16  provides a fair and reasonable method to equitably distribute the Net Settlement Fund among

17  Authorized Claimants, and respectfully submits that the Plan should be approved by the Court.

18  **IX.    THE FEE AND EXPENSE APPLICATION**

19         90.    In addition to seeking final approval of the Settlement and approval of the Plan

20  of Allocation, Class Counsel, on behalf of all Plaintiffs' Counsel, is applying to the Court for an

21  award of attorneys' fees and payment of expenses incurred by Class Counsel during the course of

22  the Action.[9]  Specifically, Class Counsel is applying for attorneys' fees in the amount of 22% of

23  the Settlement Fund, or $13,200,00 plus interest earned at the same rate as earned by the

24  Settlement Fund, and for Litigation Expenses in the amount of $280,272.17.[10]  Class Counsel also

25

_____

26  [9]     Any determination with respect to Class Counsel's application for an award of attorneys'
    fees and Litigation Expenses will not affect the Settlement, if approved.

27  [10]    The time and expense detail for Class Counsel is set forth in the Declaration of Michael
    P. Canty on behalf of Labaton Keller Sucharow LLP ("Labaton Fee and Expense Decl."), attached

28  hereto as Exhibit 5.  The declaration sets set forth the names of the attorneys and professional

1    seeks reimbursement in the aggregate amount of $17,000 to Class Representatives for their costs,

2    including lost wages, incurred in connection with their representation of the Class in accordance

3    with the PSLRA, 15 U.S.C. § 78u-4(a)(4).  *See* Ex. 1 at ¶¶8-11; Ex. 2 at ¶¶8-11.  As noted above,

4    Class Counsel's Fee and Expense Application is consistent with the amounts set forth in the

5    Notice and, to date, not one objection regarding the maximum fee and expense amounts set forth

6    in the Notice has been received.

7         91.    Below is a summary of the primary factual bases for Class Counsel's Fee and

8    Expense Application.  A full analysis of the factors considered by courts in the Ninth Circuit when

9    evaluating requests for attorneys' fees and expenses from a common fund, as well as the

10   supporting legal authority, is presented in the accompanying Fee and Expense Memorandum.

11   **A.    Class Counsel's Fee Request Is Fair and Reasonable
          and Warrants Approval**

12

13        **1.    The Result Achieved**

14        92.    Here, the Settlement provides for a recovery of $60 million in cash for the benefit

15   of the Class.  For the reasons set forth above and in light of the substantial risks of continued

16   litigation, Class Counsel believes that the Settlement represents a very good result for the Class.

17   Indeed, given the serious challenges that Class Representatives faced in this case—most

18   significantly, proving that the two surviving misstatements were materially false and misleading

19   at summary judgment and trial—there was significant risk that there would be no recovery at all.

20   In contrast, the Settlement avoids the potential impact of this challenge and other risks and

21   achieves a fair and certain result.

22        93.    Indeed, the Settlement represents a meaningful portion of the Class's reasonably

23   recoverable damages, as estimated under various potential scenarios analyzed by Class

24   Representatives' damages expert.  If the Class's claims survived summary judgment, trial, post-

25

26   _____

     support staff members who worked on the Action, their hourly rates, the lodestar value of the time
27   expended by such attorneys and professional support staff, the expenses incurred, and the
     background and experience of the firms.    Additional counsel Adamski Moroski Madden
28   Cumberland Green, LLP and O'Neill, Heinrich, Damkroger, Bergmeyer & Shultz, P.C., L.L.O.,
     which served as outside counsel to NIC, will share in any fees awarded to Class Counsel by the
     Court but are not submitting their own fee and expense declarations.

1    trial motions, and appeals completely intact, then maximum aggregate damages were estimated

2    to be approximately $1.036 billion, after netting out Class Member gains on pre-Class Period

3    purchases. However, Defendants would have likely sought to establish that their maximum

4    exposure, assuming liability was proven, was roughly $600 million. Accordingly, the Settlement

5    recovers a range of approximately 5.8% to 10% of these potential damages.

6        94.    Moreover, as a result of the Settlement, numerous Class Members will benefit

7    and receive compensation for their losses and avoid the substantial risks of a lesser, or no,

8    recovery in the absence of settlement.

9                **2.    The Risks of the Litigation and the Contingent Nature of the Fee**

10        95.    The risks faced by Class Counsel in prosecuting this Action are highly relevant

11    to the Court's consideration of an award of attorneys' fees, as well as its approval of the

12    Settlement. Here, Defendants adamantly deny any wrongdoing and, if the Action had continued,

13    would have aggressively litigated their defenses through a trial, and the appeals that would likely

14    follow. As detailed in Section VI. above, Class Counsel and Class Representatives faced

15    significant risks to proving Defendants' liability, loss causation, and damages at all stages of the

16    litigation.

17        96.    These case-specific litigation risks are in addition to the risks accompanying

18    securities litigation generally, such as the fact that this Action is governed by stringent PSLRA

19    requirements and case law interpreting the federal securities laws and was undertaken on a

20    contingent-fee basis. From the outset, Class Counsel understood that this would be a complex,

21    expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the

22    substantial investment of time and financial expenditures that vigorous prosecution of the case

23    would require. In undertaking that responsibility, Class Counsel was obligated to ensure that

24    sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting

25    the Action, and that funds were available to compensate vendors and consultants and to cover the

26    considerable out-of-pocket costs that a case like this typically demands. With an average lag time

27    of several years for these cases to conclude, the financial burden on contingent-fee counsel is far

28    greater than on a firm that is paid on an hourly, ongoing basis. Counsel have dedicated 4,618.8

hours in prosecuting the Action for the benefit of the Class yet have received no compensation for their efforts.

97.    Class Counsel also bore the risk that no recovery would be achieved.  Class Counsel is aware that despite the most vigorous and competent efforts, a law firm's success in contingent litigation such as this is never guaranteed.  Moreover, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to persuade sophisticated defendants to engage in serious settlement negotiations at meaningful levels.  Class Counsel is aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts by a plaintiff's counsel produced no fee for counsel.

98.    Successfully opposing a motion to dismiss and a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial.  While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007) (tried by Labaton), and *In re Tesla, Inc. Securities Litigation*, Case No. C-18-04865 (N.D. Cal. Feb. 3, 2023), or substantially lost as to the main case, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

99.    Even plaintiffs who succeed at trial may find their verdict overturned by a post-trial motion for a directed verdict or on appeal.  *See, e.g.*, *In re BankAtlantic Bancorp, Inc.,* No. 07-cv-61542-UU, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2010) (in case tried by Labaton, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd,* 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on

loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)); *Robbins v. Koger Props., Inc*., 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice).  And, the path to maintaining a favorable jury verdict can be arduous and time consuming.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court rejecting unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id*.) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

100.    The United States Supreme Court and numerous other courts have repeatedly recognized that the public has a strong interest in having experienced and able counsel enforce the federal securities laws through private actions. *See, e.g.*, *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (Private securities actions provide '"a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to [SEC] action.'") (citations omitted).  Vigorous private enforcement of the federal securities laws can only occur if private investors can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action as well as the economics involved.

101.    Class Counsel's efforts, in the face of substantial risks and uncertainties, have resulted in what Class Counsel believes to be a significant (and certain) recovery for the Class. In these circumstances, and in consideration of their hard work and the excellent result achieved, Class Counsel believes the 22% fee request is fair and reasonable and should be approved.

### 3.    The Skill Required and Quality of Counsel's Representation

102.    The skill and diligence of Class Counsel also support the requested fee.  As demonstrated by the firm biography included as Exhibit D to the Labaton Fee and Expense Declaration, Class Counsel is among the most experienced and skilled law firms in the securities

litigation field, with a long and successful track record representing investors in such cases, and is consistently ranked among the top plaintiffs' firms in the country. Here, Labaton attorneys have devoted considerable time and effort to this case, thereby bringing to bear many years of collective experience. *See, e.g., In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re Dell Techs. Inc. Class V S'holders Litig.*, Consol. C.A. No. 2018-0816-JTL (Del. Ch.) (securing $1 billion shareholder settlement); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp./ ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million). *See* Ex. 5-D.

103. The quality of the work performed by Class Counsel in obtaining the Settlement should also be evaluated in light of the quality of opposing counsel. Defendants in this case were represented by experienced counsel from Gibson, Dunn & Crutcher LLP, a prominent litigation firm that vigorously and ably defended the Action on behalf of Defendants. In the face of this formidable defense, Class Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Action on terms that are favorable to the Class.

### 4.    The Time and Labor Devoted to the Action

104. As more fully described above, Class Counsel: (i) conducted an extensive investigation of the claims at issue, including interviews with approximately 19 former Okta employees (nine of whom provided information for use in the Complaint); (ii) prepared and filed a detailed Complaint, which expanded the scope of the initial complaint by adding particularized allegations supporting claims that Defendants misled investors about the Auth0 integration; (iii) opposed Defendants' wide ranging motion to dismiss the Complaint through briefing and oral

argument; (iv) moved for and obtained class certification; (v) researched, drafted, and propounded discovery requests on Defendants; (vi) reviewed nearly 4,000 documents in connection with the mediation process; (vii) prepared for and participated in a formal mediation process, including drafting and analyzing extensive mediation statements; and (viii) consulted with experts in the fields of damages and loss causation. *See supra* Sections III-V.  Class Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Class, whether through settlement or trial, by the most efficient means possible.

105.    Throughout the litigation, Class Counsel worked efficiently and maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action.  Experienced attorneys at Labaton were involved in motion practice, mediation, and the settlement negotiations.  More junior attorneys and paralegals worked on matters appropriate to their skill and experience level, such as drafting pleadings, legal research, discovery matters, and document review.

106.    The time devoted to this Action by Class Counsel is set forth in the Labaton Fee and Expense Declaration, attached hereto as Exhibit 5.  Included with the declaration are schedules that summarize the time expended by attorneys and professional support staff, as well as expenses ("Fee and Expense Schedule").  The Fee and Expense Schedule also reports each person's resulting "lodestar," *i.e.*, their hours multiplied by their current hourly rates, and break the lodestar into categories of work.

107.    The hourly rates of Class Counsel here range from $750 to $1,275 per hour for partners, $800 to $925 per hour for of counsels, and $300 to $650 for associates and other attorneys.  *See* Ex. 5-A.  These hourly rates are reasonable for this type of complex litigation. Exhibit 6, attached hereto, is a table of hourly rates for defense firms compiled by Labaton from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2023.  The analysis shows that across all types of attorneys, Class Counsel's hourly rates here are consistent with, or lower than, the firms surveyed.

108.    In total, from the inception of this Action to date, Class Counsel expended 4,618.8 hours on the investigation, prosecution, and resolution of the claims against Defendants

representing a total lodestar of $2,882,615.50.[11] Thus, pursuant to a lodestar "cross-check," Class Counsel's fee request of 22% of the Settlement Fund (or $13,200,000, plus interest), if awarded, would yield a multiplier of approximately 4.58 on Class Counsel's lodestar, which is within the range of fee multipliers awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in the Ninth Circuit. *See* Fee and Expense Memorandum, §I.E.

### 5. Class Representatives' Endorsement of the Fee and Expense Application

109.    Class Representatives are sophisticated institutional investors that have closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. Class Representatives have evaluated and fully support Class Counsel's fee and expense request. As set forth in the declarations submitted on behalf of Nebraska Investment Council and North Carolina Retirement Systems (Exs. 1 and 2), Class Representatives have concluded that the requested fee has been earned based on the efforts of Class Counsel and the favorable recovery obtained for the Class in a case that involved serious risk.

110.    Class Representatives' endorsement of Class Counsel's Fee and Expense Application further demonstrates its reasonableness, and this endorsement should be given meaningful weight in the Court's consideration of the fee award.

### B. Class Counsel's Request for Litigation Expenses Warrants Approval

#### 1. Class Counsel Seeks Payment of Reasonable and Necessary Litigation Expenses from the Settlement Fund

111.    Class Counsel seeks payment from the Settlement Fund of $280,272.17 for expenses that were reasonably and necessarily incurred in connection with the Action. The Notice informs the Class that Class Counsel will apply for payment of Litigation Expenses in an amount not to exceed $410,000, including the request for reimbursement of the reasonable costs and expenses (including lost wages) incurred by Class Representatives directly related to their

---

[11]    Class Counsel will continue to perform legal work on behalf of the Class should the Court approve the Settlement. Additional resources will be expended assisting Class Members with their Claim Forms and related inquiries and working with the Claims Administrator to ensure the smooth progression of claims processing. No additional legal fees will be sought for this work.

representation of the Class in accordance with 15 U.S.C. § 78u-4(a)(4).  The amount of Litigation Expenses requested by Class Counsel, along with the aggregate amount requested by Class Representatives, is substantially below the maximum expense amount set forth in the Notice.

112.    From the inception of the Action, Class Counsel was aware that it might not recover any of the expenses incurred in prosecuting the claims against Defendants and, at a minimum, would not recover any expenses until the Action was successfully resolved.  Class Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants.  Class Counsel was motivated to take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the Action.

113.    Class Counsel's expenses include fees and costs for, among other things: (i) experts and other professionals in connection with various stages of the litigation; (ii) mediation; (iii) litigation support related to electronic discovery; (iv) work-related travel; and (v) online factual and legal research.[12]   Courts have consistently found that these types of expenses are payable from a fund recovered by counsel for the benefit of a class.

114.    The largest component of Class Counsel's expenses (*i.e.*, $121,105.64, or approximately 43% of total expenses) was incurred for experts and outside counsel to represent confidential witnesses identified during the investigation.  As noted above, in connection with class certification, Class Counsel retained an expert to opine on loss causation and market efficiency.  Counsel also retained consulting experts to analyze aggregate damages and to draft the proposed Plan of Allocation.

115.    Another substantial component of the expenses (*i.e.*, $65,453.40 or approximately 23% of total expenses) was for document hosting and management related to electronic discovery.

---

[12]    Class Counsel's expenses are listed in detail in the Labaton Fee and Expense Declaration.  *See* Exhibit 5-B.  The expenses incurred by Labaton are reflected on the books and records maintained by the firm.  These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.  These expense items are not duplicated in the firm's hourly rates.

As noted above, among other things, Class Counsel retained a third-party vendor to host Defendants' productions on its sophisticated electronic database and litigation support platform. Class Counsel used this electronic database to, among other things: (i) maintain the electronic database through which the approximately 4,000 documents produced by Defendants were reviewed; (ii) process documents so that they would be in a searchable format, including the conversion and upload of any hard copy documents; and (iii) apply data analysis tools to focus the review on the most significant documents to efficiently target information counsel needed to support their allegations.

116.    Class Counsel incurred $45,800 (or approximately 16% of total costs) in connection with the services of David M. Murphy of Phillips ADR and the mediation in the Action.

117.    The expenses also include $15,830.01 for work-related transportation expenses, meals, and lodging related to, among other things, working late hours and traveling in connection with discovery, the mediation, and meetings with Class Representatives.  (Any first-class airfare has been reduced to be comparable to economy rates.)

118.    The costs of computerized research services, such as Lexis, Westlaw, and PACER, amounted to $15,351.08. It is standard for attorneys to use online services to assist them in researching legal and factual issues and, indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class.

119.    The other expenses for which Class Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely paid in non-contingent cases. These expenses include, among others, court and service fees, duplicating costs, and overnight delivery expenses.  All of the Litigation Expenses were reasonable and necessary to the successful litigation of the Action.

**2.      PSLRA Reimbursement to Class Representatives Would Be Fair and Reasonable**

120.    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made

to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).  Accordingly, Class Representatives seek reimbursement for the time they spent in connection with their efforts on behalf of the Class.  Specifically, Nebraska Investment Council seeks reimbursement of $10,000 for the 50 hours it dedicated to the Action.  Ex. 1 at ¶¶8-11.  North Carolina Retirement Systems seeks $7,000 for the 70 hours it dedicated to the Action.  Ex. 2 at ¶¶8-11.  Class Representatives' efforts required their representatives to devote considerable time and resources to this Action that would otherwise have been devoted to the retirement systems and their beneficiaries.

121.    As discussed in the Fee and Expense Memorandum and in Class Representatives' supporting declarations, Class Representatives have been fully committed to pursuing the Class's claims since they became involved in the litigation.  Class Representatives provided valuable assistance to Class Counsel during the prosecution and resolution of the Action.  The efforts expended by Class Representatives during the course of this Action, as set forth in Exhibits 1 and 2, included communicating with Class Counsel, reviewing pleadings and motion papers, responding to discovery requests and gathering and reviewing documents in response, preparing for and attending the mediation session, and communicating with counsel regarding the settlement negotiations, are precisely the types of activities courts have found to support reimbursement to class representatives, and fully support the request for reimbursement here.

## X.    MISCELLANEOUS EXHIBITS

122.    Attached hereto as Exhibit 7 is a true and correct copy of *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024), by Edward Flores & Svetlana Starykh.

123.    Attached hereto as Exhibit 8 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee and Expense Memorandum.

## XI.    CONCLUSION

124.    For all the reasons set forth above, Class Counsel respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Class Counsel further submits that the requested fee in the amount of 22% of the Settlement Fund should

be approved as fair and reasonable, and the requests for payment of Litigation Expenses in the amount of $280,272.17, and reimbursement of Class Representatives' costs in the aggregate amount of $17,000, should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed in New York, New York this 3rd day of October 2024.


MICHAEL P. CANTY

1

2

## **<u>CERTIFICATE OF SERVICE</u>**

3

 I hereby certify that on October 3, 2024, I electronically filed the foregoing document

4

with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel

5

of record by operation of the Court's electronic filing system.

6

7

         /s/ *Michael P. Canty*

8

         MICHAEL P. CANTY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28